UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| TANJA BENTON, ) | |
| ) | |
| Plaintiff, ) | Jury Demanded |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| BLUECROSS BLUESHIELD OF ) | |
| TENNESSEE, INC., ) | |
| ) | |
| Defendant. ) | |

# COMPLAINT

Comes Plaintiff Tanja Benton, through her counsel, and sues her former employer Defendant BlueCross BlueShield of Tennessee, Inc. for unlawful employment actions pursuant to Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.* Plaintiff would show the Court as follows:

## I. JURISDICTION

1. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. § 2000e-5(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

2. The actions giving rise to this Complaint occurred in Hamilton County, Tennessee, and venue is proper in this district pursuant to 28 U.S.C. § 1391.

## II. NATURE OF PROCEEDING

3. This is a proceeding for back pay; emotional damages; reinstatement or front pay in lieu of reinstatement; the value of all employee benefits; pre-judgment interest; attorney fees

and costs; punitive damages; and for such additional damages as may be necessary to effectuate the purposes of Title VII and the THRA.

### III.  THE PARTIES

4. At all relevant times at issue in this lawsuit, Plaintiff was a resident of Hamilton County, Tennessee, and was employed by Defendant in Hamilton County, Tennessee.

5. Defendant BlueCross BlueShield of Tennessee, Inc. (hereinafter referred to as "BCBST") is a Tennessee corporation with its principal place of business in Hamilton County, Tennessee.  BCBST is an "employer" within the meaning of, and is subject to, the provisions of Title VII, 42 U.S.C. § 2000e(b); and the THRA, Tenn. Code Ann. § 4-21-102(5).

### IV.  FACTUAL BASES OF PLAINTIFF'S CLAIMS

6. Plaintiff was employed by BCBST from July 2005 through November 4, 2021, when her employment was involuntarily terminated.

7. From July 2007 through her termination date, Plaintiff held the position of Bio Statistical Research Scientist.

8. Plaintiff's job rarely involved direct interaction with clients.  In fact, approximately one percent (25 hours) of her total annual working hours (2,080 hours) involved client interaction.

9. Plaintiff normally had a portfolio of 10 to 12 clients.  Except for one client, Plaintiff only interacted with each client once per year.  Normal client interaction consisted of one meeting no longer than two hours in length.  One client required quarterly meetings, which lasted no more than one hour.  For some clients, several years would pass before requesting a meeting with Plaintiff.

10. During her lengthy career with BCBST, Plaintiff never performed any work or attended any meetings in medical facilities where patients were being treated.  With respect to hospital

clients, Plaintiff met with Human Resources staff in locations not designated for patients, such as executive conference rooms or off-site corporate offices.

11. Not all of Plaintiff's client meetings were conducted in-person. Many of Plaintiff's client meetings were conducted by remote means, such as telephone conference or videoconference.

12. Plaintiff normally worked alone and independently. She occasionally sought input from her peers, which usually entailed email exchanges, instant messaging, and occasional phone calls. Physical in-person interaction with co-workers was never a job requirement.

13. As a result of the COVID-19 pandemic, beginning on March 16, 2020, BCBST required Plaintiff to work 100 percent from home. From March 16, 2020 through the end of her employment, Plaintiff performed 100 percent of her job duties remotely from home without any problems or complaints from anyone.

14. During this 19-month work-from-home period, Plaintiff conducted all client meetings by remote means. No client expressed any concerns or problems about remote interactions, nor did any client express a desire for Plaintiff to have physical in-person interactions with them.

15. On August 27, 2021, BCBST advised Plaintiff that she would be required to be fully vaccinated for COVID-19 as a condition of her continued employment.

16. Because of her sincerely held religious beliefs, Plaintiff refused to be vaccinated for COVID-19. Specifically, Plaintiff firmly believes, based upon personal research, that all COVID-19 vaccines are derived from aborted fetus cell lines. Because of her sincerely held religious beliefs concerning abortion, Plaintiff cannot in good conscience consume the vaccine, which would not only defile her body but also anger and dishonor God.

17. On September 15, 2021, Plaintiff submitted a request for a religious accommodation concerning the vaccine mandate to Jennifer Shields in BCBST's Human

Resources department. In her religious accommodation request, Plaintiff provided a detailed explanation of her religious objection to all COVID-19 vaccinations.

18. In the religious accommodation request, Plaintiff asked that BCBST continue to allow her to perform 100 percent of her job duties remotely from home, as she had been doing for the past 18 months.

19. On September 27, 2021, Ms. Shields informed Plaintiff that BCBST had "accepted" her religious accommodation request, but BCBST determined that Plaintiff could not continue in her job as a Bio Statistical Research Scientist based on the claim that "an essential job function . . . is regular external public-facing interactions."

20. Despite Plaintiff's repeated explanations that her job did not entail "regular external public-facing interactions," Ms. Shields stated that "[t]here are no exceptions" to BCBST's mandatory vaccine policy for Plaintiff's specific job title.

21. Plaintiff was then advised that she would be given 30 days from October 4, 2021 "to pursue other positions within the Company that are not currently subject to BCBST's vaccine mandate." This option (referred to hereinafter as the "Safe Harbor" period) was proposed to Plaintiff as an alleged "alternative accommodation."

22. BCBST provided no assistance to Plaintiff in finding a vacant position not subject to the vaccine mandate that best met her job grade, skills and qualifications. Plaintiff's requests for assistance were ignored. BCBST even informed Plaintiff that for any vacant job that she selected for possible transfer, Plaintiff would still be required to participate in the competitive fill process. In other words, BCBST's alleged "alternative accommodation" was to treat her the same as any job candidate, with no guarantee that she would be offered any job for which she applied.

23. On September 29, 2021, Plaintiff accepted BCBST's "alternative accommodation" under protest and without waiver of her right to seek redress for a denial of her religious accommodation rights. In a follow up email with Jennifer Shields on September 30, 2021, Plaintiff again protested BCBST's "alternative accommodation."

24. During the Safe Harbor period, Plaintiff experienced difficulty locating vacant jobs not subject to the vaccine mandate that met her pay grade, skills, and qualifications. She voiced this problem to Jennifer Shields and Hal Gault (HR Director) in an October 27, 2021 email. Eventually, before the expiration of the Safe Harbor period, Plaintiff applied for two vacant positions which supposedly did not require the COVID-19 vaccination.

25. Effective November 4, 2021, BCBST terminated Plaintiff's employment because of her failure to comply with the COVID-19 vaccine mandate.

26. The hollowness of BCBST's Safe Harbor period soon became apparent. Within days of the expiration of the Safe Harbor period, BCBST extended its COVID-19 vaccine mandate to **all** jobs. Thus, the two vacant positions to which Plaintiff applied during the Safe Harbor period suddenly ceased as alternatives to accommodate Plaintiff's sincerely held religious beliefs. As Brooke Cordell, BCBST Principal Recruiter, informed Plaintiff in a November 9, 2021 email, "**Unfortunately all positions require the vax now**."

## V. ADMINISTRATIVE EXHAUSTION

27. On November 5, 2021, Plaintiff filed a Charge of Discrimination with the EEOC, which was assigned Charge Number 494-2022-00229. On May 11, 2022, the EEOC issued Plaintiff a Notice of Right to Sue. Plaintiff brings this action within 90 days of the Notice of Right to Sue.

## VI. PLAINTIFF'S CLAIMS

Count I: Title VII Religious Accommodation

28. Under Title VII, an employer may not "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's religion. 42 U.S.C. § 2000e-2(a)(1).

29. According to the United States Supreme Court, "Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment. . . . Title VII requires otherwise-neutral policies to give way to the need for an accommodation." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S.Ct. 2028, 2034 (2015).

30. BCBST terminated Plaintiff's employment because she refused to comply with its COVID-19 vaccine mandate, to which she objected based upon her sincerely held religious belief.

31. BCBST cannot prove that allowing Plaintiff to continue her employment as a Bio Statistical Research Scientist without being vaccinated for COVID-19 constitutes an undue hardship.

32. BCBST also cannot show that it made any good-faith efforts to accommodate Plaintiff's sincerely held religious beliefs.

33. By refusing to accommodate Plaintiff's religious beliefs – and instead terminating her employment – BCBST violated Title VII.

Count II: THRA Religious Accommodation

34. The duty of employers to make reasonable accommodations to the religious needs of employees has been incorporated into Tennessee law through legislation which established the

6

Tennessee Human Rights Commission. *DePriest v. Puett*, 669 S.W.2d 669, 675 (Tenn. Ct. App. 1984).

35. By refusing to accommodate Plaintiff's religious beliefs – and instead terminating her employment – BCBST violated the THRA.

## VII. DAMAGES

36. As a result of BCBST's wrongful actions described above, Plaintiff has suffered both financially and emotionally. In particular, Plaintiff lost and will continue to lose wages, opportunities and advancement, which she would have earned had she been allowed to continue in her employment with BCBST. In addition, Plaintiff has suffered mental anguish and emotional distress, which she experienced because of BCBST's wrongful actions.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays as follows:

a. That the Court issue and serve process on Defendant and require Defendant to answer within the time prescribed by law;

b. That Plaintiff be awarded back pay and all lost benefits of employment;

c. That Plaintiff be awarded damages for emotional distress, grief, and anguish;

d. That the Court issue an injunction requiring Defendant to re-employ Plaintiff at an equivalent job with all employment rights and benefits to which she would have been entitled but for her discharge, and without harassment or illegal condition imposed on her job; or, in the alternative, front pay and benefits in lieu of reinstatement;

e. That Plaintiff be awarded punitive damages;

f. That Plaintiff be awarded pre-judgment interest;

g. That Plaintiff be awarded attorney fees and costs, and such other and further relief as the Court deems proper; and

h. That a jury try all claims and issues triable by a jury.

          **MIKEL & HAMILL PLLC**

By: s/ *Doug S. Hamill*
Doug S. Hamill, BPR No. 022825
Attorney for Plaintiff
620 Lindsay Street, Suite 200
Chattanooga, TN 37403
(423) 541-5400
dhamill@mhemploymentlaw.com

8

Case 1:22-cv-00118-CEA-SKL   Document 1   Filed 05/16/22   Page 8 of 8   PageID #: 8