UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

TANJA BENTON,                           )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        No. 1:22-cv-00118-CEA-SKL
                                        )
BLUECROSS BLUESHIELD OF                 )
TENNESSEE, INC.,                        )
                                        )
        Defendant.                      )

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff submits this memorandum of law in support of her motion for summary judgment.

## I. INTRODUCTION

This is an employment claim involving a request for religious accommodation to BCBST's Covid vaccination mandate for "public facing" employees. Rather than individually assess Plaintiff's request, BCBST resorted to a predetermined, one-size-fits-all approach (which it characterizes as the company's alternative "accommodation"). The evidence will show that BCBST's alternative accommodation was unreasonable. BCBST offered Plaintiff two choices: (1) abandon her religious beliefs by taking the Covid vaccination, or (2) find another position within 30 days that did not require the Covid vaccination, but without any help from the company and without any guarantee that Plaintiff would be offered a job even if she located a position that met her qualifications and pay grade.

On the other hand, Plaintiff's accommodation request was simple and reasonable. She asked to continue working remotely – which she had been doing for the past 18 months – without receiving the Covid vaccination. Plaintiff's job involved very little direct client interaction – only

1% of her annual work time. During the 18-month period that she worked 100% remotely, no client had expressed dissatisfaction with remote interactions or even a desire to resume in-person meetings in the future. It is undisputed that clients – not BCBST – determine whether meetings are to be held in person or remotely. BCBST cannot show that Plaintiff's accommodation request constituted an undue hardship. Moreover, BCBST abandoned its vaccine mandate two months after it took effect. Such a short-lived mandate demonstrates that Covid vaccination was not an essential function of Plaintiff's job, or that vaccination status impacted BCBST's bottom line.

The Supreme Court's recent clarification of the undue hardship standard in *Groff v. DeJoy*, 600 U.S. 447 (2023) now requires an employer to prove that the burden of accommodation "is substantial in the overall context of an employer's business." As the Fifth Circuit recently noted, "This is a heavy burden." *Hebrew v. Texas Dep't of Criminal Justice*, 2023 WL 5989580, at *3 (5th Cir. Sept. 15, 2023). Indeed, the *Groff* decision "suggests that, all other things being equal, larger businesses and institutions must bear a heavier burden in proving undue hardship." *Hebrew*, 2023 WL 5989580, at *3, footnote. Simply put, BCBST cannot meet its heavy burden. For this reason, Plaintiff is entitled to judgment as a matter of law in her favor.

## II. RELEVANT FACTUAL BACKGROUND

Dr. Tanja Benton[1] was employed by BCBST from 2005 through November 4, 2021, when her employment was involuntarily terminated. (Pl. depo. p. 11.) From 2007 through her termination date, Plaintiff held the position of Bio Statistical Research Scientist. (Id. at 12.) Mike McPherson was Plaintiff's direct supervisor for her last nine years. (McPherson depo. p. 40.)[2] He consistently gave Plaintiff good reviews, and he believed that Plaintiff did an overall good job. (Id. at 43.)

---

[1] Plaintiff has a doctorate in cognitive psychology. (Pl. depo. p. 6.) Excerpts from the deposition of Tanja Benton are attached to the motion as Exhibit 1.
[2] Excerpts from the deposition of Mike McPherson are attached to the motion as Exhibit 2.

Plaintiff's job primarily involved data analytics – tracking and forecasting trends for BCBST clients' group health insurance employment plans. (Pl. depo. p. 14.) Plaintiff normally handled data analytics for 10-12 clients. (McPherson depo. p. 44.) With respect to these clients, BCBST assigned an Account Executive (not Plaintiff) to each client who served as the "face" of BCBST, or main contact person, to each client. (Id. at 52-53.) Plaintiff's job rarely involved direct interaction with clients. In fact, approximately one percent (18 hours) of her total annual working hours (2,080 hours) involved client interaction. (Pl. depo. pp. 129-30.) Client communications were normally filtered to Plaintiff through the Account Executive. (Id. at 49.) The only direct interaction Plaintiff had with clients was once per year at client annual meetings. (McPherson depo. p. 55; Pl. depo. p. 56.) Annual client meetings normally lasted 1.5 hours. (Id. at 57.) These client meetings occurred yearly in March, April, and May. (Id. at 102.) The Account Executive normally ran client meetings, although Plaintiff would present her report and answer client questions. (Id. at 55.) Plaintiff did not solely perform client work throughout the year; she had other general responsibilities geared toward Defendant's internal processes, such as data validation. (Id. at 48, 50.)

Beginning in March 2020, Plaintiff and her entire team were instructed to work 100% from home. (McPherson depo. pp. 57-58.) From March 2020 through September 2021, Plaintiff performed 100% of her job duties remotely. (Id. at 59.) During this period, Plaintiff interacted 100% remotely with her clients. (Id.) Plaintiff's work performance during this period was satisfactory, and McPherson received no complaints about Plaintiff's work performance or any complaints from Plaintiff's clients about interacting remotely versus in-person. (Id. at 59-60.) No client expressed an opinion that Plaintiff's remote presentations were any less effective than her in-person presentations. (Id. at 134-35.) Indeed, McPherson admitted that since March 2020, none of Plaintiff's clients have

insisted on resuming in-person meetings. (Id. at 80, 88.) Moreover, none of Plaintiff's clients expressed a desire that any BCBST team member must be vaccinated against Covid. (Id. at 88.)

In late summer of 2021, BCBST's senior leadership team formulated a corporate directive that all "public facing" employees (i.e., those who interacted with external third parties) would be required to be vaccinated against Covid (hereinafter referred to as the "vaccine mandate"). (Exhibit 3.) According to Chief Human Resources Officer Roy Vaughn, who was involved in formulating the vaccine mandate, the vaccine mandate decision was made "in a rapid sequence." (Vaughn depo. pp. 26-27, 36.)[3] The vaccine mandate was approved approximately one week before it was announced to BCBST's workforce on August 11, 2021. (Id. at 42, 44.)

BCBST decided that senior leaders of each business unit would determine which employees should be deemed "public facing" for purposes of the vaccine mandate. (Shields depo. p. 34.)[4] To that end, on August 5, 2021, Vaughn requested from Sherri Zink[5] a list of employee names who have direct customer contact or the potential for direct customer contact. (Exhibit 6.) Zink in turn requested her subordinates – including Director of Advanced Analytics Maureen Lowe – to identify employees with direct customer contact. (Lowe depo. p. 10.)[6] Lowe was not advised why Zink was requesting this information. (Id. at 24-25.) Within just two hours, Lowe compiled a list of "public facing" employees, which included Plaintiff. (Id. at 31.) In compiling this list, Lowe did not consult with Plaintiff's supervisor, Mike McPherson. (Id. at 32.) Nor was Lowe aware of how little time Plaintiff spent directly interacting with customers. (Id. at 22.)

When the vaccine mandate was approved by senior leadership, BCBST already had a written procedure for handling religious accommodation requests. (Exhibit 8.) That procedure was first

---

[3] Excerpts from the deposition of Roy Vaughn are attached to the motion as Exhibit 4.
[4] Excerpts from the deposition of Jennifer Shields are attached to the motion as Exhibit 5.
[5] Zink was Chief Data Officer and in charge of the division in which Plaintiff worked. (Vaughn depo. p. 89.)
[6] Excerpts from the deposition of Maureen Lowe are attached to the motion as Exhibit 7.

published in April 2019.  (Exhibit 9, BCBST's Resp. to 3rd Set Interog. #3.)  Under that procedure,

both the employee's direct supervisor and HR Business Partner were involved in determining whether

to grant or deny the employee's religious accommodation.  (Exhibit 9; Gault depo.[7] pp. 30-31, 57;

Shields depo. pp. 48, 71-72.)  With respect to the vaccine mandate, however, BCBST chose not to

follow the religious accommodation procedure already in place.  (Gault depo. pp. 39-40.)  BCBST

removed the roles of the employee's direct supervisor and the HR Business Partner in determining

whether to grant or deny the religious accommodation request.  (Vaughn depo. p. 53; Gault depo. pp.

67, 75; Shields depo. pp. 48-50.)  Instead, BCBST instructed HR Business Partners to send all

religious accommodation requests to outside legal counsel,[8] who would evaluate the requests.  (Id. at

47-48.)  The HR department merely acted as a "conduit" of information between the employee

requesting the accommodation and the legal department.  (Gault depo. pp. 75-76.)

Thirteen days after announcing the vaccine mandate to the workforce, Gault and Vaughn

began drafting a new protocol for handling accommodation requests.  (Gault depo. p. 53.)

Significantly, the new protocol stated that, "As a general matter, the Company views requests for

an accommodation in the form of maintaining current job functions . . . but not getting fully-

vaccinated is unduly burdensome to the Company."  (Exhibit 11.)  This new protocol set forth the

company's blanket "accommodation" that would be offered to all employees who requested an

accommodation to the vaccine mandate.  (Vaughn depo. pp. 77-78.)  The predetermined

"accommodation" would temporarily remove the employee from "public-facing" duties and give

the employee 30 days to either get vaccinated or find another position not subject to the vaccine

mandate.  (Id. at 76.)

---

[7] Excerpts from the deposition of Hal Gault are attached to the motion as Exhibit 10.
[8] Attorney Josh Wood was identified as BCBST's outside legal counsel.  (Shields depo. p. 50.)

On August 23, 2021, Plaintiff emailed HR requesting a religious accommodation to the vaccine mandate. (Shields depo. p. 36.) Plaintiff was informed that HR could not accept religious accommodation requests before September 7, 2021. (Id. at 38.) On September 15, 2021, Plaintiff submitted her official religious accommodation request. (Pl. depo. p. 93.) Shields forwarded Plaintiff's accommodation request to outside legal counsel, Josh Wood. (Exhibit 12.) Plaintiff objected to the vaccine based on her research that the vaccine was derived from aborted fetal cell lines, which she believed would dishonor God and defile her body. (Id.) Plaintiff requested that she be allowed to continue to work remotely and interface with clients remotely, as she had done for the past 18 months, without receiving the Covid vaccine. (Id.) According to Shields, no one in the accommodation process doubted the sincerity of Plaintiff's religious beliefs. (Shields depo. p. 72.)

On September 24, 2021, in response to Plaintiff's inquiry, Shields informed Plaintiff that "Legal" was reviewing her request. (Shields depo. p. 54.) Shields further stated to Plaintiff that "Legal" was "providing us with final determinations." (Id. at 57-58.) On September 27, 2021, Shields sent an email to Plaintiff denying her original accommodation request. (Exhibit 13; Shields depo. p. 62.) Shields did not author of the email's contents; it was merely a template that she received from her boss, Hal Gault. (Id. at 59, 68, 70.) Gault received this email template from outside legal counsel. (Gault depo. p. 41.) The email template that Plaintiff received set forth the following alternative "accommodation": Plaintiff would be given 30 days to either get vaccinated or find another job not subject to the vaccine mandate. During the 30-day period Plaintiff would not be required to perform any "public-facing" duties. (Exhibit 13.) The 30-day "accommodation period" ended on November 3, 2021. (Id.)

Plaintiff accepted the alternative "accommodation" under protest, voicing to Shields that the accommodation offered was unreasonable. (Exhibit 14.) Plaintiff continued to challenge BCBST's denial of her accommodation request. (Shields depo. pp. 75, 80.) On October 1, 2021, Plaintiff asked Shields how her original accommodation request posed an undue hardship. (Exhibit 14.) On October 21, 2021, Shields sought from Gault and attorney Wood a formal response to Plaintiff's undue hardship question. (Shields depo. p. 76.) By then, over half of the 30-day "accommodation period" had expired. (Id. at 78-79.)

On October 27, 2021, Plaintiff remotely participated in a meeting with Shields and Gault. (Shields depo. pp. 79-80.) In this meeting, Plaintiff explained that only 1% of her total yearly work time involved direct interaction with clients. (Id. at 83-84.) Plaintiff provided details about the remote nature of her work. (Id. at 85.) When Plaintiff asked why it was detrimental to remotely interact with clients only 1% of her total work time, Gault responded that it was not HR's role to make determinations on where she performed her work duties. (Id. at 85-86.) This meeting was not interactive or informative; rather, the responses from Gault and Shields were scripted. (Pl. depo. pp. 106-07, 271, 274.)

After the meeting Shields spoke with Maureen Lowe, but Shields did not ask whether Plaintiff's continued remote interactions with clients would be detrimental to the company. (Shields depo. p. 86.) Instead, Shields asked whether Plaintiff's position should have been included on the public-facing list, to which Lowe responded that Plaintiff's role "could be potentially forward facing." (Id. at 87-88.) In other words, there was a *possibility* that Plaintiff could have in-person client meetings, but Lowe did not say how likely the potential in-person client interaction might occur in the future. (Id. at 90.) Lowe did confirm that Plaintiff had been solely interacting with clients remotely for the past 18 months. (Id. at 89-90.) Notably, Lowe

admitted that she had not been given any instructions that Plaintiff's 100% work-from-home duties would cease in the near future. (Lowe depo. pp. 53-54.) In fact, there had been no communications or even hints from McPherson or Lowe that Plaintiff would be resuming in-person client interactions in the near future. (Pl. depo. pp. 101, 114, 342.)

Meanwhile, Plaintiff began searching for internal job postings not subject to the vaccine mandate. On several occasions, Plaintiff asked Shields for a specific list of available positions not subject to the vaccine mandate. (Shields depo. pp. 94, 95-96, 99.) Shields never provided Plaintiff with the list she requested. (Id. at 99.) Plaintiff advised Shields that she was having difficulty discerning from the job postings whether the jobs were subject to the vaccine mandate. (Id. at 93, 98.) When asked whether BCBST would automatically offer Plaintiff a vacant job if she met its minimum qualifications, Shields responded that Plaintiff would still be required to compete with other applicants. (Id. at 100.) During the 30-day "accommodation period," BCBST had a total of 55 job vacancies not subject to the vaccine mandate. (Exhibit 15, BCBST's Resp. to 2nd Set of Interrogs. #4.) Of those 55 vacancies, only 5 vacant jobs were at Plaintiff's Grade 12 pay level. (Exhibit 9, BCBST's Resp. to 3rd Set of Interrogs. #2.) During the 30-day "accommodation period," BCBST received a total of 435 applications for vacant positions classified as Grade 12 or above. (Exhibit 15, BCBST's Resp. to 2nd Set of Interrogs. #5.) Shields admitted that HR was not providing any assistance to Plaintiff to find another job internally. (Shields depo. p. 105.) Of the 55 job vacancies not subject to the vaccine mandate, Plaintiff was only qualified for two jobs. (Pl. depo. pp. 110, 139, 141.) She applied for both, one of which was a grade below her current pay level. (Id.)

Effective November 4, 2021, Plaintiff's employment was terminated because she failed to comply with the vaccine mandate. (Exhibit 16.) At that point, Plaintiff had not been selected for

an internal position not subject to the vaccine mandate, despite applying for two vacancies that met her qualifications.  (Exhibit 17.)

BCBST received 60 accommodation requests to its vaccine mandate – 44 religious accommodation requests and 16 medical accommodation requests.  (Exhibit 18, BCBST's Suppl. Resp. 2nd Set Interog. #1-2.)  For all 60 accommodation requests made, BCBST refused to allow the employee to continue working in his or her current role without receiving the Covid vaccine. (Id. – Interog. #3.)

BCBST's vaccine mandate was short-lived.  In late November 2021 when the federal contractor Covid vaccine mandate was legally enjoined by the Sixth Circuit, BCBST ceased enforcing its public facing vaccine mandate.  (Gault depo. pp. 87-88.)  Thus, the vaccine mandate was in effect less than two months.  (Vaughn depo. p. 101.)  When Mike McPherson finally hired Plaintiff's replacement in May 2022, the individual hired was not required to have received the Covid vaccination.  (McPherson depo. p. 128; Lowe depo. p. 75.)  According to Vaughn, BCBST has no plans to resume enforcement of the vaccine mandate, nor has it entertained such ideas since late 2021.  (Vaughn depo. p. 103.)

## III.  LEGAL ANALYSIS

### A.  Prima Facie Case

"Title VII makes it unlawful for an employer to 'discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion[.]'" *Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1378 (6th Cir.1994) (quoting 42 U.S.C. § 2000e–2(a)).[9]  A religious accommodation

---

[9] Plaintiff also asserts a religious accommodation claim under the Tennessee Human Rights Act (THRA).  See Doc. 1, ¶¶34-35.  The duty of employers to make reasonable accommodations to the religious needs of employees has been incorporated into Tennessee law through legislation which established the Tennessee Human Rights Commission.

claim begins with determining whether plaintiff has established a prima facie case of religious discrimination. *Virts v. Consol. Freightways Corp.,* 285 F.3d 508, 516 (6th Cir. 2002). To establish a prima facie case, a plaintiff must demonstrate that: (1) she holds a sincere religious belief that conflicts with an employment requirement; (2) she has informed the employer about the conflicts; and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Id.* "Once the plaintiff has established a prima facie case, the burden shifts to the defendant employer to show that it could not reasonably accommodate the employee without undue hardship." *Id.*

1.   <u>Plaintiff's Sincerely Held Religious Beliefs</u>

Religion is very broadly defined under Title VII. *Janes v. Bardstown City Sch. Bd. of Educ.*, 1996 WL 536794 at *4 (6th Cir. Sept. 20, 1996). Title VII's protections apply "whether the religious beliefs or practices in question are common or non-traditional, and regardless of whether they are recognized by any organized religion." *EEOC Compliance Manual on Religious Discrimination* § 12–I(A)(1) (Jan. 15, 2021). "[O]verlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an isolated teaching." *Id.* *See also Gadling-Cole v. W. Chester Univ.*, 868 F. Supp. 2d 390, 396-97 (E.D. Pa. 2012) (emphasizing that Title VII religious discrimination claims have been held cognizable as to topics that "overlap both the religious and political spectrum, **such as abortion**, so long as the claims are based on a plaintiff's bona fide religious belief") (emphasis added).

---

*DePriest v. Puett*, 669 S.W.2d 669, 675 (Tenn. Ct. App. 1984). "Claims under the THRA are analyzed in the same manner as those under Title VII." *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 213 F. Supp. 3d 951, 959 (E.D. Tenn. 2016) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996)). Thus, Plaintiff will only discuss the Title VII framework rather than parsing them out separately.

10

"To ascertain whether an activity qualifies as the kind of religious belief that merits accommodation, courts look to whether the beliefs professed by a claimant are sincerely held and whether they are, 'in his own scheme of things,' religious." *EEOC v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 699 (M.D. Tenn. 2020). It should not be assumed that an employee's beliefs are insincere "simply because some of his or her practices deviate from the commonly followed tenets of his or her religion, or because the employee adheres to some common practices but not others." *EEOC Compl. Man.* § 12–I(A)(2). *See also* 29 C.F.R. § 1605.1 (fact that religious group to which individual professes to belong may not accept such belief is not determinative).

In this case, Plaintiff's religion is Christianity. (Exhibit 19, Pl. Resp. to Interog. #11.) While Plaintiff does not identify with a specific Christian denomination or attend a particular church, she follows the teachings of Jesus Christ, reads the Christian Bible, and attends Bible studies. (Pl. Resp. to Interog. #11; Pl. depo. pp. 33, 35, 164.) During the spring of 2021, Plaintiff began researching Covid vaccinations to satisfy her own curiosity. (Id. at 76, 93.) At the time, she had not formed an opinion (good or bad) about Covid vaccinations, nor determined whether she would take it. (Id. at 96, 120.) She did not have any initial concerns with the vaccine. (Id. at 94.) However, during her research, Plaintiff discovered that aborted fetal cell lines were used in the manufacturing and/or testing of Covid vaccinations. (Id. at 82-83, 121.) Plaintiff discovered this information from various websites, including websites operated by the North Dakota Department of Health, the Louisiana Department of Health, and a website called "nebraskamed.com." (Exhibit 19, Pl. Resp. to Interog. #10; Exhibit 20.)[10]

---

[10] The printed website article from the North Dakota Department of Health bears a date of 10/5/21. Plaintiff viewed an earlier version of the website article, but the earlier version is no longer available on the state website. Plaintiff's counsel found the 10/5/21 updated version through an archive search, but could not locate the earlier version that Plaintiff viewed while performing her Covid vaccination research. (Pl. depo. pp. 222-25.)

11

Based upon her Christian beliefs, Plaintiff is opposed to taking the Covid vaccination because of its connection to aborted fetal cell lines. (Pl. depo. pp. 83, 121-23.) Specifically, Plaintiff believes that God promotes the sanctity of human life; that humans are made in God's image; and abortion is antithetical to God's law about the sanctity of life. (Exhibit 12.) She cites several Bible verses to support her beliefs. (Id.) She believes that "the knowing consumption of products that have any connection whatsoever to aborted fetal cell lines would be defiling" to her body and a violation of God's law. (Exhibit 12; Pl. depo. p. 87.) Plaintiff's pro-life religious stance has been a long-held personal belief. (Id. at 84.) Courts have held that an employee's beliefs about abortion – including abortion-based objections to Covid vaccines – meet Title VII's requirement for a sincerely held religious belief. *See, e.g., Ellison v. Inova Health Care Servs.*, 2023 WL 4627437, at *6 (E.D. Va. July 19, 2023) (plaintiff linking verses from the Christian Bible about the sanctity of human life to the use of fetal cell tissues in the testing or manufacture of vaccinations adequately satisfies the sincerely religious belief requirement); *Aliano v. Twp. of Maplewood*, 2023 WL 4398493, at *7 (D.N.J. July 7, 2023) (denying a motion to dismiss when the plaintiff identified the textual source of the anti-abortion belief and explained how their understanding of the verse led them to conclude that receiving the Covid vaccine conflicted with their faith).

2.  Plaintiff Informed BCBST About Her Religious Conflict

On August 11, 2021, BCBST announced its Covid vaccination mandate to its workforce. Plaintiff informed BCBST in detail of her religious-based conflict with the mandate on September 15, 2021. (Pl. depo. p. 93; Exhibit 12.)

12

3. <u>Plaintiff Was Discharged Because of the Conflicting Employment Requirement</u>

Plaintiff was discharged on November 4, 2021, solely because she failed to comply with BCBST's vaccination mandate. (Exhibit 16.)

**B.  Alternative "Accommodation" Offered by BCBST**

BCBST will likely argue that it satisfied its burden under Title VII by offering its alternative "accommodation" of 30 days for Plaintiff to find another position not subject to the vaccine mandate.  While it is true that offering a reasonable accommodation satisfies the employer's duty under Title VII,[11] the accommodation offered by the employer must be ***reasonable***.  In this case, BCBST's offered accommodation was not reasonable.

"The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead, it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another." *Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir.1987).  "The focus of the inquiry as to what type of accommodation is 'reasonable' is on whether the accommodation preserves the employee's terms, conditions, and privileges of employment, once the employer has eliminated the religious conflict with the employee's requirements." *Reed v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.,* 523 F.Supp.2d 592, 599 (E.D. Mich. 2007).  If an accommodation results in an employee losing an employment benefit "enjoyed by all other employees who do not share the same religious conflict," the result is discriminatory. *Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1379 (6th Cir. 1994).

BCBST's proposed accommodation consisted of two options:  (1) Plaintiff had 30 days to reconsider her objection to the Covid vaccine; and (2) Plaintiff had 30 days to find another job not

---

[11] "Once an employer has offered a reasonable accommodation, it has met its duty under Title VII." *Crider v. Univ. of Tenn., Knoxville,* 492 F. App'x 609, 612 (6th Cir. 2012).

subject to the vaccine mandate. The first option is *per se* unreasonable. An accommodation cannot require the employee to violate her religious beliefs.

The second option is also unreasonable. BCBST did not offer Plaintiff any affirmative assistance in identifying jobs not subject to the vaccine mandate that met Plaintiff's qualifications and pay grade. As Shields admitted, HR was not providing any assistance to Plaintiff to find another job internally. (Shields depo. p. 105.) Plaintiff advised Shields that she was having difficulty discerning from the job postings whether the jobs were subject to the vaccine mandate. (Id. at 93, 98.) Plaintiff repeatedly asked Shields for a specific list of available positions not subject to the vaccine mandate. (Id. at 94, 95-96, 99.) It is undisputed that Shields never provided Plaintiff with the list she requested. (Id. at 99.)

Not only did Plaintiff have to locate suitable job vacancies on her own, BCBST was unwilling to automatically offer vacant jobs for which Plaintiff qualified. When asked whether BCBST would automatically offer Plaintiff a vacant job if she met its minimum qualifications, Shields responded that Plaintiff would still be required to compete with other applicants. (Shields depo. p. 100.) The statistics demonstrate that Plaintiff's chance of finding a suitable job transfer by the end of the 30-day "accommodation period" without any affirmative assistance was exceedingly slim. Plaintiff's position of Biostatistical Research Scientist was classified as a Grade 12 pay band. (Pl. depo. p. 29.) During the 30-day "accommodation period," BCBST only had 12 job postings that were at or above Plaintiff's pay band. (Exhibit 15, BCBST's Resp. to 2nd Set of Interogs. #4.) Accepting a position with a pay rate below Plaintiff's pay grade would not be a reasonable accommodation because Plaintiff would be losing an employment benefit (i.e., pay) because of her religious beliefs. *See O'Barr v. United Parcel Serv., Inc.*, 2013 WL 2243004, at *6 (E.D. Tenn. May 21, 2013) (reasonableness of accommodation disputed where alternative job

offered by employer was only part-time, at a lower pay rate, and an entry-level position rather than a skilled position employee previously held) (citing *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir. 1994)).

Only five vacant positions within Plaintiff's pay band were not subject to the vaccine mandate.  (Exhibit 9, BCBST's Resp. to 3rd Set of Interogs. #2.)  Of the 55 vacancies not subject to the vaccine mandate (including all pay grade bands), only two were compatible with Plaintiff's skillset; she was not qualified for the other 53 vacant positions.  (Pl. depo. p. 141.)  During the 30-day "accommodation period," BCBST received a total of 435 applications for vacant positions classified as Grade 12 or above.  (Exhibit 15, BCBST's Resp. to 2nd Set of Interogs. #5.)  Thus, Plaintiff only had two potential jobs which would not violate her religious beliefs and for which she was qualified to perform.  One of the jobs for which she applied was at a lower pay grade.  (Pl. depo. p. 139.)  While Plaintiff applied for these two jobs, the competition for these jobs was intense, and BCBST refused to give her any preferential treatment as to the selection process.

Title VII requires some affirmative action by the employer to help resolve the employee's religious conflict.  *See, e.g., EEOC v. Texas Hydraulics, Inc.*, 583 F.Supp.2d 904, 911 (E.D. Tenn. 2008) ("At a minimum, Defendant could have compiled a list of employees that were qualified to substitute for [plaintiff], informed them of [plaintiff's] religious conflict, and asked if they would be willing to switch shifts or substitute."); *EEOC v. Robert Bosch Corp.*, 169 F. App'x 942, 944-45 (6th Cir. 2006) ("some employers have curried favor with affirmative actions like holding meetings with the employee, attempting to find the employee another job, supplying the employee with a roster sheet containing the schedules of co-workers, and allowing the employee to advertise his need for shift swaps during daily roll calls and on the employer's bulletin board").  *See also Moates v. Hamilton Cnty.*, 976 F. Supp. 2d 984, 993–94 (E.D. Tenn. 2013) (because employer is

typically in a superior position as to knowledge of accommodation opportunities, employer is obligated to work with employee in identifying possible accommodations). The Supreme Court recently made this point clear.

> Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. This distinction matters. Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. **Consideration of other options,** such as voluntary shift swapping, **would also be necessary**.

*Groff v. DeJoy*, 600 U.S. 447, 473 (2023) (emphasis added). Recently, the Fifth Circuit, in elaborating on this language from *Groff*, noted that "[i]f a requested accommodation poses an undue hardship, the employer must *sua sponte* consider other possible accommodations." *Hebrew v. Texas Dep't of Criminal Justice*, 2023 WL 5989580, at *4 (5th Cir. Sept. 15, 2023). "Only after thorough consideration of other options may the employer deny the employee's request for accommodation." *Id*.

According to the EEOC's regulations regarding religious accommodation, "When an employee cannot be accommodated either as to his or her entire job or an assignment within the job, employers and labor organizations should consider whether or not it is possible to change the job assignment or **give the employee a lateral transfer**." 29 C.F.R. § 1605.2(d)(1)(iii) (emphasis added). This EEOC regulation suggests that the employer "give" a lateral transfer to the employee. The verb "give" in this regulation indicates that an employer must go beyond merely allowing an employee to compete for an open position. If an open position is identified that meets the employee's qualifications, then the accommodation should be a firm offer to transfer the employee to the vacant position. The EEOC's religious accommodation regulations such as 29 C.F.R. § 1605.2 recently received favorable treatment by the Supreme Court. *See Groff v. DeJoy*, 600 U.S.

447, 471 (2023) ("We have no reservations in saying that a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today."). In this case, BCBST did not give Plaintiff one of the two vacant jobs for which she was qualified. By forcing Plaintiff to openly compete for these vacant positions, BCBST failed its affirmative duty to make a firm lateral transfer offer to Plaintiff.

In this case, BCBST made no affirmative efforts to help Plaintiff locate another job that was not subject to the vaccine mandate and for which she was qualified. BCBST neither offered Plaintiff any alternative jobs nor granted her preferential treatment in the selection process for alternative jobs. The so-called "accommodation" offered by BCBST was simply a temporary approach to a permanent problem. Essentially, BCBST's response was a 30-day delayed termination decision because no assistance in finding a suitable replacement job was offered. An employer does not satisfy its burden under Title VII by taking a temporary wait-and-see approach. "[A] week-to-week, wait-and-see posture is no accommodation at all. Nor is the statute satisfied by an ad hoc arrangement contemplating that the inevitable collision between the employee's religious beliefs and the company's new work schedule would be dealt with when it arose." *EEOC v. Texas Hydraulics, Inc.*, 583 F. Supp. 2d 904, 910 (E.D. Tenn. 2008) (quoting *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991)).

Ironically, the two positions for which Plaintiff applied were not filled by BCBST until long after the 30-day accommodation period had expired on November 3, 2021. Plaintiff received rejection text messages from BCBST for these positions on January 11, 2022 and February 2, 2022. (Exhibit 17.) Obviously BCBST was in no hurry to fill these vacant positions, and Plaintiff was powerless to hasten the selection timeline to meet her short 30-day deadline. This evidence highlights the hollowness of BCBST's proposed accommodation. Without any affirmative

assistance by BCBST in obtaining a suitable position, Plaintiff's termination by the 30-day deadline was inevitable.

## C. Undue Hardship

Because BCBST did not offer Plaintiff a reasonable accommodation, the court must next determine whether Plaintiff's accommodation proposal would place an undue hardship on the employer. *See Creusere v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*, 88 F. App'x 813, 818 (6th Cir. 2003). An employer is liable under Title VII unless accommodating the employee's beliefs would cause an undue hardship. *Id.* Would granting Plaintiff's accommodation request have created an undue hardship? The short answer is no.

### 1. "Substantial Increased Costs" Undue Hardship Standard

In *Groff v. DeJoy*, the Supreme Court recently clarified the undue hardship standard to mean that "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." 600 U.S. 447, 470 (2023). In clarifying the standard, the Court held that "showing 'more than a *de minimis* cost' . . . does not suffice to establish 'undue hardship' under Title VII." *Id*. In evaluating undue hardship under the standard clarified in *Groff*, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer." *Id*. at 470-71.

Even though the *de minimis* cost standard was the applicable undue hardship standard when Plaintiff requested a religious accommodation, the retroactivity rule announced by the Supreme Court in *Harper v. Virginia Dep't of Taxation* requires application of the clarified standard in *Groff* to this case. "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still

open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." *Harper*, 509 U.S. 86, 97 (1993). *See also Watkins v. Healy*, 986 F.3d 648, 665 (6th Cir. 2021) (*Harper*'s retroactivity rule compelled application of judicial decision that post-dated party's challenged conduct by 17 years).

  2. <u>BCBST Cannot Show Undue Hardship</u>

  Allowing Plaintiff to continue working in her role of Biostatistical Research Scientist without receiving the Covid vaccination would not cause an undue hardship on the conduct of BCBST's business. Yet, weeks before Plaintiff even submitted her accommodation request, BCBST determined that any request to maintain current job duties without being vaccinated would be viewed as "unduly burdensome to the Company." (Exhibit 11.)

  As the Tenth Circuit has recognized, the employer's handling of a Title VII religious accommodation claim – like an ADA accommodation claim – "involves an interactive process that requires participation by both the employer and the employee." *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000) (citing *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 69 (1986) (consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business")). An employer's determination of what accommodation it is willing to offer ***before ever speaking with the employee*** demonstrates a failure to engage in the interactive process and casts doubt upon the reasonableness of its offered accommodation. *See Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 605–06 (6th Cir. 2018); *Lowe v. Calsonickansei N. Am., Inc.*, 2020 WL 2473757, at *8 (M.D. Tenn. May 13, 2020).

In this case, BCBST failed to engage in the interactive process in considering Plaintiff's accommodation request. Even before Plaintiff submitted her request, BCBST had already predetermined a response to every accommodation requested. On or about September 1, 2021, BCBST approved a blanket "accommodation" that would be offered to all employees who requested an accommodation to the vaccine mandate. (Vaughn depo. pp. 77-78.) The "accommodation" predetermined by the executive leadership team to be offered to each employee would be as follows: temporarily removing the employee from "public facing" duties and giving the employee 30 days to either get vaccinated or find another position not subject to the vaccine mandate. (Id. at 76.) This one-size-fits-all approach greatly differed from the company's then-existing written procedure for handling religious accommodation claims, which involved a more individualized assessment based upon decision-making input from the employee's supervisor and an HR Business Partner.

Interestingly, in depositions, BCBST's HR personnel could not even identify the person or persons who made the decision to deny Plaintiff's original accommodation request. (Vaughn depo. pp. 83, 92; Gault depo. p. 36; Shields depo. p. 50.) In fact, no HR member was involved in determining whether to grant or deny Plaintiff's request or whether Plaintiff's request created an undue hardship. (Vaughn depo. pp. 82, 92; Gault depo. p. 36; Shields depo. pp. 48, 58.) HR Business Partner Jennifer Shields admitted that she did not even read Plaintiff's accommodation request, but simply forwarded it to attorney Josh Wood. (Id. at 41.) Likewise, Chief Human Resources Officer Vaughn admitted that he did not read Plaintiff's accommodation request. (Vaughn depo. p. 81.) According to Vaughn, the senior leadership team – of which he was a member – never discussed or even mentioned Plaintiff's accommodation request. (Id. at 83-84.) Plaintiff's direct supervisor and others in her management chain-of-command were not involved

(or even asked) in determining whether Plaintiff's request should be granted or whether it created an undue hardship. (McPherson depo. pp. 73, 105; Lowe depo. pp. 47-48.) This lack of a decision-maker makes sense because BCBST had predetermined that all employee accommodation requests would be denied. The statistics support that conclusion. Of all 60 accommodation requests made, **BCBST denied every single one**. (Exhibit 18, BCBST Suppl. Resp. to 2nd Set of Interog. #3.)

Allowing Plaintiff to continue interacting with clients remotely while not receiving the Covid vaccination would not have resulted in substantial increased costs in relation to the conduct of its business. First, no evidence suggests that Plaintiff's remote client interactions were harmful to BCBST's business operations. Plaintiff had been interacting with her clients 100% remotely for the past 18 months. (McPherson depo. p. 59.) Her work performance during that 18-month period was satisfactory, and none of Plaintiff's clients complained about interacting with her remotely rather than in-person. (Id. at 59-60.) None of Plaintiff's clients expressed concern that Plaintiff's presentation was less effective because it was done remotely versus in-person. (Id. at 134-35.) Tellingly, Plaintiff's managers had no plans in the fall of 2021 for Plaintiff to resume in-person client meetings within the near future. (Lowe depo. p. 53.) Furthermore, there is no evidence that BCBST lost money because of Plaintiff's remote client interactions. (McPherson depo. p. 63.) Even without conducting in-person client meetings, McPherson admitted that BCBST was still able to effectively implement its competitive advantage over its competition. (Id. at 81.)

Second, direct client interaction composed only a tiny fraction of Plaintiff's entire work time. Approximately one percent (18 hours) of Plaintiff's total annual working hours (2,080 hours) involved direct client interaction. (Pl. depo pp. 106, 129-30.) Neither McPherson nor Lowe can dispute this fact, and both agree that Plaintiff would be the best person to know how much time she directly interacts with clients. (McPherson depo. pp. 86-87; Lowe depo. pp. 22-23.) Direct client

21

interaction normally occurred at annual client meetings, which generally take place in the spring.[12] (McPherson depo. pp. 55, 102.)  Many of Plaintiff's client interactions were via indirect means; that is, client communications were frequently relayed to and from Plaintiff through the Account Executive.  (Id. at 54-55.)  Plaintiff's job was mainly "behind-the-scenes" and not in front of clients.

Third, ***in-person*** client interaction was not an essential function of Plaintiff's job.  Plaintiff's physical presence at a client meeting was not a requirement.  (Pepper decl. ¶16.)[13]  While Plaintiff was an integral part of BCBST's team approach to Major Account customers, so long as she could participate in customer meetings via some type of live-streaming platform (such as Microsoft Teams or Zoom), Plaintiff's remote interaction with customers was satisfactory.  (Id.)  There was no legal or contractual requirement for Plaintiff to interact with clients in-person versus remotely.  (Lowe depo. p. 54; McPherson depo. p. 84.)   Tellingly, since the Covid pandemic began in March 2020, none of the clients serviced by Plaintiff's team have asked to resume in-person meetings or to cease meeting remotely.  (Id. at 80; Lowe depo. p. 55.)  Nor was there any plan in the fall of 2021 for Plaintiff to resume in-person client meetings within the next 90 to 120 days.  (Id at 53.)  Because the purpose behind the vaccine mandate was to prevent the spread of Covid (Gault depo. p. 49), by remotely interacting with clients, Plaintiff would pose no risk of spreading Covid to her clients.  (Lowe depo. pp. 51-52.)  Thus, Plaintiff's accommodation request would serve the mandate's purpose without compromising client relationships.

Fourth, none of Plaintiff's clients insisted or even suggested that she or her BCBST teammates receive the Covid vaccination as a requirement for interaction.  (McPherson depo. pp. 87-88; Lowe depo. pp. 54-55.)   The fact that BCBST **halted** the Covid vaccine mandate for "public facing"

---

[12] By the following spring, BCBST had halted enforcement of its public-facing vaccination mandate.  (Gault depo. pp. 87-88.)

[13] The declaration of Tony Pepper is attached to the Motion as Exhibit 21.

employees **less than two months after it was implemented**[14] demonstrates that an employee's vaccine status was not essential to the company's business operations. Indeed, the fact that senior leadership has never even considered resuming the mandate (Vaughn depo. p. 103) is significant in that it shows that unvaccinated employees are not detrimental to business operations.

Fifth, BCBST did not suffer any harm to its customer relationships by Plaintiff's remote client interactions. There is no evidence that BCBST lost money because of Plaintiff's remote client interactions. (McPherson depo. p. 63.) According to BCBST's Director of Major Accounts, BCBST suffered no harm whatsoever to its reputation or position in the marketplace by its remote customer interactions for the period March 2020 through September 2021. (Pepper decl. ¶14.) Even without conducting in-person client meetings, BCBST was still able to effectively implement its competitive advantage over its competition. (McPherson depo. p. 81.) Clients – not BCBST – dictated whether their meetings would be conducted in-person or remotely. (Id. at 77, 79.) That no clients have requested to return to in-person meetings demonstrates that clients do not view remote interaction as detrimental. (Id. at 80.) In summary, BCBST would have suffered no harm whatsoever to its reputation or position in the marketplace by allowing Plaintiff to continue interacting with her Major Account customers remotely without receiving the Covid vaccination. (Pepper decl. ¶13.)

### 3.   Alternative Accommodations Not Even Considered

Finally, BCBST failed to work with Plaintiff to consider possible options that would have accommodated Plaintiff's religious beliefs without creating an undue burden on business operations. Assuming *arguendo* that Plaintiff's originally proposed accommodation was not feasible, BCBST

---

[14] It is understandable that BCBST did not proceed with enforcement of its proposed company-wide Covid vaccine requirement because of the legal injunction against the federal contractor executive order. However, BCBST's "public facing" Covid vaccination mandate enforced against Plaintiff was not tied to any executive order, nor was it subject to any legal injunction. It was announced one month before the federal contractor executive order was issued on September 9, 2021. See Executive Order No. 14042, 86 FR 50985, 2021 WL 4148112.

had a duty to consider all possible accommodation options. "It would not be enough for an employer to conclude that [plaintiff's proposed accommodation] would constitute an undue hardship. Consideration of other options . . . would also be necessary." *Groff v. DeJoy*, 600 U.S. 447, 473 (2023). Apart from Plaintiff's accommodation request, the most logical accommodation possibility was for Plaintiff to interact in-person with clients while wearing a face mask and practicing social distancing, or for her to undergo periodic Covid testing (or a combination of all three). Plaintiff was willing to abide by those options, but she was never given a chance to make any counter proposals. (Pl. depo. pp. 105, 114.) Furthermore, these options were never specifically considered by BCBST's senior leadership team. When pressed for an answer as to whether the masking/social distancing combination was considered, Vaughn admitted that he could not say "whether we specifically considered that for her" (Vaughn depo. p. 96) and finally admitted, "I can't answer that." (Id. at 97-98.) Likewise, Plaintiff's managers could not answer whether client relations would be harmed if Plaintiff interacted in-person with clients without being vaccinated, but while wearing a mask and social distancing. (Lowe depo. pp. 55-56; McPherson depo. p. 84.)

By predetermining the one and only "accommodation" that it would offer to all objecting employees, BCBST made an unlawful "end run" around its obligations to individually assess a request and engage in the interactive process, considering all possible accommodation options. In summary, BCBST cannot carry its burden of proof that Plaintiff's original accommodation request (maintaining status quo of remote client interactions) or alternative accommodation options such as wearing a mask, practicing social distancing, and/or periodic Covid testing "would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).

24

## IV. CONCLUSION

Based on the foregoing, Plaintiff submits that she is entitled to judgment as a matter of law in her favor on her religious accommodation claims under Title VII and the THRA.

Respectfully submitted,

**MIKEL & HAMILL PLLC**

By:___*s/ Doug S. Hamill*_____
               Doug S. Hamill, BPR No. 022825
               Attorney for Plaintiff
               620 Lindsay Street, Suite 200
               Chattanooga, TN 37403
               (423) 541-5400
               dhamill@mhemploymentlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of October, 2023, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

By:___*s/ Doug S. Hamill*_____