1                IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF TENNESSEE

3                    CHATTANOOGA DIVISION

4    ------------------------------------------------------
                                      :
5    TANJA BENTON,                    :
                                      :
6              Plaintiff,             :
                                      :
7    v.                               :        1:22-CV-118
                                      :
8    BLUECROSS BLUESHIELD OF          :
     TENNESSEE, INC.,                 :
9                                     :
               Defendant.            :
10   ------------------------------------------------------
                                Chattanooga, Tennessee
11                              June 25, 2024

12           BEFORE:  THE HONORABLE CHARLES E. ATCHLEY, JR.
                      UNITED STATES DISTRICT JUDGE
13

APPEARANCES:
14
              FOR THE PLAINTIFF:
15
              DOUGLAS S. HAMILL
16            MIKEL & HAMILL
              620 Lindsey Street
17            Suite 200
              Chattanooga, Tennessee 37403
18
              FOR THE DEFENDANT:
19
              ROBERT E. BOSTON
20            JOSHUA T. WOOD
              DAVID ZEITLIN
21            HOLLAND & KNIGHT
              511 Union Street
22            Suite 2700
              Nashville, Tennessee 37219
23

24                     JURY TRIAL
                    FIRST DAY OF TRIAL
25               EXCERPT OF PROCEEDINGS
                   OPENING STATEMENTS

1          (Prior proceedings were heard but

2          not requested to be transcribed herein.)

3     MR. HAMILL:  Predetermined.  Take it or leave

4     it.  One size fits all.  Those should not be

5     descriptions of a company's response to a religious

6     accommodation case, but that is exactly the response and

7     approach that BlueCross took when it was responding to

8     objections to its COVID vaccine mandate.

9          And, ladies and gentlemen, this trial is not

10    about the legalities of the company's COVID vaccine

11    mandate itself, nor is this trial about whether the

12    vaccine is safe or effective.  Rather, this trial is

13    about one employee's request for a religious

14    accommodation to the company's vaccine mandate.

15         Now, Dr. Tanja Benton was a long-time BlueCross

16    employee, hired in 2005.  For most of her career, she

17    worked as a biostatistical research scientist.  It's a

18    mouthful.  She crunched a lot of numbers.  She analyzed

19    a lot of data.  And mainly her job was a

20    behind-the-scene -- a behind-the-scenes role.

21         Now, Dr. Benton typically had 10 to 12 clients

22    with whom -- that she directed her interactions only

23    once a year, and that was normally in the springtime.

24    And these interactions that she had with clients were --

25    were typically called "annual client meetings."  Now,

1  you will hear that these meetings were normally an hour

2  and a half in length.  And you'll hear Dr. Benton

3  testify that less than 1 percent of her total annual

4  work time was spent interacting directly with these

5  clients.

6         Now, like many employees, the COVID pandemic in

7  the spring of 2020 changed Dr. Benton's job status.  She

8  and her colleagues shifted from working at the corporate

9  office to performing 100 percent of their job duties

10 from home.  And COVID also affected how client meetings

11 were conducted.  Before the pandemic, there were

12 normally in-person meetings.  But with the pandemic, the

13 shift went to 100 percent virtual meetings using

14 Microsoft Teams and other type of virtual livestreaming

15 technology.

16        Now, despite the change in the mode of

17 Dr. Benton's client communications, the proof will show

18 that her limited client interactions were just as

19 effective through virtual technology as they were in

20 person.  And you're going to hear evidence that none of

21 her clients ever complained about virtual meetings.  And

22 there was no proof from the clients that her virtual

23 meeting presentations were any less effective than her

24 older presentations in person.

25        In fact, you're not going to hear any evidence

1   that during this time period clients were ever asking

2   for in-person meetings to resume.  In fact, the proof is

3   going to show that no members of BlueCross management

4   within Dr. Benton's chain of command ever even brought

5   up the subject of resuming in-person client meetings.

6           So for 18 months, Dr. Benton and her coworkers

7   continued to work in a virtual at-home role with no

8   problems.  Now, in the summer of 2021, BlueCross's

9   executive leadership team decided to impose a COVID

10  vaccination mandate on all employees that it deemed to

11  be public facing.  Now, the company decided that

12  Dr. Benton -- her role would also fall under this

13  mandate.  So, therefore, on August the 11th, 2021,

14  Dr. Benton was notified via a companywide email that her

15  job would now require the COVID vaccination for her to

16  keep her job.

17          Now, this news was deeply disturbing to

18  Dr. Benton.  She had discovered through her own

19  research, you will hear, that the two COVID vaccinations

20  that had been approved for use in the United States at

21  the time involved the use of aborted fetal cell lines in

22  either the testing or development.  Now, as part of her

23  Christian faith, Dr. Benton had a strong biblically

24  rooted belief about the sanctity of human life,

25  including the life of a fetus, and, therefore, she had a

1  firm religious objection to abortion.  As you'll hear

2  Dr. Benton explain, she sincerely believed that

3  ingesting the vaccine would defile her body and go

4  against God's law.  And for this reason, Dr. Benton's

5  religious convictions prohibited her from taking the

6  COVID vaccine.

7        Well, as soon as was practical, you'll see that

8  Dr. Benton submitted her religious accommodation request

9  to human resources.  And you're going to have the

10  opportunity in this case to read her detailed statement.

11  Her accommodation was very simple.  She asked if she can

12  continue working in her remote role, including

13  interacting virtually with clients as she'd been doing

14  for the past 18 months, but just not getting vaccinated.

15        After all, what harm would she pose by

16  spreading COVID if she was meeting virtually with her

17  clients?  And you'll hear at the time there was no talk

18  of resuming these client meetings in person any time in

19  the near future.  We submit that Dr. Benton's request

20  was a reasonable request and that it posed no undue

21  hardship to the company.

22        Now, unbeknownst to Dr. Benton, before she even

23  was able to make a request for accommodation, the

24  company had already decided its plan of action to deal

25  with anyone who submitted an accommodation request to

1  its vaccine mandate.

2        Ladies and gentlemen, I submit to you that this

3  is the most disturbing part of this case.  For you see,

4  before the COVID pandemic, BlueCross already had a

5  procedure and a protocol in writing for handling

6  religious accommodation requests.  Under that procedure,

7  which you'll see, when an employee submits a religious

8  accommodation request, a frontline human resources

9  person along with the employee's direct supervisor will

10  get together with the employee and determine whether an

11  accommodation can be made.

12        But when it came to the company's COVID vaccine

13  mandate, the company deliberately chose not to follow

14  its own policy.  Instead, before ever receiving even the

15  first accommodation request from any employee, the

16  company determined its so-called "accommodation" that it

17  was willing to offer to any employee objecting to the

18  vaccine mandate no matter who they were or what their

19  unique jobs were.

20        Now, unlike the policy that was already on the

21  books, this new policy was far from an individualized

22  assessment.  No, this was predetermined.  This was one

23  size fits all.  And this was certainly a

24  take-it-or-leave-it proposal.  And you'll get a chance

25  to see this new policy, and I want you to notice how

1   vastly different the new policy was to the old policy.

2          Ladies and gentlemen, we submit that it was

3   designed this way on purpose, and that was to effect a

4   uniform outcome.  See, the new procedure was clear about

5   achieving a uniform outcome.  This -- it's in writing,

6   and you'll see this statement that the company made in

7   the procedures.

8          Quote, "As a general matter, the company views

9   requests for an accommodation in the form of maintaining

10  current job functions, but not getting fully vaccinated

11  is unduly burdensome to the company," end quote.

12         That statement was made even before the first

13  employee had ever submitted a request for accommodation.

14  So even before Dr. Benton had a chance to explain her

15  side of the story for her to give her proposal, the

16  company had already decided what it was willing to offer

17  to Dr. Benton and to every other employee who was

18  objecting.

19         So here are the three things that the company

20  said it was willing to offer:  Number one, it said the

21  company would remove any public-facing duties of an

22  objecting employee for 30 days; second, the company

23  would allow the employee, during this 30-day period, to

24  hunt for another internal vacant job not subject to the

25  mandate; and, number three, the company said that the

1    employee could use this 30-day period to reconsider

2    getting vaccinated.

3         Essentially, this accommodation offer from

4    BlueCross was essentially a delay of the employee's

5    termination for 30 days.  That's all it was.  We submit

6    that this predetermined, one-size-fits-all offer made

7    without any input whatsoever from any employees who were

8    requesting the accommodations was not a reasonable

9    accommodation at all.

10         You've already heard about the law.  The law

11   requires affirmative action by an employer to help

12   resolve, if possible, the conflict between the

13   employee's religious beliefs on the one hand and the

14   conflicting policy on the other.  And as part of its

15   legal obligation, the employer must consider all

16   available options as potential accommodations before

17   making a decision.

18         Ladies and gentlemen, the proof is going to

19   show in this case that BlueCross did not thoroughly

20   consider all of the potential accommodations out there.

21   Rather, without input from any of the objecting

22   employees, the executives at BlueCross decided that no

23   one in a, quote, "public-facing role" could ever serve

24   in that role without being vaccinated, period.  Masking,

25   social distancing, periodic COVID testing, any other

1   potential accommodation, they refused to consider.  No

2   matter the person's unique job role, no matter with whom

3   they were interacting, how frequently they were

4   interacting.  One size fits all.  That was the approach.

5        Now, Dr. Benton accepted the accommodation

6   offered by the company under protest because of her deep

7   religious convictions.  She couldn't reconsider not

8   getting vaccinated.  That wasn't an option for her.

9        And the offer to remove any, quote,

10  "public-facing duties" for 30 days was of no practical

11  benefit.  Ladies and gentlemen of the jury, the proof

12  will show she had no public-facing duties scheduled for

13  that 30-day period.  In fact, for the next five months,

14  she had no public-facing duties.

15       As for the 30-day period to look for another

16  job not subject to the mandate, this too was hollow and

17  of no practical benefit to Dr. Benton.  The proof is

18  going to show that BlueCross provided no affirmative

19  assistance whatsoever to Dr. Benton in trying to find

20  some type of job that met her qualifications that was

21  not subject to the vaccine mandate.

22       You're going to see emails, and you're going to

23  hear Dr. Benton and other HR professionals testify here

24  that Dr. Benton asked on multiple occasions, "Hey, would

25  you at least let me know which of these job vacancies

1  are subject to the mandate or not so I can figure out
2  which ones I can apply to?"  That's a simple request;
3  right?  Did BlueCross do anything to help?  Nope.  They
4  never would provide a list.
5        You'll also hear proof that during this 30-day
6  time window, there was a hiring freeze -- a hiring
7  freeze, which made the posting of job vacancies
8  extremely difficult and very slow in the process.  Also,
9  Dr. Benton was faced with the struggle of not being able
10 to find jobs that met her qualifications among the
11 vacant postings.  And when she did eventually find two
12 that met her qualifications, BlueCross, rather than just
13 allowing her to transfer into those jobs, said no,
14 you're going to have to go through the competitive bid
15 and interview process, which even made it even more
16 difficult for her to slow the process down.
17        Ladies and gentlemen, Dr. Benton, she did apply
18 for the only two jobs that she was qualified for that
19 were not subject to the mandate, and, not surprisingly,
20 she didn't get an interview, nor was she selected for
21 the jobs.  So you see, the company's 30-day offer to go
22 find another job was simply a sham.  Simply a sham.  It
23 was not a permanent, workable solution.  It was a delay.
24 A 30-day delay.
25        Now, you're probably asking yourselves the big

1   question here.  Why didn't BlueCross just grant her

2   request?  Why was it so problematic for Dr. Benton to

3   continue working virtually with her clients as she'd

4   been doing for the past 18 months without any trouble?

5           THE COURTROOM DEPUTY:  Five minutes.

6           MR. HAMILL:  In this case, the company claims

7   that it was an undue burden.  They're claiming that she

8   had to meet in person with these clients.  Well, that

9   argument is a sham.

10          The law defines undue hardship as a substantial

11  increased cost to the company's business.  You're going

12  to hear testimony that Dr. Benton meeting with clients

13  virtually was of no impact on client relationships, nor

14  did it have any impact on cost to the business.

15          You're going to hear a witness, Tony Pepper.

16  He was the director responsible over all the clients for

17  whom Dr. Benton provided -- provided services, and he

18  will testify that there was no harm whatsoever to client

19  relationships because Dr. Benton was meeting virtually

20  with them rather than in person.  In fact, he's going to

21  tell you that it was not essential for the business

22  consultant, analytical consultant like Dr. Benton to

23  meet in person with its clients.  And even Dr. Benton's

24  supervisor will tell you that no clients complained that

25  Dr. Benton's virtual interactions were no better or no

1    worse than her in-person interactions.

2              You will also hear importantly -- this is

3    important -- it was the client, not BlueCross, who chose

4    which method they wanted to have their meetings.  If the

5    clients wanted virtual meetings, which -- the evidence

6    shows BlueCross couldn't change the client's mind.

7              So there's going to be no evidence that her

8    proposal was an undue hardship.

9              You see, we're here today because BlueCross

10   chose not to offer a reasonable accommodation.  The end

11   result was that Dr. Benton was fired on November

12   the 4th, 2021.  Ironically, less than 30 days later,

13   BlueCross's vaccine mandate came to a screeching halt.

14   The mandate was only in effect two months, ladies and

15   gentlemen.  And you're going to hear BlueCross paused

16   enforcement of that mandate on November the 30th, 2021,

17   and that the company has never resumed the mandate since

18   that date.

19             You will also hear proof that Dr. Benton's

20   replacement took six months to be hired.  That

21   replacement came in in May of 2022.  And oh, by the way,

22   by that point in time, Dr. Benton's job did not require

23   a COVID vaccination.

24             Now -- now, after the mandate was paused, was

25   there any effort by BlueCross to reach out and recruit

1    Dr. Benton back to her old job?  No, sadly not.  But for

2    Dr. Benton, it took her 13 months to find a new job, and

3    you're going to hear her struggles as she goes to

4    interview after interview after interview to then be

5    ghosted and then to be ghosted.  The struggles.

6          Now, ladies and gentlemen, you've heard the

7    three main questions that you're going to have to

8    decide.  Was Dr. Benton's objection to the COVID

9    vaccination based on a sincerely held religious belief?

10   Yes, it was.  And the proof that you're going to hear to

11   the contrary from BlueCross is nothing but speculations

12   and wild theories not backed up by any evidence.

13         Second question you've got to decide:  Was the

14   offer or proposal from BlueCross, was it a -- a real

15   reasonable accommodation?  Answer:  No, it was not.

16         And third is Dr. Benton's proposal:  Was it

17   really an undue hardship as the company claims?

18   Absolutely not.  And as a result, Dr. Benton suffered

19   harm.  She lost her job because of a violation of the

20   law.  She suffered damages as a result.  The primary

21   breadwinner of the Benton family lost her entire income

22   as well as valuable healthcare insurance, which covered

23   her husband and her three kids.  She suffered great

24   stress and anxieties and frustrations as she went

25   through a difficult 13-month period desperately looking

1  for work.

2        All of this harm could have been avoided had

3  BlueCross simply followed the law rather than pushing

4  forward its predetermined one-size-fits-all agenda that

5  ignored Dr. Benton's specific roles and her very

6  limited --

7        THE COURTROOM DEPUTY:  20 minutes is up.

8        MR. HAMILL:  -- client interaction.

9        Thank you.

10       THE COURT:  Thank you, Mr. Hamill.

11       Mr. Boston?

12       MR. BOSTON:  Thank you, Judge.

13       THE COURT:  How much time, Mr. Boston?

14       MR. BOSTON:  20 minutes.

15       THE COURT:  Okay.

16       MR. BOSTON:  Members of the jury, the opening

17  statement is designed just to be a road map to where the

18  lawyers think that they -- the evidence will go.

19       In voir dire, I mentioned to you that you're

20  going to hear from multiple people and asked if you knew

21  them.  The individuals you're going to hear from include

22  Roy Vaughn, who was one of the upper-level members of

23  the human resources department at BlueCross BlueShield;

24  a gentleman named Hal Gault, who is right under

25  Mr. Vaughn; and a young a lady named Jennifer Shields,

1   who is right under Mr. Gault.  And those are the human

2   resources people that have responsibility for

3   administering the program that counsel has told you

4   about.

5          And this is the mandatory vaccine proposal that

6   was turned into a policy of BlueCross BlueShield for a

7   short period of time between roughly -- roughly August

8   of 2021 and November of 2021.  And the proof that's

9   going to be presented to you will explain what happened

10  to the policy and why.  And that proof is going to

11  explain that -- how it came about and why and then how

12  it was administered for not just Dr. Benton -- Dr. --

13  but all the people that were public facing, which were

14  800 different people within the BlueCross organization

15  that had public-facing positions.

16         I'm going to refer to Dr. Benton throughout the

17  trial as "Dr. Benton" because she has a PhD, a doctorate

18  degree.  And out of respect for her degree, that's how

19  I'm going to refer to her.  She refers to herself in her

20  business when she still worked for my client as a

21  consultant.  Consultants were a part of the operation in

22  which she worked, and I'll cover that in just a moment.

23         At the end of the trial, I'm going to be asking

24  you in my closing statement, consistent with Judge

25  Atchley's instructions, to return a verdict for

1  BlueCross BlueShield finding that it did not violate the

2  equal employment opportunity law that's relevant to this

3  case.

4        BlueCross BlueShield has been in business, as

5  you know -- we all know -- for many, many years here in

6  Chattanooga.  It has roughly 6,000 employees across the

7  state of Tennessee in all 95 -- they are in almost all

8  95 counties.  It has major office operations at the time

9  we're dealing with in Memphis, Nashville, and

10 Chattanooga, which is where its headquarters are.  It is

11 the largest private employer in Chattanooga.

12       In 2022 -- excuse me -- 2020 and years before,

13 BlueCross has in place a policy and procedure that says

14 we will comply with the EEO laws, including those that

15 relate to accommodations -- reasonable accommodations

16 for covered needs.  And for purposes of COVID, there

17 were two that people raised before -- before the company

18 by way of a request for accommodation.  One would be

19 something like medical issues that precluded them from

20 taking the COVID virus [sic].  The -- the company's

21 policy on EEO, equal employment opportunity, compliance

22 covers those.

23       The second one was some people would -- at the

24 time in their employment, from time to time, in all --

25 in all employment laws, have a request for a religious

1  accommodation. The request for the religious

2  accommodation covered many, many things prior to COVID.

3  People who couldn't work because of a religious tenet

4  from their religion on Saturdays. And Seventh Day

5  Adventists come to mind. People who couldn't work on a

6  particular holiday. Easter comes to mind. Or they had

7  an objection because of their doctrinal underpinnings of

8  their religion that they needed to request an

9  accommodation.

10         Those are what had been presented prior to 2020

11  when COVID fell in on all employees and individuals

12  alike. That's what the policy related to. That's what

13  had occurred before. The EEO policy says -- in its very

14  last line, it covers -- it says the policy can be

15  adjusted and changed from time to time --

16  paraphrasing -- as needs permit. That's what happened

17  in 2020 forward because nobody, the proof will show, had

18  ever addressed this before.

19         There had been minor-type issues that related

20  to diseases that didn't rise to the level of pandemics.

21  There was an issue prior to this where measles became

22  prevalent throughout society where people had to be

23  vaccinated. Certain job descriptions within the company

24  say you may need to get a vaccination.

25         BlueCross will testify through -- its witnesses

1  will testify that we thought that made sense because

2  we're a healthcare company that deals with people and

3  members in their homes as well as vendors as well as

4  providers and plan operators.

5        BlueCross doesn't -- the proof will be --

6  doesn't just sit on the hill and do nothing.  A good bit

7  of what it does in its public-facing roles is going to

8  people's homes and providing caregivers or wellness

9  coordinators or people that help administer care for

10  people.  A good deal of what it does -- you'll hear

11  substantial proof on this -- is it deals with employers,

12  individual commercial companies, individuals, as well as

13  government entities about what they need in their plan

14  and how they're going to get it and how they're going to

15  pay for it.

16        That's generally what Ms. -- Dr. -- Dr. Benton

17  did in her public-facing role.  Her role was to analyze

18  data throughout the year from individual companies that

19  were assigned to her -- big ones -- and help them come

20  to the conclusion as to what their healthcare plan might

21  should include for the needs of their -- the needs of

22  their employees and the cost factor they were willing to

23  pay for it.  And it was an incredibly valuable service

24  that BlueCross BlueShield provided to those employers.

25        Dr. Benton was the person that was the

1  figure -- not just the figurehead.  She was the

2  lightning rod of that discussion, which was annual

3  meetings and sometimes quarterly.  And she would go --

4  throughout all of her career that she served as a

5  consultant in the department that she worked, she would

6  go and handle the substantive portion of that meeting.

7          And she was liked substantially by these

8  customers.  It was important to them.  You will hear

9  testimony as to why she was there and what value she

10  added to the discussion.  That's why she was public

11  facing.  The 1 percent of the time she spent doing that,

12  you'll hear proof as to the importance of that.

13          You're going to hear from a man named Michael

14  McPherson.  Mike was her direct supervisor.  He

15  administered her department, and he knows the importance

16  of the meetings that she was asked to handle.  That part

17  of -- she wasn't the only person.  There -- others were

18  there, but when the rubber met the road, she was the

19  person the customers wanted to hear from.  Why?  Because

20  she had done the data crunching to explain to them why

21  this made sense for their plan and for all of their

22  employees to be a better benefit to them.

23          You're going to hear proof of the importance of

24  that to BlueCross's competitive advantage in the

25  marketplace.  It was there to derive the -- the data,

1    and it did it well to then convey it to the customers,

2    the -- the plan organizers, the other members of the

3    world in a way that they could decide this is important

4    to us for our business operations, not just yours.

5            If they bought more insurance, if they changed

6    their coverage, if they did it in a different way, if

7    they expanded the coverage, that started with

8    Dr. Benton.  If she wasn't included in that

9    communication and that role, that benefit in the

10   marketplace goes away.  That's where we -- you'll hear

11   the proof -- have a competitive advantage over our

12   competitors, United, Amerigroup, and other healthcare

13   providers, other healthcare insurers.  But, more

14   importantly, it's part of the mission of BlueCross

15   BlueShield to help their members that are derived

16   through the relationships with employers.

17           Dr. Benton, her skill at this was good.

18   That -- she was -- she was allocated to give some of the

19   most largest, most important customers that we had --

20   that we have to handle it, and she did it well.

21           Dr. Benton has brought forward a claim that

22   says because of my beliefs in a certain religion, I

23   shouldn't have had to go and participate in those

24   meetings once BlueCross went back to them.  Notice I

25   said "once BlueCross went back to them."  Prior to

1    March -- prior to March of 2020, the norm for Dr. Benton

2    and all other consultants in her department was hands-on

3    meetings if the customer wanted them.  Usually annually,

4    sometimes quarterly.  That was part of the job.

5            In March of 2020, it was temporarily --

6    temporarily removed when BlueCross shut down its

7    operations like other employers did.  Everybody went

8    home, including the CEO, the COO, the CFO, the large

9    upper-level management employees.  Most of them started

10   working from home for an indefinite period of time

11   before there was some flex that would be done depending

12   on what job position somebody had.  But otherwise --

13   excuse me -- you reported to work.

14           In March of 2020, the company said because of

15   several things, the -- the prevalence of the pandemic,

16   not knowing where it was going, the risk of people, it

17   simply said we're going remotely.  When it went

18   remotely, substantial changes had to be made.  It had to

19   go -- go and buy -- and it did -- equipment for people

20   to work from home, computers, monitors, systems to put

21   them in place.  It had to adjust job descriptions and

22   job assignments if, in fact, people were no longer able

23   to work for a temporary period of time by interfacing

24   directly with their customers, their clients; if they

25   were a home caregiver, their people at home; if they

1   were Dr. Benton, the -- the customers she worked with

2   during annual meetings and getting to that; their teams

3   internally.  They had to take away direct interaction

4   while the pandemic was addressed, and they did.

5           The company did it, and it did it through the

6   people that I mentioned you're going to hear from.  This

7   doesn't just happen by edict from above.  It happened by

8   decisions and responsibilities that were assigned to

9   people, one of which -- the decision to go home, to

10  close down headquarters -- came from what's called --

11  you'll hear the proof -- "senior leadership."  That is

12  the highest level -- the highest level of administrative

13  and leadership responsibility at BlueCross.  It is the

14  group that took the concept of what are we going to do

15  about the pandemic and addressed it.  It addressed it

16  for the safety of people, including its members, the

17  safety of people with which it interacted outside, its

18  customers, the safety of its people that worked for it,

19  and to adjust while the world found its levelling water

20  for the COVID pandemic.

21          Before that, some people worked from home part

22  time.  Many people still worked from headquarters.  It

23  looked at those positions to see, well, now that we're

24  in a different universe, can we adjust some of those?

25  And it was successful in adding more people to

1  telecommuting roles from at home.  That didn't

2  include -- didn't include Dr. Benton's position.

3         When the company started to try to figure out

4  what to do post-COVID, it had to pivot.  It had to pivot

5  from what it did before, including its own jobs and how

6  it's going to deliver them.  If nobody could have

7  meetings for a while, it couldn't either.

8         But it never had a concept that -- you will not

9  hear any proof of this whatsoever -- that it ever

10  intended to adjust permanently to where Dr. Benton's

11  position and all of the other Dr. Bentons that worked in

12  these positions, all the other consultants were going

13  not to deal face to face with individuals on -- on the

14  other side of their relationships.  Never once was that

15  in concept.

16         BlueCross didn't know the timing of that

17  because nobody knew.  Nobody knew the timing of the

18  pandemic.

19         The lady to my left, I introduced her before.

20  That's Dr. Andrea -- I forgot your name.

21         MS. WILLIS:  Willis.

22         MR. BOSTON:  Willis.  Sorry.

23         -- Dr. Andrea Willis.  She works for BlueCross

24  full time.  She's its medical director.  She's part of

25  its senior leadership role.  She was a part of the

1  process by which Dr. Willis and the CEO and other senior

2  leadership -- you'll hear who they were -- were -- there

3  were about eight to ten people who met regularly as

4  COVID was advancing and then COVID was receding to

5  determine what the company should and could do by way of

6  putting in place its -- its rules and regulations about

7  what to do to get back to work.  She monitored

8  everything that they saw and needed to do as a medical

9  doctor to determine and provide that to the company.  Do

10 this.  Do that.  Here's why.  Here's otherwise.

11        One of the things that fell on to her was to

12 evaluate what -- the word is the "efficacy," meaning the

13 benefit of the utility of a COVID vaccine mandate, and

14 Dr. Willis recommended it along with the senior

15 leadership, and that's how the policy came in place.  It

16 was designed to get the company back to work steady

17 state in the best way to deliver its services.  And

18 Dr. Willis was instrumental in that, and you will hear

19 her reasons why.

20        THE COURTROOM DEPUTY:  Five minutes.

21        MR. BOSTON:  Thank you.

22        One of the things that happened in that is

23 Dr. Willis -- excuse me -- Dr. Benton, her position was

24 selected.  You're going to hear why that it was

25 selected.  It's because of her interaction with the

1  clients which she was assigned and the importance of

2  that to the company's operations.  I just ask you to

3  listen carefully to the -- to Mr. McPherson's testimony

4  about that as to why that was done.

5        Now, one part about this -- and I want to

6  mention this -- two -- two other points that I think are

7  important in my opening statement.  You're not going to

8  hear any proof -- you're not going to hear any proof

9  from Dr. Benton, I don't believe, that she thought

10  people were out to hurt her.  The "sham" that I just

11  heard about, it was put in place by people who wanted

12  people to be at work and to stay at work and come back

13  to work.

14        The problem was what Dr. Benton had presented

15  was a nonstarter.  It is I will come to work so long as

16  I can do it from home and not have to need to meet with

17  my people -- excuse me -- my -- my clients face to face.

18  Who put the restriction on it is something that is

19  important for you to evaluate.  Dr. Benton never

20  proposed something that would have allowed her to come

21  back and go back to work in her job as it was before.

22        One of the elements that Dr. Benton has to

23  prove is if she is -- if you believe her, you decide

24  that she is entitled to some recovery.  That's her

25  damages.  When Dr. Benton left, she -- she took a

1  "sabbatical," as she used it, some -- some time off.

2  And when she did that, you can decide if she was

3  actively looking for a job or not.

4        When she got a job, she loves it.  It pays more

5  than what she made at BlueCross BlueShield.  It's

6  meaningful work.  It gives her an opportunity to make

7  money in her new job.  And you will find that when she

8  took that job, she has said before she took it, I don't

9  want to work for BlueCross anymore.  She used a

10  pejorative term.  I'm not going to use it in my opening.

11  I want you to evaluate her claim for damages consistent

12  with the elements of proof that she has to meet.

13        Now, final point I'm going to make in my

14  opening statement is -- is one that is difficult.

15  Dr. Benton -- you're going to hear an instruction, I

16  believe, from Judge Atchley -- has to prove that she had

17  a sincerely held religious-based belief in order to ask

18  for the accommodation.  There's going to be proof to

19  question that.  I won't go into detail, but listen for

20  it.

21        She has made inconsistent statements.  She has

22  made statements that are designed to show a political

23  opposition to taking the vaccine.  And she's taken steps

24  in her own family that she -- her objections to the

25  vaccination was perhaps not religious based, but is

1    based on politics, personal desires, and personal

2    interests.

3            If that is the case, I'm going to ask you to

4    find that she did not have a sincerely held religious

5    belief.  The company, at the time it was working through

6    the accommodation process with her, accepted that she

7    did so, that the accommodation process could be

8    triggered.  If at that point the company said, you don't

9    have it, the accommodation process would start.  It

10   didn't do that.  It brought her forward into that and

11   then applied the accommodations it thought would work.

12           The final point is the remote -- that

13   accommodation is not an exclusion.  It's what is

14   reasonably able to be done based on all costs.  Not just

15   economic, but all costs to the company's business at the

16   time.  You're going to hear substantial proof that what

17   Dr. Willis proposed, which is to stay home and not be

18   subject to the mandate, didn't work for her job position

19   for very basic, important reasons to the company's

20   operations.

21           Thank you for listening to my opening

22   statement.  I'm going to ask you at the end of the --

23   the trial to come back and prove -- and rule that

24   Dr. Benton has not proven her case by the standard that

25   Judge Atchley will ask you to apply.

1          Thank you very much.

2          (Subsequent proceedings were heard but

3          not requested to be transcribed herein.)

4          END OF PROCEEDINGS

5

6          I, Stephanie Fernandez, do hereby certify that
I reported in machine shorthand the proceedings in the
7    above-styled cause, and that this transcript is an
accurate record of said proceedings.
8
                              s/Stephanie Fernandez
9                             Stephanie Fernandez,
                              Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25