IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TENNESSEE

CHATTANOOGA DIVISION

---

TANJA BENTON,

Plaintiff,

v. : 1:22-CV-118

BLUECROSS BLUESHIELD OF TENNESSEE, INC.,

Defendant.

---

Chattanooga, Tennessee
June 27, 2024

BEFORE: THE HONORABLE CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

DOUGLAS S. HAMILL
MIKEL & HAMILL
620 Lindsey Street
Suite 200
Chattanooga, Tennessee 37403

FOR THE DEFENDANT:

ROBERT E. BOSTON
JOSHUA T. WOOD
DAVID ZEITLIN
HOLLAND & KNIGHT
511 Union Street
Suite 2700
Nashville, Tennessee 37219

JURY TRIAL
THIRD DAY OF TRIAL
EXCERPT OF PROCEEDINGS
CLOSING ARGUMENTS

(Prior proceedings were heard but not requested to be transcribed herein.)

MR. HAMILL: Thank you.

Ladies and gentlemen of the jury, thank you for your patience in this case.

If you recall, in BlueCross's opening statement, you may recall that Mr. Boston gave you a baseball analogy about an umpire calling the balls and strikes. You see, it's the umpire's job to treat every batter the same, but that's not the case here. Not everyone involved in BlueCross's vaccine accommodation process was treated the same. You see, it was the employee who didn't get a fair shake in this process, and that's because the accommodation process was not a level playing field. Far from it.

The better baseball analogy I like to make for this case would be like telling the employee to step up to the plate, but you can't use a bat to swing at any of the pitches.

See, throughout this case, BlueCross has told you that it wanted to ensure its accommodation process was uniform, but it was rigged to effectuate a uniform outcome. No employee that requested a religious accommodation would remain employed after the 30-day deadline. And the proof has shown that is exactly what

happened. And Dr. Tanja Benton was one of the victims.

Now, that's the big picture. Now let's look at the three specific questions that you, as a jury, will be asked to answer in this case. And right off the bat, I'm going to show you the verdict form that you will be given.

The first question that you have to answer: Has the plaintiff, Tanja Benton, proven by a preponderance of the evidence that her refusal to receive the COVID vaccination was based upon a sincerely held religious belief? The answer is yes.

Now, under the law that the judge will charge you, religion includes all aspects of religious observance and practices as well as beliefs that are, in the plaintiff's own scheme of things, religious. Now, one factor to consider is that religion addresses fundamental and ultimate questions having to do with deep and imponderable manners.

Now, Dr. Benton has explained her Christian belief about the sanctity of human life. She believes that God created humans in his own image. Human life, she believes, begins at conception. According to Dr. Benton's religious beliefs, a fetus is a human. You see, the origin of life and the connection to God is certainly a deep and imponderable manner for the

definition of religion under the law that you'll be given.

Religion is also defined as a comprehensive -- being comprehensive in nature. It consists of a belief system. Dr. Benton's Christian beliefs are all encompassing. She testified that she is guided by God's teaching in the Bible. And those biblical teachings, she's testified it shapes and influences how she views life and her mission in life.

Now, the law's protections, you'll hear, apply to religious beliefs whether they are common or non-traditional, regardless of whether they are recognized by any organized religion. So just because Dr. Benton is not a formal member of a particular church or denomination, she -- her religious beliefs are still protected under the law.

So what proof have you heard about Dr. Benton's objections being sincerely held religious grounds for objecting to the COVID vaccination? Well, first, you got to see Dr. Benton's detailed accommodation request form that she submitted, and if you recall looking at that, all her grounds for objections were based upon her religious beliefs. There's nothing in her accommodation form that had anything to do with I am not taking this vaccine because no one can tell me what to do about my

body. There was no complaints or objections based on medical reasons, such as I don't think the vaccine is safe, I don't think the vaccine is effective. No political statements whatsoever. The only grounds she gave were religious based.

Now, you don't have to just go off what she stated at that time. You see, you have a good snapshot into what she sincerely believed because you've seen what she's posted in private chat groups and in private texts with her friend, and that was part of Defense Exhibit 10.

You may recall her statement on this private chat group where she was describing for her, Ephesians 6:10-18 had been a verse that she'd been dealing with for several months now. "We're engaged in a spiritual war." You see, Dr. Benton sincerely believed that her act of objecting to COVID vaccination was an act of spiritual warfare that she believed was God honoring, and she sacrificed her job for that.

You'll also remember a private text message that she had with a coworker, Renea Tennyson, and this text message was two days before she lost her job. She and Ms. Tennyson were talking about the impending termination. Ms. Tennyson would say, well, wish you the best of luck. You remember what her response was? She

said to "keep this thought with you today, it takes tremendous courage to do what you're doing. I know God is on our side no matter what bad decisions they make." Now, she was motivated by her religious beliefs. If she was irreligious, why in the world would she be talking about spiritual warfare and believing that God was on her side?

You can think about these instant chat messages and text messages sort of like someone's private journal or a diary. These are things that she's sharing privately without any expectation that anyone's going to be reading them. They're sincere. They're genuine. They were made roughly at the same time, within about two months of her decision to object to the COVID vaccination. They're trustworthy sources, ladies and gentlemen. If you want to look into her heart -- because that's kind of what you're having to do -- was this sincerely held? Was this a religious belief? The answer is yes. This is strong proof of that.

Now, there -- BlueCross has not put on any proof that Dr. Benton has ever told anyone else I objected to COVID vaccination for this reason and that reason, politics, blah blah blah. There -- you have not seen any proof where she has made contradictory statements. She has been consistent -- consistent

throughout this case on that point.

And, ladies and gentlemen, you heard the testimony of her sister-in-law, Lynn Benton. Now, when you look and consider her testimony, you'll realize that the sister-in-law really does not have a close relationship with Tanja. They haven't spoke on any spiritual matters in over 20 years. And you know why? Because they have divergent views on spiritual matters. It is not uncommon for people who have completely opposite religious views not to bring religion up in conversation, particularly if you very rarely talk with the person. Lynn Benton admitted that she had only been at her house twice a year. Thanksgiving, Christmas. Three hours at a time.

She finally had to admit that no, she'd never had any conversations with Dr. Benton about her spiritual or her Christian beliefs. No conversations about her beliefs about abortion and sanctity of human life. No conversations whatsoever about why Dr. Benton objected to the COVID vaccination. And she finally had to admit that she really has no proof as to why Dr. Benton objected. She was speculating because Dr. Benton is a private person.

In fact, she admitted Tanja doesn't talk much. And that's right. She doesn't talk much, and she's not

going to share her private Christian beliefs with someone that she's not close to and that she knows doesn't have the same beliefs as her.

So, in summary, you don't -- as a jury, you don't have to necessarily agree with Dr. Benton's religious beliefs. All you have to do is determine, were these beliefs sincerely held? Were they genuine? And was that the basis for her objection to the COVID vaccination? We have submitted proof, and we believe that is the answer.

Now, the second question you're going to have to answer is -- and the burden has now shifted over to BlueCross -- has BlueCross proven by a preponderance of the evidence they offered a reasonable accommodation to the plaintiff?

Now, BlueCross had a procedure on the books whereby the employee's supervisor and frontline HR person were supposed to make a determination on whether a reasonable accommodation could be made or not. You heard that. But BlueCross deliberately ignored this procedure and decided they were going to come up with a new procedure. This was a predetermined decision that they came up with. The offer that you saw was made well before Dr. Benton or any employee even had input, even knew that the vaccine mandate existed or was going to

apply to them. This -- this was an accommodation that -- that the company had come to that was, again, predetermined and made without ever reading any of the specific requests.

You heard the proof. Jennifer Shields didn't thoroughly read through Dr. Benton's accommodation request. She just merely funneled it up to Attorney Wood. Hal Gault, her boss, said, I didn't read it. That wasn't our job. HR's role was not to read these accommodation requests. We funnel it up to legal. Chief human resources officer who was part of the executive leadership team: I didn't read it. That's not our job. That's what legal does. This was a one-size-fits-all offer that the company made. There was no individualized assessment.

You remember what the old policy was? Get the frontline supervisor talking with the employee and the frontline HR, and they're going to work it out. There was nothing like this. There was nothing individualized.

They told you that they were assessing a generalized job category called "public facing." Okay? That's over 800 employees. They never knew anything about Dr. Benton. They knew nothing about what she did. They didn't know how frequently she interacted with

clients. They didn't know who the clients were. They knew nothing whatsoever about Dr. Benton when they came up with their accommodation, the take-it-or-leave-it accommodation.

You recall when they sent the email and Dr. Benton was asking, what other information do you need? Do you remember the response in the -- in the template email that came from legal? Doesn't matter. Doesn't matter what you have to say. We don't need any more additional facts from you because, remember, this is the offer as is. It's not going to change.

Now, looking at the three parts of the offer, the first one was they were going to remove for 30 days her public-facing duties. Well, what benefit was that for Dr. Benton? You see, Dr. Benton testified and her boss testified she didn't have any public-facing duties for 30 -- in that 30-day period, so there was nothing to modify. In fact, she didn't have any public-facing duties for the next five months. So was that offer even beneficial whatsoever to her? No.

Second, they said, well, you can use this 30 days just to figure out maybe you should go get vaccinated. Okay. That's insulting because Dr. Benton -- the reason why she requested the accommodation is 'cause she said I can't -- I can't get

vaccinated. So to tell her jettison your religious beliefs, get vaccinated so you won't lose your job, is very insulting.

The third thing that they offered was this: You've got 30 days to look for a new job. Good luck. We're not going to actually give you any affirmative assistance.

Now, ladies and gentlemen, when Judge Atchley charges you with the law, the law says it requires affirmative action by the employer to solve the conflict between the employee's religious belief and an employment rule in conflict. There was no affirmative action here. No assistance was given to her. You recall she asked time and time again, can you at least tell me which of these jobs are subject to the mandate and which are not? She asked multiple times. And you heard Jennifer Shields as well as the others say, no, we didn't have a list to give to her. She could just look it up.

And she talked about the frustrations trying to go through all these job descriptions. There was no conspicuous heading that said "This job is subject to the COVID vaccination mandate." And, finally, three days before the deadline, the recruiter said, oh, yeah, your -- you should be looking at some kind of innocuous

type of language that says, oh, "various immunizations may be required." That's the language you should be looking for. That just shows how confusing and frustrating it was for her.

When we talk about there was a hiring freeze at the time, not very helpful when you've got a short 30-day window that suddenly job vacancies are delayed in posting. And you heard a lot of proof about the length of time it took at BlueCross for jobs to be posted and then filled.

Do you remember Mike McPherson? He said yeah, it takes a long time. In fact, it took him over six months to fill Dr. Benton's job. The two vacant jobs that Dr. Benton eventually applied for, did you see the time window, how long it took for them when she got her rejection letters? January, February, way past the November 3rd deadline for her. This was a long, cumbersome process, and she was going to have to stand in line with all the other people applying for vacant jobs. She wasn't going to get a speed up on an interview, and it was going to be very, very hard.

The recruiter. What did the recruiting department do for Dr. Benton? Nothing. They didn't even pop up. If -- if -- if the recruiting department was going to provide any assistance, don't you think

that they would show up at the beginning of the 30-day period? The only time a recruiter popped up was November the 1st, right at the end, and that wasn't to say hey, let me work with you with your skills. I've identified some jobs. Let me help you. Let me try to speed up this interview process. We know who the interviewers are. At least get you in the cue. Nothing. She didn't even get interviews for the jobs that she applied for.

Finally, very important, if you recall, there was an email that Jennifer Shields sent to her boss, Hal Gault, and she was -- this was at the very end of the recruiting process. If you recall seeing her email, Ms. Shields was reporting to her boss, you know what? There's a whole bunch of employees that have been requesting the accommodations that I feel like they have not been benefited from by the accommodation and that the 30-day accommodation was not workable.

Amen. It wasn't workable. You see, the proof is the company's proposal was not a permanent solution. It was temporary at best. It was really just a temporary 30-day delay in her termination.

So has the company, BlueCross, met its burden of proving that this was a reasonable accommodation? It's their burden, not ours. The answer is no. They

have not met their burden. This was not a reasonable accommodation.

The last thing that you're -- question that you have is, again, something that BlueCross has to prove. Has BlueCross proven by a preponderance of the evidence that it could not reasonably accommodate the plaintiff's religious beliefs without undue hardship? It's their burden.

BlueCross claims it would be an undue burden for Dr. Benton to meet virtually with her clients. Well, what proof has BlueCross come forward with that meeting virtually with clients has somehow caused a substantial increase in costs? Have -- have you seen any evidence of damage to client relationships because Dr. Benton was virtually communicating with the clients? No.

Do you remember Tony Pepper? Tony Pepper was the guy in charge of all the major account clients. Those are every one of Dr. Benton's clients. He came in and said, hey, I know if my clients don't like things, and my clients have said nothing about we don't like virtual communications, we want to have all of ours in -- in person. No.

And do you remember the key here? The proof is it was the client's choice, not BlueCross's. The

client's choice whether these were going to be in person or whether they were going to be virtual. And at the time that this was going on, the clients were resoundly choosing virtual. You heard the proof. All of 2021, every one of her clients chose virtual. All of 2022, all of her clients chose virtual.

Mr. McPherson, the only person that has testified for BlueCross on this point, claims that, oh, in his opinion, in person is just better. Okay. Well, it's kind of hard for him to even make such a statement when he's never even witnessed Dr. Benton performing her client meetings virtually.

There's been no evidence whatsoever that her virtual presentations were any less effective than her in person. Y'all haven't seen any evidence of a loss of business, of money damages, of clients being unhappy. Nothing. BlueCross has failed utterly to meet its burden of showing that Dr. Benton's proposal was an undue hardship.

So where does that leave things? Having found, number one, that Dr. Benton had a sincerely held objection to COVID; number two, that the accommodation offered to her was not reasonable; and, number three, her proposal was not an undue hardship, that means she's entitled to --

THE COURTROOM DEPUTY: Five minutes.

MR. HAMILL: -- damages. And so the damages here would be her lost pay and benefits. This is unrefuted testimony. Okay? $170,000.

She suffered emotionally. You've heard that. I'm not going to go back through that. That's up for you -- that -- the number you put there, that's for you to decide.

The last question you have to deal with is punitive damages. Number five, if you award damages in this case, do you find the plaintiff, Tanja Benton, has proven by a preponderance of the evidence that she is entitled to punitive damages?

What's the evidence on punitive damages here? The executives in this case that -- many of the HR folks that testified, they know what the law is. They told you we know exactly what the law is when it comes to religious accommodations in the workplace and the protocol. But in this case, they run -- they did an end-run. They deliberately chose not to make this an interactive process. They deliberately chose to jettison their old policy.

And when they claim that they're having an interactive process, it's lip service. Do you -- do you remember where the interactive process was? Was it at

the beginning with the employee and the company talking about how can we come to a reasonable accommodation? No. They shifted it out to the end. The company said, here it is. Now you can have your interactive process. And what -- what was the point of that? They said, well, so the employee could feel like they'd been heard. But it wouldn't change anything.

Ladies and gentlemen, this was a predetermined, rigged method, and the process was uniform for a reason.

Remember Tony Pepper? He tried to engage and advocate for some of his employees not to get -- to -- who didn't want to get vaccinated. He said we can handle it at the local level. We can handle it here. Management. They said no, no, no, no, no. This is a uniform process. Up to legal it goes. You see, the company was afraid that some of these employees would actually get accommodations. They would keep their job. And that is not what they had in mind.

The proof shows that every single person that requested a religious accommodation lost their job come November the 4th, 2021. You think that's a coincidence? You see, the company rigged -- with full well knowledge of what they were doing -- rigged this accommodation procedure to effectuate a uniform outcome, and that is exactly what they did. No employee like Dr. Benton came

out of this process with any benefit whatsoever except for a pink slip.

Thank you.

THE COURT: Thank you.

MR. BOSTON: Members of the jury, when I first met you two days ago, I asked you if you would be able to consider my client as a person and people like Ms. -- Ms. Benton is, and you said yes. I -- and I appreciate you doing so. Thank you for your time and your attention and listening to me and the courtesies you've shown.

This is the last time that we visit with one another. I have 35 minutes, which we've asked the Court to give each of us. In doing that, at the end of my comments, Mr. Hamill can return to the podium, and he can simply look at you and say everything Mr. Boston said is wrong. It's not supported. It's not there. I disagree. It's argumentative. I can't do anything other than sit and watch. This is the last time I get to come -- I can wring my hands, but that's it. Thus, I'm asking for just a little bit of your patience as I go through the points I want to summarize on behalf of BlueCross.

You notice that Mr. Hamill mentioned very briefly, in quick passing, the economic claim that his

client is making? Rest assured, Ms. Benton is telling you she wants substantial money. If I don't address it, then it will come back up to me when I'm sitting down and say he didn't even raise the money issue, he didn't even talk about it. So I'm doing it not because my client believes there's any money due, because I want to put it in context of what is being sought. If I don't, I won't have the ability ever to address it no matter what he says about it.

Is a person entitled to over 100 grand of compensation based upon what my client contends is a difference of opinion and difference of view as to how somebody is going to try to save lives? I've just heard in the trial that my client's approach was a sham and it was somehow some type of dictated, created thing to harm.

Let's go back into the context of what we faced back in 2020 and '21. It was an unprecedented pandemic where lives were being lost, and our client being a healthcare, a leader in the field, was addressing it to save people's lives as well as to help their own safety, not harm. My client has been presented in tactful language as some type of villainous operation that's trying to get rid of people, not keep people safe. That's why we went to the mandate to start with.

Recall Dr. Willis's testimony. 56 different -- 56 different medical organizations had come forward supportive of the vaccine at the time it had come into play, which it was available. It was used to return a corporate entity and organization with multiple employees back to how it was before, to evolve into it, yet the vaccine mandate has become in the presentation presented to you as some type of horrid thing that's designed to harm, and that's not the case.

The proof from the people who talked about how it was developed is it was there to help. It is there to provide comfort, safety, and a resource to keep people safe and healthy. That's why it was there. We are being accused of doing something wrong and illegal when we're trying to do something that is helpful to the entire country at the time.

In return for that, if you'll look at the jury instructions that Judge Atchley is going to give you shortly, there's a stipulation that's in there that's on -- I think it's going to be on page 9, page 10 when you look at the instructions, which will be written in. The stipulation says that Ms. Benton -- Dr. Benton was making $116,000 at the time. She is seeking from you -- that's her base salary. She's seeking from you well above that.

If you recall her cross-examination, I asked her, how did you get that? And she admitted my lawyer came up with the calculation of that. It's jumped dramatically both in base and compensation as well as what she is seeking from you. This is the back pay of -- back pay and benefits.

In addition -- in addition, she is seeking a substantial amount for benefits, which, if you'll recall the Plaintiff's Exhibit Number 22, this is her offer letter. You'll have these, by the way, when you go back to the jury room. 22 is the offer letter. It provides that she is getting -- didn't go in detail -- 401(k), 4 percent match, company paid health, fully funded HSA, a health savings account, dental coverage, long- and short-term disability, a fully stocked kitchen, unlimited paid time off, general parent -- parental leave, as well as -- as well as stock options.

She is asking you to reward her for a decision that she needed to make for her own reason in a huge amount of money. I'm asking you not to take that bait. Don't do it based upon what she has presented to you.

In addition, Dr. Benton is asking you to award her compensatory damages, some damages for pain. On what basis would you do this on this record? Dr. Benton said it was difficult, it was hard, like life in general

can be for all of us. Change is difficult. But was the compensatory damages proven? You can't do it, members of the jury, based upon sympathy, compassion, just on that. You have to be doing it on proof. And what did she prove?

Well, very quickly, Dr. Benton seems like a nice person to all of us. She is accomplished. She's educated. She's done a lot. She has a job that many, many people in the world would love to have. But did she prove that she is -- is deserving of being compensated by money in addition to her other claim?

She's able to function in her life. She takes -- takes care of her family. She still works. She's active, involved in the things she does. She has all the things that she had before. This is not a case that's deserving of your consideration for compensatory damages. It is a difference of view on a business and personal decision from both sides looking at one another. That doesn't dictate an award of damages.

Finally, Mr. Hamill mentioned the concept of punitive damages. Punitive damages are an award -- it's an opportunity to punish, to punish someone or to make an award to prevent something else from happening.

Take the latter first. There's no longer a mandate based on the government -- government action.

There was an injunction that was entered that precluded that from being done, and there's been no hint, discussion, or other references to it since that time. There is no risk that something will happen further. Even if you disagree with my client's decision before, there is no risk that it were to come back. No evidence was proposed that it could.

In addition, punitive damages are to punish somebody. Now, think back with what I said a moment ago and what you've heard from the trial. What was my client's goal with going to 800 people and saying we want you to be -- be vaccinated so that you help stop the spread of the pandemic for our people -- our people we deal with, our vendors, and our customers? Do you punish someone for doing the things that the world was doing at the time, which was attempting to stop it and attempting to address it? Did what everyone else was trying to do. Let's find a solution in -- in a here -- heretofore never experienced situation.

Is that something that you punish someone for even if you disagree with the underlying business decision? And the answer is no.

I point out each of those three things related to damages only because I don't have the opportunity ever to mention them again.

My client is asking you to answer the questions, are we liable? No. No. No in all of those. The verdict form you look at, it's -- it's your score card as to what you're doing. I'm asking you to rule in favor of BlueCross BlueShield on each of those -- on each of those situations.

Now I want to turn to those, if I may, the three questions that have to be asked. The first one is the issue of sincerely held religious belief. Awkward, difficult, concerning. Dr. Benton testified from the start, and she said I had a sincerely held religious belief. And if you'll remember, what she did was she provided -- my -- mine has gotten marked up with notes, but this is Joint Exhibit Number 7. And -- excuse me. That's -- I'm sorry. That's -- I misstated the number. Excuse me. Just a second.

MR. WOOD: Number 6.

MR. BOSTON: Joint Exhibit Number 6 was her letter that she wrote asking for the accommodation. And in it, what she has said is, "I strive to honor God in all I" -- "I do. My sincerely held religious beliefs are" -- "are all-encompassing aspect" -- "are all-encompassing aspects within my life. They govern all I do in life." Her words. Her summation. Her suggestion.

When we were talking on cross-examination about those sincerely held religious beliefs, she said, yes, I have them. She said, in essence, it's in here, and I remember pointing to my chest at one point because she said it's internal. I think her words were "they are" -- "my religious beliefs are what I profess."

There's no way to go back other than to take her word for it. There is no doctrine that she follows. There is no church, scripture, or material matter approach that she has presented to you for which we would gauge it if we were asked to do it. And that's a difficult thing for us to do 'cause we all have our internal needs, various means to get through life. But she has told you, in her own words, this is what I reflect. They are all I do in life.

When I was presenting evidence on this point, I brought forward to you, through the witnesses, several different perspectives, though, that Dr. Benton also admitted occurred. The first one of those was her postings. First one was the postings, and that was her own social media uses. I took a snippet of those -- I took six of them. And there's exhibits. Defendant's Exhibits 10 and 11. But we put them up there and -- I put them up there so you would have the different picture of the rest of her life.

Her -- her objections to the vaccine were taken and were influenced by multiple different resources that she was using and was involved in in her own life and in her own interactions with people. They're there. I didn't come creating one of them. I just showed them to you. And they show a different view. They show inconsistencies between action and behavior and comments and -- and what she did.

What were those? Remember her commentary her boss was a member of a cabal? He might be in the CIA. Where one -- where one go, we all go, which is a phrase used in some of the social organizations that are designed -- or excuse me -- they're influencing other types of reasons other than religious accommodations. We don't have any doctrine we can go to to see what a church or other organization of religion teaches or they follow and whether or not she's consistent with that.

We know she said she had taken her own vaccinations in prior times and never investigated how they were created, whether they were influenced by way of testing and/or development with aborted fetal cells. We know that she had her children vaccinated by the same thing without any investigation. We know that she took her kids out of school because of the masking needs that she was objecting to as opposed to vaccination needs.

That's inconsistent with you if you're -- if you're objecting to vaccinations.

One of the things you do is look and see if there's consistency in what you did versus what you said. And I submit to you, members of the jury, one of the decisions you have to make is did -- by a preponderance of the evidence, more likely than not -- more likely than not, did she prove to you that her objection was religious based or not? If it was not, the first question is you do not -- you find she did not have a sincerely held religious belief. And that ends the inquiry for your trial.

The second issue that we have to address in the verdict form is the one about whether or not the accommodation was reasonable. You saw what it was, and we've talked about this -- I think the right word is "ad nauseam" -- until we're sick of it. Everybody has. Were there things that were offered that were reasonably designed to accommodate a need not to be vaccinated? That is a question of judgment. It is a question of difference of opinion.

Dr. Benton would say no, they weren't reasonable. My client had pointed out in an effort to -- to explain what it did at the time, why it picked the ones it did. They were fivefold. They were in

Jennifer Shields' summary email that you saw yesterday when she was testifying. And they were presented in ways of time, resources, people, accommodation, effort, possibilities, and continuation after the relationship might be there for a rehire. Those are steps.

An employee is not entitled, members of the jury, to their accommodation. That is not the law. They are entitled to an accommodation that's reasonable under the circumstances. My client was not faced, when it put in place its mandate, with one person. It was faced with everybody that had to be considered within its organization.

If it's going to do what the mandate was for, which is help create an opportunity for safety and health to take over versus death -- death and destruction otherwise -- that's what was faced. Recall back at the time, this is not an esoteric-type issue that Mr. Hamill would want us to have perfect -- perfect guidance on, hindsight to deliver it. Didn't work that way. It didn't work that way.

The accommodation was reasonable under the circumstance, and it was designed to find some ground that would allow there to be progress towards a solution.

The third question comes. Was the -- if, in

fact, the reasonable accommodation was made, was it a hardship to do something else different or otherwise? And a lot of that comes down to Mr. McPherson's testimony, and this goes into the issue about whether or not the department could, should, needed to, or was -- needed to continue to operate temporarily as it had, which is pull back, or could it move forward back to where it was in its operation?

Now, let's -- let's take Mr. McPherson. He's the one that testified mostly about what was needed and what was required. Let's critique Mr. McPherson's opinion. He talked a lot. He also was passionate. And he also was very proud of his department.

But what was not questioned about Mr. McPherson? Two people, Tony Pepper -- Dr. Benton said he was honest, he was straightforward, he was transparent, and they would believe him. He told you why there was a need to come back to -- for face-to-face interactions. He described what it was, why it was important to the department, why it was important to the company, and why it was important to the clients. That reasoning was not impeached. It was questioned. It was not impeached.

Was he right or not? 71 percent of Dr. Benton's customers that she dealt with at the time

have come back to requesting face-to-face meetings. We know it was important. We know the company's -- this part of the company's business was based on that type of interaction, and Mr. McPherson testified why it was important to come back to it. Dr. Benton disagreed. She didn't need to -- want -- want to do it.

If you would pull up Joint Exhibit Number 6, Mr. Zeitlin.

I have one exhibit I would like to show you very quickly.

Go down to the bottom. The last page. If you'll bold up the paragraph, "the requested accommodations." The next to last paragraph. Get it all on the screen, if you would.

This -- this is what Dr. Benton is requesting, her requested accommodation. Find anywhere in there that there's any remote suggestion that I'm going to be able to come back to work as we were before, which is the meetings that annually were driven by the customers and relations with everybody else. It's not there. She, for what reasons that are important to her, put the stiff arm on it. There's not an accommodation that can be made other than what my client did after what she said.

When Dr. Benton says, "I'm willing to continue

to work in this same manner," that's the manner that had been going on during the time that we were in shutdown. It's not the way it was before. Other than throwing the mandate out the window, other than forgetting about the reason why it was put in place to start with, there's not a solution, according to what Dr. Benton has suggested to the company.

When that happens, the difference of opinion is framed. And the reasonableness of the other accommodations that were out there -- time, opportunity, the ability to transfer if there's an open position for which you're entitled -- become relevant.

Dr. Benton waited, members of the jury, till four days before the time had run before she ever started seeking other positions. If you recall her time frame, the company doesn't tell her when to go seek one or what it would be or what you're entitled to. It can't do it just for her. It's got all the other people. If it's going to act fair and equitable to everybody, it makes the opportunity available from which the individuals then will pursue it. It doesn't have the ability -- if -- if, in fact, I was seeking a job -- if I was employed and I was seeking a job and somebody went and favored, you know, another person right there, that's -- that's to my disadvantage. It doesn't work

that way.

Dr. Benton is a college-educated doctorate-level -- doctorate-level person. She has every ability to use the services, the portals, and the information at the company as everybody else. She chose not to, and the suspicion would be probably because she hoped things would change.

But she was on notice that was running. When the time runs, it runs. She had the opportunity to seek additional employment afterwards. She chose not to. She got upset with me when I was asking her about would you do it? The opportunity was there, and she worked with people that she liked who were supportive of her. Maureen Lowe, Mike McPherson were -- as she told you, were good bosses. By that time, she was jobless. She didn't have the right taste in her mouth about how she felt she had been treated, so she didn't try to continue to do so.

Two other points I wanted to make. Dr. Benton mentioned -- in part of her proof, she said I only spent 1 percent of my time that was doing face-to-face meetings. If you spend 1 percent of your time doing face-to-face meetings, does that undermine the importance, or does that increase their importance? It increases the importance 'cause that's the limited time

you have to provide the service that's applicable to that time and that action. Dr. Benton was using that arguing with me on cross-examination of -- that she was using that to point out it really wasn't important to have face-to-face time.

My client disagrees with that, and you heard why. It was very important to have the face-to-face time with customers and clients. That's how we had our business advantage. That's how we delivered our services. That's how we had grown.

Taking the analogy I think I made inartfully when I was doing my cross-examination, what if you have -- what if you have an athlete that is -- her or his event is the 100-yard dash? The 100-yard dash takes about 10 seconds to run it at a national level kind of a person. If, in fact, time is the indicator of importance, then that 10 seconds is pretty darn important for what you're doing. But it doesn't indicate that that employee is -- that athlete didn't have weeks and months and years of training and training to be ready to do it.

Dr. Benton had plenty of time to get ready to be a -- a -- an athlete in my analogy. But the time to run the race is not how you measure that. The importance of what you're doing at the time you're

running the race is what you look to. And here -- and here those face-to-face meetings are described, in my words, pretty much the bread and butter of what this department does. Dr. Benton was in a position where she couldn't do it for a reason that was important to her, but it's not an illegal reason.

The final thing I want to mention to you, members of the jury, is this, with, again, my thanks for your patience: Do you pay somebody hundreds of thousands of dollars or $100,000 or some other calculation because they have a different view of how to make a judgment call that's important at the time in an unprecedented circumstance of the healthcare crisis to you? Or do you find that it's a sham when people are trying to save lives, not harm? Do you find that some kind of contrived thing -- that people are trying to get rid of Dr. Benton when you heard she was one of the better people in the department and what she did? Or do you find it's a situation where a difference of view has resulted in an unfortunate situation for two entities, BlueCross BlueShield and Dr. Benton?

Sometimes -- members of the jury, I'm going to leave you with this thought: Sometimes two good people just shouldn't be married to one another. Regardless of there being some accusation of fault, sometimes it

doesn't work that way. And in the fall of 2021, my client submits and I argue to you -- again, my thanks for your patience -- that's what happened. That's what happened. It doesn't create illegality based upon somebody's religion just because someone asserts that that is the reason why I think it might have done so.

I ask you -- it's interesting. I appreciate my adversary's point of raising the analogy I made in voir dire about the umpire -- about the umpire. The equivalent of what Dr. Benton is asking you to do is simply shoot the umpire and simply say she and he didn't make the right call. They didn't do it right. So they are somehow wrong even if all good intentions and all good efforts and all good judgment was to make the right call. Is having to make a call in a difficult situation subject to being criticized to the point of illegality, or is it you're doing the best you can in a never heretofore circumstance?

I'm asking you to consider my comments and the proof you heard from the witness stand and those exhibits and come back and make your ruling for BlueCross BlueShield of Tennessee.

And thank you very much for listening to my comments.

THE COURT: Thank you, Mr. Boston.

MR. HAMILL: Ladies and gentlemen, as I told you at the outset, this case is not about the legalities of the vaccine mandate itself. This case is not about whether the vaccines are safe or effective. And yet time and time again throughout this case, you've heard BlueCross say we're the only ones that seem to care about people's health. Dr. Benton doesn't seem to care. I'm sorry. We have a problem with that. Did you see what her request was? To continue working virtually. How in the world can Dr. Benton be any kind of risk of spreading COVID to any clients or anyone if she's working virtually? And that's what she had been doing this whole time. That was her request.

BlueCross has used the word "unprecedented" way too many times in this case, but let me tell you when you look back at the time Dr. Benton made her accommodation requests, was there any testimony -- was -- did you hear anything that -- that would give her any opinion that, oh, things are changing, we're supposed to be going back to in person and meeting with clients? No. Tony Pepper said no, that wasn't being discussed. Mike McPherson was all over the board, but I finally got him to admit no, no clients were asking for in-person meetings. Why is she supposed to raise that as a proposal when it's not even on the table? Okay.

But I will tell you this: Do you recall Ms. Shields' testimony about what was discussed in the October 27th meeting? She admitted that Dr. Benton, at that point in time, when there were -- when she was told, oh, yeah, there's something about in person, did you hear the testimony from Ms. Shields? She said that Dr. Benton said, I'll go back in person, I'll mask, I'll social distance, I'll do periodic testing. If that's what you want me to do, I'm fine with that. BlueCross has mischaracterized throughout this whole case this theory that Dr. Benton just didn't want to meet in person and she was just going to slough off her job duties. That is so, so far from the truth.

It is undisputed in this case that Dr. Benton was a great employee. You heard from Mike McPherson it took him over six months to replace her. If Dr. Benton was such a great employee, why didn't BlueCross rehire her once it halted the vaccine mandate? That would have been a simple solution, don't you think?

And is it merely a coincidence that every single employee that requested a religious accommodation wound up losing their job? Every single one. What does that tell you about the so-called "reasonableness" of BlueCross's accommodation it offered to everybody, including Dr. Benton? It wasn't a reasonable

accommodation.

There's no evidence of undue hardship. No evidence whatsoever that there was any damage -- any potential damage that could have been done for Dr. Benton to continue doing what she had successfully been doing for 18 months.

And, ladies and gentlemen, as far as sincerely held religious beliefs, you saw her writings, her private personal writings. This is spiritual warfare. Spiritual warfare that she's been enduring for the past two months, that she believes that God's on her side. Do you want to know what's in her heart? That's what's in her heart. She lost her job because of that.

She's not asking for the moon. She's only asking for the compensation that she went through for the 13 months that she struggled. And BlueCross could have reached out to her and said the mandate's done, come on back. You were a good employee. Did they give her that opportunity? No. No.

This is a sophisticated company. They know what the law was. They knew how to get around the law. They knew how to tweak things, throw in verbiage that sounded great. Interactive process. We just want our employees to be heard. Well, we don't want them at the table with us when we're going to determine what they're

going to do because we think we know better than the employee.

That's not what the old procedure was. That was the new procedure designed for one purpose: Everyone vaccinated --

THE COURTROOM DEPUTY: Time.

MR. HAMILL: -- or you're done.

Thank you.

THE COURT: All right. Thank you, Mr. Hamill.

(Subsequent proceedings were heard but not requested to be transcribed herein.)

END OF PROCEEDINGS

I, Stephanie Fernandez, do hereby certify that I reported in machine shorthand the proceedings in the above-styled cause, and that this transcript is an accurate record of said proceedings.

s/Stephanie Fernandez
Stephanie Fernandez,
Official Court Reporter