**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA**

| | | |
|---|---|---|
| **TANJA BENTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:22-cv-00118-CEA-SKL** |
| **v.** | ) | |
| | ) | **Judge Charles E. Atchley, Jr.** |
| | ) | **Magistrate Judge Susan K. Lee** |
| **BLUECROSS BLUESHIELD OF** | ) | |
| **TENNESSEE, INC.,** | ) | |
| | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT BLUECROSS BLUESHIELD OF TENNESSEE INC.'S
RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND
MEMORANDUM OF LAW**

Defendant BlueCross BlueShield of Tennessee, Inc. ("BCBST") moved during trial at the conclusion of proof for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). (*See* ECF No. 85). The Court, having not granted the Motion, "submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." See Fed. R. Civ. P. 50(b). BCBST now renews its Motion under Federal Rule of Civil Procedure 50(b), which is supported on at least these grounds: (1) While Plaintiff labeled her purportedly sincere belief against obtaining a COVID-19 vaccination as "Christian," her testimony demonstrates there exists no reasonable dispute of fact that her objection was not premised upon a comprehensive religious belief system and thus lacks protection under Title VII; (2) the unrebutted trial proof shows that BCBST offered a workable accommodation to Plaintiff's objection but Plaintiff failed to meet her burden to make good-faith efforts to render the offered accommodation workable; and (3) BCBST put forth unrebutted evidence that it would have incurred substantial increased costs—those costs

1

to Plaintiff's business unit and BCBST's mission—if it offered Plaintiff her requested alternative accommodation.

Separate and distinct from these reasons, the Court should grant BCBST judgment as a matter of law vacating the punitive damages award because Plaintiff did not meet her burden of proof to demonstrate BCBST acted maliciously or in reckless disregard to Plaintiff's rights, which precludes an award of punitive damages.

## I.      Legal Standard

"Judgment as a matter of law is appropriate '[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Burley v. Gagacki*, 729 F.3d 610, 621 (6th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)).  A court should only grant judgment as a matter of law if "there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Id.* (quotation omitted).  Courts thus review the evidence "in the light most favorable to the non-moving party" and determine whether there was a "genuine issue of material fact for the jury." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001) (citation omitted).  Where, as here, "the court does not grant a motion for judgment as a matter of law made under Rule 50(a)," then, within 28 days of entry of judgment, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).

2

## II.    Argument

> A. <u>Plaintiff Did Not Present Sufficient Evidence that Her Objection to Being Vaccinated Against COVID-19 Was Rooted in a Sincerely Held Religious Belief.</u>

Plaintiff did not offer any testimony from which a jury could reasonably conclude that her objection to vaccination against COVID-19 was a legally protected religious belief. Her testimony demonstrates the belief is emblematic of an "isolated teaching," not part of a "comprehensive belief system," and cannot sustain her legal burden.

This Court instructed the jury at trial, "[o]nly sincerely held religious beliefs warrant protection under the law." (Tr. Jury Charge, at 16:10–11, ECF No. 99). The Court further instructed the jury that:

> Social, political, and economic philosophies, as well as mere personal preferences, are not religious beliefs protected by Title VII. However, overlap between a religion and political belief does not place the belief outside the scope of the law's religious protections as long as the belief is ***part of a comprehensive belief system and is not simply an isolated teaching***.

(*Id.* at 17:8–15) (emphasis added).

Plaintiff did not put forth evidence that her opposition to COVID-19 vaccination is part of a comprehensive belief system. Plaintiff offered her testimony that she is a Christian, (Tr. Benton Testimony, Day 1, at 6:23–24, 7:6–7, ECF No. 96), but she did not identify any Christian belief she holds that has impacted her life decisions in any way, other than opposition to abortion leading her to object to vaccination. (*see id.* 6:23–8:14, 132:20—135:3).[1] She explained that her belief required her to object to COVID-19 vaccination because "aborted fetal cell lines were used in . . .

---

[1] Plaintiff's decision to enroll her children in a Christian school, (*Id.* 8:20–23), does not suffice absent "evidence that her faith calls upon her to patronize parochial schools. . . . a preference for such an education need not itself be an aspect of religious observance, practice, or belief." *Janes v. Bardstown City of Sch. Bd. of Educ.*, No. 95-5531, 1996 U.S. App. LEXIS 24997, at *12 (6th Cir. Sept. 20, 1996) (finding plaintiff had not met her burden to show that her preference for religious education was a protected religious belief under Title VII).

3

research, development, or testing of the COVID vaccines that were authorized for use in the United States." (*Id.* 28:2–6).

Opposition to abortion is not, *per se*, religious. A secular person could believe that life begins at conception and be opposed to abortion on moral, non-religious grounds. Plaintiff did not identify any comprehensive belief system she holds. To the contrary, when asked where one could look to determine what her religious beliefs are, she could not identify an external source or doctrine, instead testifying that her beliefs are "what I profess." (*Id.* 134:3–135:3). A belief is not religious merely because a plaintiff says so. Self-pronouncement is not a comprehensive belief system.

Plaintiff's past actions further indicate that her opposition to the COVID vaccine is an isolated teaching and not part of a comprehensive belief system. Plaintiff admits she used to receive annual flu vaccinations. (*Id.* 137:20–21). She has vaccinated her children. (*Id.* 137:7–11). Plaintiff testified that she ***never even inquired*** whether any other vaccine she has taken or scheduled for her children would violate her beliefs by being derived from "aborted fetal cell lines." (*Id.*). Her past conduct, evidencing that she never before made any effort to avoid ingesting substances derived from "aborted fetal cell lines," demonstrates that her supposed religious belief necessitating accommodation is not part of a comprehensive belief system, but rather an isolated teaching, trained only upon the COVID-19 vaccine.

Likewise, Plaintiff's belief is not marked by the presence of formal and external signs characteristic of religion, (Tr. Jury Charge, at 16:17–17:7), which can be an identifier of a comprehensive belief. She neither attends formal religious services, nor ceremonial functions, nor follows any clergy, nor any religion's organizational structure, nor participates in any efforts of propagation, nor observes religious holidays (with the exception of a secular Christmas). (*Id.*

4

133:15– 135:3); (*see also* Tr. Lynn Benton Testimony, at 255:1–4, 260:7–19, ECF No. 97). Plaintiff could not identify at trial where her religious beliefs come from other than herself—and some "podcasts." (*Id.* 7:9–11, 134:25–135:3). That death is inconsistent with what the law expects of beliefs that one would recognize as "religious," for two reasons. First, her belief is emblematic of an isolated moral teaching because she did not articulate any other "Christian" belief that she holds. *See, e.g.*, *Winans v. Cox Auto, Inc.*, 669 F. Supp. 3d 394, 401 (E.D. Pa. 2023) (Dismissing complaint for failure to state a claim because it did not allege "that Plaintiff's concern with the use of fetal cell lines arises out of any comprehensive religion" nor "why Plaintiff objects to the use of fetal cell lines in the development of the COVID-19 vaccine"). Second, her "religion" is not epitomized by the "formal and external" signs emblematic of (but not necessary of) religion, such as ceremonies, rituals or clergy. *See* EEOC Compliance Manual, § 12: Religious Discrimination n.27 (explaining "'religion' is often marked by external manifestations such as ceremonies, rituals or clergy, such manifestations are not required for a belief to be 'religious.'" (citing *Malnak v. Yogi*, 592 F.2d 197, 209–10 (3d Cir. 1979))). Rather, when scrutinized, Plaintiff articulated a one-off belief against COVID-19 vaccination. While the belief would be protected under Title VII if tied to a comprehensive religious belief system, Plaintiff did not meet her burden to demonstrate that her belief is any more than an isolated teaching.

For the foregoing reasons, reasonable minds could not differ that Plaintiff failed to meet her burden to put forth evidence indicating that her opposition to BCBST's Covid-vaccine mandate was based on a legally recognized religious belief.

B. <u>No Dispute of Fact Exists that BCBST's Offered Accommodation Was Workable but Plaintiff—Because of her Misconceptions About the Accommodation and Later Hard Feelings about BCBST—Failed to Make Diligent Efforts to Make the Offered Accommodation Workable.</u>

There is a second and distinct reason from that in Subsection A, above, that supports BCBST's Motion. Where, as here, an employer offers the employee an accommodation that could, with some cooperation by the employee, eliminate the religious conflict, then the employer has met its duty under the law. The employee's failure to cooperate in good faith cannot render the offered accommodation unreasonable. *See, e.g.*, *Bruff v. N. Miss. Health Servs.*, 244 F.3d 495, 502–504 (5th Cir. 2001); *Telfair v. Fed. Express Corp.*, 567 F. App'x 681, 684 (11th Cir. 2014); *Walden v. Ctrs. For Disease Control & Prevention*, 669 F.3d 1277, 1294 (11th Cir. 2012); *see also Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987).

In *Bruff v. Northern Mississippi Health Services*, Ms. Bruff—an employee assistance program ("EAP") counselor—was assigned to counsel a woman who informed Ms. Bruff that "she was a homosexual" asking "for help in improving her relationship with a female partner." 244 F.3d at 497. Ms. Bruff declined to counsel her and—after Ms. Bruff's supervisor received a complaint from the client about Ms. Bruff's declination of counsel—Ms. Bruff sought to "be excused from . . . actively helping people involved in the homosexual lifestyle to have a better relationship with their homosexual partners." *Id.* Management determined that the accommodation was not feasible because of the burden it would impose on the two other counselors, and Ms. Bruff was placed on unpaid leave. *Id.* at 498.

The employer offered Ms. Bruff one potential accommodation: she could request a transfer and, if she did so, she would be given thirty days to find and obtain an alternative position; if unsuccessful, her employment would be terminated. *Id.* Ms. Bruff accepted the offered accommodation, applied for one open position, was not offered the position, and her employment

6

ended after the thirty-day accommodation period. *Id.*

The Fifth Circuit concluded that the employer's offered accommodation was reasonable, noting that because "Bruff displayed almost no . . . cooperation or flexibility"—she failed to comply with her "duty to cooperate in achieving accommodation of his or her religious beliefs." *Id.* at 503. The court ultimately concluded, as a matter of law, that "the Medical Center's ***offer to give Bruff 30 days*** to transfer to another position where conflict of care issues were less likely to ***arise was beyond peradventure a reasonable accommodation***." *Id.* (emphasis added).

Likewise, in *Telfair v. Federal Express Corporation*, Garett and Travis Telfair—brothers and Jehovah's Witnesses who worked for Federal Express as part-time couriers—were "redeployed" from Monday–Friday schedules to Tuesday–Saturday schedules. 567 F. App'x at 682. The Telfairs each sought religious accommodations—specifically, exemptions from Saturday work—given their faith did not permit them to work on Saturdays. *Id.* Federal Express declined to offer the Telfairs' preferred accommodation, and instead offered alternative positions that would have resulted in reductions of pay of about $5 per hour or, alternatively, the opportunity to apply for open positions during a 90-day leave of absence. *Id.* The Telfairs chose the latter, but did not apply for any jobs during their leaves of absence. *Id.*

The Eleventh Circuit, affirming summary judgment in Federal Express's favor, concluded that Federal Express's offered accommodation was reasonable as a matter of law. *Id.* at 683–84. The court, in concluding that the offer of time to obtain alternative employment was reasonable, cited its prior decision in *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012), from which the *Telfair* court explained, "***an employer satisfied its obligation of providing a reasonable accommodation to an employee by encouraging the employee to obtain new employment with the company*** and offering the employee assistance in obtaining a new

position. We further recognized *the employee had failed to comply with her own duty to make a good-faith attempt to accommodate her needs through the offered accommodation*, which had been triggered by the employer's offer of a reasonable accommodation." *Id.* (emphasis added) (internal citation omitted).

*Walden* went further than *Telfair*. In *Walden*, the employee—an EAP like *Bruff* who objected to certain counseling—insisted upon informing patients of her religious views when referring homosexual clients to other providers. 669 F.3d at 1281. Her employer admonished her for doing so. *Id.* at 1281–82. Ms. Walden refused to modify her approach to referring out homosexual clients, and she was laid off from her position. *Id.* at 1282. Given the layoff designation, Ms. Walden was provided the opportunity to be rehired by her employer, retaining her seniority for a period of one year. *Id.* Nevertheless, Ms. Walden did not apply for any positions during that time. *Id.*

The court concluded that *the layoff designation* was a sufficiently reasonable accommodation, but that Ms. Walden failed to meet her duty to cooperate in making the accommodation workable—instead insisting on her preferred accommodation—a transfer to a non-EAP position. *Id.* at 1293–95. The court effectively concluded that Ms. Walden, through her own stubbornness, did and could not render her employer's offered accommodation unreasonable. *Id.*

While the Sixth Circuit has not yet addressed whether time to obtain alternative employment that could eliminate the religious conflict is a reasonable accommodation, its approach aligns with the above sister circuits insofar as it has recognized an employee's duty to cooperate in good faith to render an offered accommodation workable. In *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987), the court recognized that:

8

> An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible.

(quoting *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1286 (8th Cir. 1977)). The *Smith* court nevertheless rejected the offered accommodation—voluntary shift-swapping when scheduled to work Sundays—as unreasonable, given the employee had a categorical religious objection to anyone working on Sundays, not just to his own Sunday work, so the accommodation could not have eliminated the religious conflict. *Id.* at 1088. The court explained, however, that "***we think it clear*** that if Smith had no religious qualms about asking others to work the Sundays he was scheduled to work, then Pyro's proposed accommodation would have been reasonable." *Id.* (emphasis added).

Here, as in *Bruff* and *Taylor*, BCBST provided Plaintiff time, access to BCBST's internal job board, and assistance by connecting her with Stephanie Jacobs to assist Plaintiff in obtaining alternative employment within the company not then subject to the vaccine mandate. (*See* Tr. Roy Vaughn, Jennifer Shields, Hal Gault Testimony, at 80:24–81:22, 122:22–124:15, 158:2–10, 159:19–23, 182:11–19, 207:9–23, 208:14–209:21, 229:16–19, 230:25–231:4, ECF No. 97). The Fifth and Eleventh Circuits, respectively, found such an accommodation to be sufficient as a matter of law to trigger the employee's obligation to make good-faith efforts to secure alternative employment within the company that would eliminate the conflict between the requirements of employment and the employee's religion.

Plaintiff did not. She testified that she spent an amount of time ***looking*** for jobs, but little time applying. (Tr. Benton Testimony, at 53:12–54:3, 55:25–57:13). She further testified that she did not request help in determining which jobs were subject to the mandate until late in the

9

accommodation period (about 4 days before the end of the accommodation period) and, when she determined to ask for the help, she was connected with Stephanie Jacobs—but did not ask any questions of her beyond those positioned to and answered in Ms. Jacobs' email. (*Id.* 60:24–63:3); (*see also* Joint Ex. 13) (indicating Plaintiff requested help on October 26, 2021). Only after receiving Ms. Jacobs' prompt response—on or about November 1, 2021—did Plaintiff apply for any jobs. (*Id.*). She testified she applied for only 2. (*Id.*). Applying for just 2 out of approximately 100 jobs does not demonstrate a good faith effort to secure alternative employment. Plaintiff's conduct after her employment ended demonstrates she knew that only applying to two jobs would likely prove unsuccessful—she applied for approximately 150 jobs with other employers. (*Id.* 77:7–9).

But, when Plaintiff failed to secure alternative employment from her two interested positions not subject to the mandate, her accommodation did not end. Rather, only the portion of the accommodation allowing her to continue to work remotely ended. When the 30-day accommodation period ended, her indefinite employment ended as well, but she was designated for rehire. (*Id.* 164:7–10). Nevertheless, she did not apply for another job with BCBST. (*Id.* 164:12–165:1). While Plaintiff was emotional in explaining why she did not continue to look for open positions within BCBST and was clearly upset with the company, that emotion does not change the fact that it was her burden to make diligent efforts to try to make the rehire accommodation workable under the law, as explained by the Eleventh Circuit in *Walden*. Plaintiff's emotional response to the offered accommodation neither rendered the offered accommodation unreasonable nor eliminated her duty to make good faith efforts to utilize it.

Plaintiff's supervisor Mike McPherson testified that, had Plaintiff reapplied after the mandate ended he would have supported her, as he had previously offered to help her however he

could. (Tr. McPherson Testimony, at 40:17–41:23, ECF No. 97).  Plaintiff testified that she knew that BCBST's mandate had by then been independently enjoined, the implication being she knew that—despite receiving an email in the weeks prior that all jobs required the vaccine—she would have been eligible for her former position in light of the injunction. (Tr. Benton Testimony, at 164:7–11).  But she did not reach out to Mr. McPherson to discuss her previous job, once it was reposted, (*Id.* at 164:12–17), when she was eligible for rehire.

For the foregoing reasons, the evidence in the record demonstrates that BCBST discharged its obligation to provide Plaintiff a reasonable accommodation as a matter of law.  By offering an accommodation that could have been workable with diligent efforts of Plaintiff—one the above-described cases suggest is reasonable—BCBST met its duty under the law. *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) ("where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end.").

C. <u>There is a Complete Absence of Evidence Rebutting BCBST's Defense that Plaintiff's Requested Accommodation Would Have Caused Undue Hardship to Plaintiff's Business Unit and/or Brand Reputation.</u>

Plaintiff, in her testimony and in her examination of other witnesses, only elicited evidence of the direct financial cost to BCBST through Plaintiff's requested accommodation.  Other costs, however, are cognizable, and can support undue hardship.

*Groff v. DeJoy*, 600 U.S. 447, 473 (2023) changed the undue hardship standard in the Sixth Circuit from a *de minimis* burden to one of substantial increased cost to the employer.  The *Groff* Court recognized that "the administrative costs of coordination with other nearby stations with a broader set of employees" could be considered as a potentially undue hardship upon remand.

In this District, Judge McDonough has since recognized that non-financial harms can still be considered in a burden analysis post-*Groff. Speer v. Ucor LLC*, No. 3:22-cv-426, 2023 U.S.

Dist. LEXIS 198889, at *20 (E.D. Tenn. Nov. 6, 2023) ("'undue hardship' does not only refer to the economic cost of providing an accommodation."). Federal courts—both before and after *Groff*—have recognized a plethora of costs that may qualify as unduly burdensome, including to health and safety, reputation, damage to the ability to achieve the employer's mission, among others—that may come into play in an undue hardship analysis. *See, e.g.*, *Id.* at *20; *Adams v. Mass Gen. Brigham Inc.*, No. 21-11686-FDS, 2023 U.S. Dist. LEXIS 174606, at *15 (D. Mass. Sept. 28, 2023); *Ryan v. Dep't of Just.*, 950 F.2d 458, 461–62 (7th Cir. 1991); *Baz v. Walters*, 782 F.2d 701, 706–07 (7th Cir. 1986); *Devore v. Univ. of Ky. Bd. of Trs.*, No. 5:22-cv-00186-GFVT-EBA, 2023 U.S. Dist. LEXIS 167239, at *11–12 (E.D. Ky. Sept. 18, 2023).

BCBST would have sustained substantial administrative costs to Plaintiff's business unit had Plaintiff's preferred accommodation been granted. Examples are ready. Mr. McPherson testified that it would have been administratively difficult to allow research scientists to trade clients. (Tr. McPherson Testimony at 64:12–65:11) (describing trading clients as "extraordinary" and explaining "if I have no clients eventually -- that fit that [desire to meet remotely], then what job do you have?"). Moreover, trading clients would have damaged BCBST's client relationships given the relationship and trust that research scientists develop with their clients. (*Id.* 65:7–66:7) ("These consultants are trusted advisors. And so it -- it would be difficult to manage a relationship where they want to meet with their trusted advisor, but every time they want to meet in person, I have to send a substitute. So that -- that's a problem."). As customers began requesting in-person meetings—and over 70% of Plaintiff's assigned clients have done so, (*Id.* 17:4–18)—the proof shows this kind of reassignment would have been a significant challenge to continually accommodate Plaintiff's need to be a remote-only employee.

Likewise, there is unrebutted proof that the policy was important to BCBST's ability to achieve its mission to keep people safe in an unprecedent time of crisis. Roy Vaughn, BCBST's Chief Human Resources Officer, and Dr. Andrea Willis, BCBST's Chief Medical Officer, each testified that prioritizing public health and safety was the purpose of the mandate policy—and core to BCBST's mission. (Tr. Vaughn and Willis Testimony, at 99:14–103:8, 113:4–21, 274:12–275:4, 282:1–283:2, ECF No. 97). Harold Gault, BCBST's, Director of Human Resources, testified that, had Plaintiff's requested accommodation—an exemption to the mandate— been granted BCBST would have essentially done away with the mandate through the exemption. (Tr. Gault Testimony, at 217:12–15, 238:8–22, ECF No. 97).

For the foregoing reasons, BCBST elicited unrebutted testimony that Plaintiff's requested accommodation would have caused it undue hardship. Plaintiff's evidence to the contrary concerned only a calculation or assessment of direct financial hardship, not non-financial costs such as discussed above. As the Court instructed, non-financial costs posed by accommodation can support a claim of undue hardship. (Tr. Jury Charge at 20:6–14). The proof offered here substantiated it.

D. Plaintiff Failed to Present any Evidence of Malice or Reckless Indifference by Any Person of BCBST that Could Support the Jury's Award of Punitive Damages.

A jury may assess punitive damages only if it finds that the alleged discriminatory conduct of the defendant's managerial employees or officers was done with malice or in reckless disregard of the plaintiff's rights. *See* 42 U.S.C. § 1981a(b)(1); *Kolstad v. American Dental Association*, 527 U.S. 526, 529–30 (1999). Here, no such proof was introduced.

13

i.      *There Exists No Evidence in the Record that BCBST Acted with Malice or Reckless Indifference Toward Plaintiff's Religious Beliefs in Enacting its COVID Vaccine Mandate.*

An action is with malice if a person knows that it violates the law and does it anyway. *Kolstad*, 527 U.S. at 529–30. An action is in reckless disregard of a plaintiff's rights if taken with knowledge that it may violate the law. *Id.* No proof was suggested through any witness that any actor of BCBST had such a state of mind. The proof was opposite.

Malice or reckless indifference will not be shown where "the employer discriminates with the distinct belief that its discrimination is lawful." *Id.* at 536–37. No proof was offered by Plaintiff of a belief that anyone connected with BCBST involved in her situation was other than acting with lawful belief.

There were two steps where Plaintiff's rights were implicated: (1) BCBST's development of the mandate; and (2) its implementation and application of it to Plaintiff. There is no evidence in the record that BCBST demonstrated malice or reckless indifference in its development of the mandate. Both Mr. Vaughn and Dr. Willis testified that its purpose was to keep people safe. (Tr. Vaughn and Willis Testimony, at 99:14–103:8, 113:4–21, 274:12–275:4, 282:1–283:2) ("we started out at the very front end saying two things we have to do: Have to protect our people and have to protect the people that we serve because this is the time when they're probably going to need us more than any other time. So this is what we -- it's part of our mission. . . . we're a health insurer, the largest in the state, and we knew that our members would need us"); ("We always -- I have always -- and definitely espoused within the company that we are a part of public health. So we just really wanted to figure out what we had to do to make sure we kept our -- kept our employees safe, our member safe, the folks we serve safe, the community in general because we are very much interwoven into the community, and the facilities interact with us a lot. So we

14

wanted to make sure we were doing our part to keep everyone safe."). That good of advancing public health and safety is the opposite of malice or reckless indifference from anyone.

Nor is there evidence in the record that BCBST demonstrated malice or reckless indifference in its application of the mandate as applied to Plaintiff. Mr. Vaughn's testimony showed that this application was narrowly drawn to apply only to public-facing (or here not relevant upper-managerial) employees. (Tr. Vaughn Testimony at 81:10–22). And, the proof showed that the accommodation would enable public-facing employees who had an objection to the mandate to investigate and seek alternative employment not subject to the mandate. (*Id.* 81:24–82:5). While Plaintiff did not like that offer, she and her employer had a difference of opinion as to the accommodation's reasonability and the importance of the vaccine policy more generally. That difference of opinion does not demonstrate malice or reckless indifference toward anyone.

Plaintiff's lone suggestion offered to support her claim for punitive damages is the fact of BCBST's change from a prior accommodation policy to that invoking the mandate. The fact that BCBST had a prior religious accommodation policy, (Pl.'s Ex. 3), designed to respond to one-off, infrequent requests for accommodations that generally concerned when people worked, and had to develop a new policy to respond to many incoming requests concerning how people worked during the pandemic, does not show malice or reckless indifference. The testimony of Jennifer Wilson established why the policy was changed and it was undisputed—for the pandemic, not to harm Plaintiff (or any other employee) with malice or willful indifference, nor with knowledge a change somehow violated the law. (Tr. Wilson Testimony 178:7–180:14, 181:18–183:1).

There is no evidence in the record whatsoever that BCBST willfully or recklessly disregarded the law in developing or applying the COVID accommodation policy. A narrowly drawn mandate, affecting public-facing employees, the group who were those that the company

deemed essential to meet its goal to keep people safe and return to normal operations, and meet its business requirements, is not evidence of malice or reckless indifference as a matter of law.

<blockquote>

ii. *Even if the Jury Could Have Reasonably Inferred that BCBST Acted with Malice or Reckless Indifference, Which it Could Not Have, BCBST Cannot Be Liable for Punitive Damages Given it Reasonably Believed a Statutory Defense to Liability Would Have Defeated the Claim of any Employee Able to State a Viable Prima Facie Case for Failure to Accommodate.*

</blockquote>

Moreover, the unrebutted evidence also suggests that BCBST had a good-faith belief that a statutory defense to liability was available, an availability which precludes a finding of malice or reckless indifference. *Kolstadt*, 527 U.S. at 536–37 (indicating that malice or reckless indifference will not be shown where "the employer discriminates with the distinct belief that its discrimination is lawful" as may occur where "an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense **or other statutory defense to liability**." (emphasis added)). Specifically, BCBST had a good-faith belief that it would suffer undue hardship from offering an alternative accommodation to Plaintiff (exemption from the mandate), given it would suffer at least *de minimis* hardship by modifying her public-facing responsibilities.

At the time Plaintiff's employment ended, a statutory defense to liability applied based on the law as it existed at the time, as Title VII does not require accommodation that would result in undue hardship to the employer, and the Sixth Circuit then applied a *de minimis* standard in assessing whether an employer would incur undue hardship from accommodating an employee's religious beliefs. *See Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508, 516 (6th Cir. 2002) (citing *Cooper v. Rubber Oak Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994)). That standard changed on June 29, 2023, when the Supreme Court's *Groff v. Dejoy* decision changed that "undue hardship" analysis within the meaning of Title VII and required the employer to show

that "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." 600 U.S. 447, 470 (2023). But in light of the then-applicable standard, there exists no evidence in the record that BCBST believed it could have accommodated Plaintiff's belief without suffering at least *de minimis* hardship.[2] To the contrary, BCBST maintains that there exists unrebutted evidence of undue hardship under the more stringent standard announced in *Groff*. *See* § II.C, *supra*. Given the evidence in the record indicates that BCBST reasonably believed a statutory defense to liability would have applied to any failure-to-accommodate claims arising out of its vaccination policy, the jury's award of punitive damages lacks evidentiary support and should be vacated.

## CONCLUSION

For the foregoing reasons, BCBST's Renewed Motion for Judgment as a Matter of Law should be granted. If not granted in full, BCBST prays that the Motion be granted in part, and that the Court vacate the jury's award of punitive damages.

/s/ Robert E. Boston
Robert E. Boston (TN BPR No. 009744)
Joshua T. Wood (TN BPR No. 035395)
David J. Zeitlin (TN BPR No. 037664)
HOLLAND & KNIGHT LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    (615) 244-6380
bob.boston@hklaw.com
josh.wood@hklaw.com
david.zeitlin@hklaw.com
*Counsel for Defendant*

---

[2] Plaintiff recognizes that, under the law that then existed, it would have been "eas[y]" for BCBST to prove its undue hardship defense. *See* Memorandum of Law in Support of Motion for Attorney Fees at 9, ECF No. 101 ("Prior to the Supreme Court's 2023 decision in *Groff v. DeJoy*, it was risky to prosecute a religious accommodation case on a contingency-fee basis because **the employer-defendant's affirmative defense could be easily met under the 'de minimis' standard**. That was the status of the law when Plaintiff sought representation in this case.") (emphasis added).

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2024, a copy of the foregoing document was served via the Court's electronic filing system.

Douglas S. Hamill
Mikel & Hamill PLLC
620 Lindsey Street, Suite 200
Chattanooga, TN 37403
423-541-5400
Email: dhamill@mhemploymentlaw.com

*/s/ Robert E. Boston*

Robert E. Boston

18