UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| TANJA BENTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-00118-CEA-SKL |
| | ) |
| BLUECROSS BLUESHIELD OF | ) |
| TENNESSEE, INC., | ) |
| | ) |
| Defendant. | ) |

## RESPONSE IN OPPOSITION TO DEFENDANT'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW

Plaintiff responds in opposition to Defendant's Rule 50(b) renewed motion for judgment as a matter of law (Doc. 104) as follows.

### I. PROCEDURAL HISTORY

This is an employment discrimination case brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, et seq. Plaintiff initiated this action on May 16, 2022, asserting that Defendant failed to accommodate her religious beliefs in connection with her accommodation request to Defendant's Covid vaccination mandate. (Doc. 1.) This case was tried to a jury for three days, beginning on June 25, 2024. At the conclusion of trial, the jury returned a verdict in Plaintiff's favor. The jury found that Plaintiff proved by a preponderance of the evidence that her refusal to receive the Covid vaccination was based upon a sincerely held religious belief. (Doc. 92.) The jury further found that Defendant failed to prove by a preponderance of the evidence that Defendant (1) offered a reasonable accommodation to Plaintiff and (2) could not reasonably accommodate Plaintiff's religious beliefs without undue hardship. (Id.) The jury

awarded Plaintiff $177,420 in backpay damages and $10,000 in compensatory damages. (Id.) Finally, the jury found that punitive damages were warranted and awarded $500,000 in punitive damages. (Docs. 92 and 92-1.) Based upon the jury's verdict, the Court entered judgment in favor of Plaintiff and against Defendant for a total amount of $687,240 on June 28, 2024. (Doc. 94.)

## II.  STANDARD OF REVIEW

A court may grant a renewed judgment as a matter of law in a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis" for its verdict. Fed. R. Civ. P. 50(a)(1). When ruling on a Rule 50(b) motion, a court may deny the motion outright, grant a new trial on any relevant issue, or grant judgment as a matter of law to the moving party. Fed. R. Civ. P. 50(b)(1)-(3). In deciding whether a party is entitled to judgment as a matter of law, the court should draw all reasonable inferences in favor of the non-moving party. *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2000). A Rule 50(b) motion for judgment as a matter of law should be granted "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Randvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007) (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001)).

## III.  LEGAL ANALYSIS

### A.  Plaintiff's Objection Was Based Upon Sincerely Held Religious Beliefs

Defendant argues that Plaintiff did not put forth evidence that her opposition to Covid vaccination is part of a comprehensive religious belief system. This argument is clearly without merit.

Plaintiff testified that she is a Christian and a follower of Jesus Christ, and that she has been a Christian her whole life. (Tr. Benton, pp. 6-7, Doc. 96.) She regularly reads the Bible, from which she seeks guidance when she is facing uncertainties in her life. (Id. p. 7.) According to Plaintiff, her Christian faith "provides the fundamental framework for how I view myself in this world, what my mission is" and that it "provides the basic underpinnings and guidance for my life." (Id.) In particular, Plaintiff explained how her Christian faith impacts her view of human life as follows: "I believe in the sanctity of human life, that we are children of God, and that our lives are sacred to him." (Id. at 9.) Specifically as to abortion, Plaintiff testified as follows about her Christian beliefs:

> I believe that God is our divine creator and he has created us in His image. I believe that life starts at conception and that the fetus is formed in God's image. I believe that God's laws prohibit the taking or killing of innocent life. So I believe that abortion is affront to God.

(Tr. Benton, p. 9, Doc. 96.)

As proof that her views on the sanctity of human life and abortion are part of a comprehensive religious belief system, Plaintiff cited several Bible passages in support of her views. (Id. at 9.) Plaintiff testified that she has held these Biblical views about abortion her whole adult life and that she has never been in favor of abortion. (Id. at 10.) Plaintiff's testimony on this topic was never rebutted at trial.

The strongest proof submitted to the jury about Plaintiff's sincerely based religious opposition to Covid vaccination were online chat messages and text messages that Plaintiff made within two months of her making a religious accommodation request. In an on-line forum while discussing objection to Covid vaccination, Plaintiff stated to the group, "For me it has been Ephesians 6:10-18 for several months now. We are engaged in a spiritual war." (Tr. Benton, p. 167-69, Doc. 96; Def. Ex. 10.) Plaintiff explained that she believed her act of objecting to Covid

3

vaccination was an act of "spiritual warfare" and "fighting something much bigger." (Id. at 169, 171.) In a text message conversation with a co-worker two days before Plaintiff was fired, Plaintiff stated in response to her co-worker's comments about potentially being fired for not complying with the vaccine mandate, "It takes tremendous courage to do what you're doing. I know God is on our side no matter what bad decisions they make." (Tr. Benton, p. 171-72, Doc. 96; Def. Ex. 11.) Plaintiff explained that she was going to choose her faith over her job and because of that, she felt that God was on her side for making the right choice. (Id. at 171-72.) This proof demonstrated to the jury that Plaintiff's opposition to the Covid vaccination was grounded in Biblical principles, which Plaintiff sincerely believed and fervently followed, even to the point of choosing her faith over her job. The undisputed proof at trial showed that Plaintiff's Christian faith greatly impacted her life decisions. Her religious opposition to Covid vaccination was not simply based upon isolated moral teachings, but upon comprehensive Biblical teachings.

Defendant argues that Plaintiff's actions related to past vaccinations somehow are fatal to her case. Defendant's argument is meritless. Plaintiff testified that she started researching the Covid vaccination because it was novel, and she was simply curious. (Tr. Benton, p. 28, Doc. 96.) She had no opinion about Covid vaccination until she researched it and learned its connection to abortion. (Id. at 28-29, 137.) Only then – in late July 2021 or early August 2021 – did she conclude that taking the Covid vaccination would violate her religious beliefs. (Id. at 29.) True, Plaintiff historically had taken the flu vaccination. (Id. at 137.) She allowed her children to be immunized without objection, but, as Plaintiff explained, "[T]here was nothing novel about them" [the vaccinations]. (Id. at 138-39.) The Covid vaccination, however, was a novel or new type of vaccination, which prompted Plaintiff to research it. (Id. at 28.) She had no reason to research previous vaccinations because they were not a new type of vaccination. Thus, Plaintiff's actions

of getting the flu vaccination and allowing her children to be immunized were not inconsistent with her sincerely held religious objection to the Covid vaccination.

Defendant also contends that Plaintiff's Christian beliefs are "not marked by the presence of formal and external signs characteristic of religion," which can be an identifier of a comprehensive belief. (Motion, p. 4, Doc. 104.) The jury instructions provided as one factor for the jury to consider whether Plaintiff's religion can be recognized "by the presence of certain formal and external signs." However, the jury instructions clearly stated that the jury "may, but [was] ***not required*** to consider" that factor. In this case, Plaintiff testified that she is "not very showy" about her Christian beliefs in that she does not wear Christian jewelry or have many Christian icons. (Tr. Benton, pp. 7-8, Doc. 96.) The jury was free to disregard this factor and still correctly conclude that Plaintiff's Christian beliefs were part of a comprehensive religious system.

Defendant briefly cites the testimony of Lynn Benton as proof that Plaintiff did not truly possess a genuine Christian faith. However, Lynn Benton's testimony and credibility were heavily discredited at trial. Lynn did not have a close relationship with Plaintiff. (Tr. Lynn Benton, p. 260, Doc. 97.) She only interacted twice per year with Plaintiff – at Thanksgiving and Christmas for only three hours each time. (Id.) Lynn had not spoken with Plaintiff about spiritual matters in over 20 years, and she never discussed the topic of spirituality with the Benton family. (Id. at 261, 265.) As Plaintiff explained during rebuttal, Lynn's lifestyle was drastically different than Plaintiff's Christian values. Lynn believes in an "open" marriage, with multiple partners in addition to her husband. (Tr. Benton, Day 2, p. 309-10, Doc. 97.) Because of this vast difference in religious beliefs, Plaintiff and her husband purposely did not pray before meals on Thanksgiving and Christmas because they did not want to offend Lynn, who admitted that she did not consider herself a religious person. (Tr. Benton, Day 2, p. 310-11, Doc. 97; Tr. Lynn Benton, Day 2, p.

5

265, Doc. 97.) Notably, Lynn never had a conversation with Plaintiff on the topic of why she had objected to the Covid vaccination. (Tr. Lynn Benton, p. 262, Doc. 97.) She finally admitted that she had no proof that Plaintiff objected to Covid vaccination based upon any other reason than a religious reason. (Id. at 269.) The jury clearly discredited Lynn Benton's testimony.

Finally, courts have held that an employee's belief about abortion, which may involve both religious and political views, are cognizable as sincerely held religious beliefs under Title VII. *See Gadling-Cole v. W. Chester Univ.*, 868 F. Supp. 2d 390, 396-97 (E.D. Pa. 2012) (emphasizing that Title VII religious discrimination claims have been held cognizable as to topics that "overlap both the religious and political spectrum, such as abortion, so long as the claims are based on a plaintiff's bona fide religious belief"). *See also Ellison v. Inova Health Care Servs.*, 2023 WL 4627437, at *6 (E.D. Va. July 19, 2023) (plaintiff linking verses from the Christian Bible about the sanctity of human life to the use of fetal cell tissues in the testing or manufacture of vaccinations adequately satisfies the sincerely religious belief requirement); *Aliano v. Twp. of Maplewood*, 2023 WL 4398493, at *7 (D.N.J. July 7, 2023) (denying a motion to dismiss when the plaintiff identified the textual source of the anti-abortion belief and explained how their understanding of the verse led them to conclude that receiving the Covid vaccine conflicted with their faith).

In summary, the jury had more than ample proof to determine that Plaintiff's opposition to Covid vaccination was based upon a sincerely held religious belief.

**B.     Defendant Failed to Offer Plaintiff a Reasonable Accommodation**

Defendant argues that its offered accommodation was "workable," but Plaintiff's lack of cooperation made it unworkable. This argument does not exactly address the reality that the jury found that Defendant failed to prove that it offered a reasonable accommodation. Certainly, disputed material facts were presented to the jury as to whether Defendant's offered

accommodation was reasonable. Plaintiff will summarize in the paragraphs that follow the evidence submitted to the jury that Defendant's accommodation was not reasonable.

The crux of this issue focuses upon the 30-day period for Plaintiff to find another position not subject to the Covid vaccination mandate, *i.e.*, whether that accommodation workable. The following evidence was sufficient for the jury to find that Defendant's accommodation was unreasonable. First, Defendant provided no affirmative assistance to Plaintiff in finding another position. It is undisputed that Plaintiff asked multiple times for a list of job vacancies not subject to the mandate, and Defendant never provided her with a list. (Tr. Benton, p. 59-60, Doc. 96; Tr. Shields, pp. 156-57, Doc. 97.) During the 30-day period, Plaintiff reviewed all job vacancies, which were maybe 100 in number. (Tr. Benton, p. 56, Doc. 96.) There was no conspicuous label on the job postings indicating whether the jobs were subject to the Covid vaccine mandate. (Tr. Benton p. 57, Doc. 96; Tr. Shields, p. 157, Doc. 97.) Thus, Plaintiff had a difficult time locating which vacant jobs did not conflict with her religious beliefs. (Tr. Benton, p. 53, Doc. 96.)

Second, Defendant's recruiting staff did not help Plaintiff match her skillset with any job vacancies or speed up the hiring process. Plaintiff several times asked for assistance in locating vacant jobs, but no assistance was given from Human Resources or Recruiting. (Tr. Benton, pp. 57, 60.) Jennifer Shields admitted that the recruiting staff was not going to help locate vacant jobs that matched Plaintiff's skillset. (Tr. Shields, p. 159, Doc. 97.) Hal Gault, who supervised the recruiting staff, did not instruct his recruiters to help Plaintiff find vacant jobs that met her qualifications. (Tr. Gault, p. 230, Doc. 97.) Nor did Mr. Gault ask hiring managers to speed up the process, given the 30-day accommodation deadline. (Id.) Essentially, Plaintiff was left on her own to find jobs that met her qualifications not subject to the vaccine mandate, as Ms. Shields admitted. (Tr. Shields, p. 159, Doc. 97.)

7

Third, there was a hiring freeze during the 30-day accommodation period. (Tr. Benton, p. 55, Doc. 96; Tr. Shields, p. 156, Doc. 97; Tr. McPherson, p. 34, Doc. 97.) The freeze slowed the process for job vacancies to be posted, which made it more difficult for Plaintiff to find another job within the narrow 30-day window.

Fourth, Defendant insisted that Plaintiff go through the competitive bid and interview process, rather than automatically offer her a vacant job if she met the minimum qualifications. (Tr. Benton, p. 60, Doc. 96; Tr. Shields, p. 157.)

Fifth, of the approximately 100 vacant job postings, Plaintiff met the minimum qualifications **for only <u>two</u> job vacancies** not subject to the mandate. (Tr. Benton, p. 64, Doc. 96.) Defendant presented no evidence to rebut this fact. Plaintiff applied for both jobs even though one paid at a lower pay grade. (Id. at 60-61, 65.) However, the hiring process was very slow. Plaintiff received notice that she was not selected for the two jobs in January 2022 and February 2022, months after the 30-day accommodation period ended. (Id. at 71-72.) Defendant did nothing to speed up the hiring process to account for the short 30-day window for Plaintiff and others like her who had received the same accommodation. (Tr. Gault, p. 230, Doc. 97.)

Sixth, even Defendant's Human Resources department knew that its 30-day accommodation period was not workable. In an October 29, 2021 email to her boss, Sr. HR Business Partner Jennifer Shields wrote the following about Defendant's accommodation proposal: "Most have responded to us with complaints about and disagreements with the process since August. **I do not think that they feel they have been benefited, nor that the 30-day accommodation was workable**." (Tr. Shields, pp. 161-63, Doc. 97; Pl. Ex. 18.)

In its motion, Defendant cites three out-of-circuit cases as support for its argument that Plaintiff failed to cooperate with Defendant, making the proffered accommodation unworkable.

8

Respectfully, the cases cited by Defendant are distinguishable. In *Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277 (11th Cir. 2012), although other positions were available, the plaintiff only once reviewed the employer's website for vacant positions and **refused to apply for any available positions**. *Id*. at 1282. Thus, the court found that she refused to accept or even attempt a reasonable accommodation. *Id*. at 1294. Likewise, in *Bruff v. N. Mississippi Health Servs., Inc.*, 244 F.3d 495 (5th Cir. 2001), the plaintiff was advised to apply for several jobs, but **she refused to do so**. *Id*. at 498-99. **The plaintiff also declined a transfer to another position**. *Id*. at 498. For these reasons, the Court found that the plaintiff had failed in her duty to cooperate. *Id*. at 502-03. In *Telfair v. Federal Express Corporation*, 567 Fed. App'x 681 (11th Cir. 2014), the plaintiffs **declined job transfers and then failed to apply for any vacant jobs,** despite being given 90 days to look for open positions. *Id*. at 682. The Sixth Circuit case of *Smith v. Pyro Mining Co.*, 827 F.2d 1081 (6th Cir. 1987) cited by Defendant simply stands for the proposition that an employee must cooperate with the employer in the accommodation process.

The evidence at trial showed that Plaintiff fully cooperated with Defendant in the accommodation process. During the 30-day period, Plaintiff reviewed all job vacancies, which were maybe 100 in number. (Tr. Benton, p. 56, Doc. 96.) There was no conspicuous label on the job postings indicating whether the jobs were subject to the Covid vaccine mandate. (Tr. Benton p. 57, Doc. 96; Tr. Shields, p. 157, Doc. 97.) Thus, Plaintiff had a difficult time locating vacant jobs not in conflict with her religious beliefs. (Tr. Benton, p. 53, Doc. 96.) Of the approximately 100 vacant job postings, Plaintiff met the minimum qualifications for only two job vacancies not subject to the mandate. (Tr. Benton, p. 64.) She applied for both jobs even though one was at a lower pay grade than her current job. (Id. at 60-61, 65.) Defendant argues that Plaintiff was slow in applying for jobs. However, as stated earlier, the job postings did not clearly identify whether

they were subject to the Covid vaccination mandate. The two jobs for which Plaintiff did apply were not posted until October 25 and October 18, respectively. (Id. at 61, 63.) The jury could reasonably infer that these job postings may have been delayed because of the hiring freeze. Regardless, once she received clarification on November 1st from recruiter Stephanie Jacobs about what language inside the job descriptions indicated that they were subject to the vaccine mandate, Plaintiff immediately applied for these two jobs. (Id. at 62, 64.) Simply stated, the proof in this case is a far cry from the blatant non-cooperation evidenced by the cases cited by Defendant.

The proof in this case showed that the 30-day accommodation period for Plaintiff to find alternative employment was not workable. Recently, a district court within the Sixth Circuit was faced with a similar scenario. In *Isensee v. Amplity, Inc.*, 2024 WL 2132419 (S.D. Ohio May 13, 2024), the plaintiff objected to her employer's Covid vaccination mandate and requested an exemption. At the time, the plaintiff's job was 100% remote. *Id*. at *1. The employer denied her accommodation request and instead, offered plaintiff the opportunity to look for other available internal jobs that were 100% remote. *Id*. at *2. Approximately 30 days later, the plaintiff was informed that the company had no current job vacancies that are 100% remote and there was no guarantee that any such vacancies would be available in the near future. *Id*.

The employer argued that it had provided a reasonable accommodation to the plaintiff. In making this argument, the employer cited the same out-of-circuit cases as Defendant cites in this case for the proposition that affording the opportunity to seek alternative positions is sufficient to accommodate the employee. *Id*. at *6. The court in *Amplity* found the cases to be distinguishable. "In all of the cases cited above, the employee was offered the opportunity to apply for positions and either neglected to do so or refused to cooperate with the defendant." *Id*. at *6. The court further explained, "The key distinction between the cases cited by Amplity and the matter at hand

10

is the availability of open positions." *Id*. The record evidence showed that there were no open positions for the plaintiff. "It is not a reasonable accommodation to suggest that a plaintiff could apply for positions that do not exist or where the prospect of those positions existing is uncertain. This would undermine the requirement that the employer find a reasonable accommodation." *Id*.

Much like the scenario in *Amplity*, the availability of open positions for Plaintiff was slim. There was a hiring freeze during the 30-day period. Defendant did not conspicuously identify which job openings were subject to the Covid vaccination mandate, and Defendant would not even provide Plaintiff with a list of openings not subject to the mandate. Moreover, of the approximately 100 openings, Plaintiff was only qualified for two. Despite having a narrow 30-day window before termination, Defendant was not in a hurry to select candidates for these job openings. Simply put, because of the obstacles created by Defendant and the slim availability of job openings for Plaintiff, the 30-day accommodation offered was not reasonable.

In summary, Defendant simply failed to carry its burden of proving that its accommodation was a reasonable accommodation under the law. Plaintiff provided more than sufficient evidence upon which the jury could determine that the proffered accommodation was not reasonable and unworkable from the start.

### C. Plaintiff's Requested Accommodation Did Not Cause Undue Hardship

Defendant failed to carry its burden of proof that Plaintiff's requested accommodation caused an undue hardship. In its motion, Defendant claims that Plaintiff only presented evidence on the lack of economic harm, but no evidence of non-economic harm. Defendant's argument completely misses the mark.

Defendant is correct that there was no proof presented at trial of any economic harm caused by granting Plaintiff's specific accommodation request to continue meeting with clients virtually.

Plaintiff's supervisor, Mike McPherson, admitted that there was no loss of money directly related to Plaintiff interacting remotely with her clients. (Tr. McPherson, p. 26, Doc. 97.) Importantly, Tony Pepper, who was responsible for Major Account clients for whom Plaintiff serviced, testified, without objection, that Defendant would not have suffered any harm whatsoever to its business operations by allowing Plaintiff to continue meeting remotely with her clients. (Tr. Pepper, p. 189, Doc. 96.)

Defendant insinuates that it would have incurred non-economic costs by granting Plaintiff's specific accommodation request. McPherson claimed that it would have been administratively difficult to allow research scientists to trade clients. However, the proof demonstrated that no client trading would have happened, or was even contemplated, by allowing Plaintiff to continue meeting virtually with clients. In the fall of 2021, none of Plaintiff's clients expressed a desire to resume in-person meetings. (Tr. McPherson, p. 29, Doc. 97.) In fact, in August and September 2021, no Major Account clients were asking to resume in-person meetings. (Tr. Pepper, p. 188, Doc. 96.) Even in 2022, none of Plaintiff's clients requested in-person meetings. (Tr. McPherson, p. 30, Doc. 97.) Furthermore, in August and September 2021, there was no discussion by management about resuming in-person client meetings. (Tr. Pepper, p. 188, Doc. 96.)

Moreover, no client trading was necessary because the proof showed that Plaintiff was just as effective in her role interacting with clients virtually as she was in-person. According to Plaintiff, her virtual client interactions were just as effective as her in-person client interactions. (Tr. Benton, p. 23-24, Doc. 96.) Mr. McPherson never attended any of Plaintiff's virtual client meetings. (Id. at 23.) Accordingly, Mr. McPherson admitted that he had no way of knowing whether Plaintiff was any less effective when interacting with clients virtually. (Tr. McPherson,

p. 69, Doc. 97.) Importantly, no client indicated that Plaintiff's virtual presentations were somehow less effective. (Id. at 24.) Finally, Mr. Pepper testified that it was not essential to the client relationship for Plaintiff to participate physically in-person at client meetings, so long as she could interact virtually. (Tr. Pepper, p. 188-89, Doc. 96.) Based on this evidence, the jury reasonably rejected Mr. McPherson's claim that granting Plaintiff's accommodation request would necessitate client trading among Plaintiff's coworkers.

Defendant's only other non-economic "hardship" argument likewise fails. Defendant claims that the Covid vaccination mandate was important to its "ability to achieve its mission to keep people safe in an unprecedented time of crisis." (Motion, p. 13, Doc. 104.) Defendant cites the testimony of Hal Gault that granting Plaintiff's accommodation request "would have essentially done away with the mandate." (Id.) Respectfully, this argument is completely devoid of merit. First, Hal Gault did **not** testify that granting Plaintiff's accommodation request would have essentially done away with the mandate. He actually testified to the contrary.

> Q: So if Ms. – if Dr. Benton had come to you and said I need to be exempted from this, would that have done away with the purpose of the mandate?
>
> A: No.

(Tr. Gault, p. 238:13-16, Doc. 97.)

Second, assuming Mr. Gault did testify in the manner characterized by Defendant in its brief, that testimony could easily be rejected by the jury. Remember, Plaintiff's specific accommodation was to interact with clients **virtually**. Granting this request would not have placed clients in harm of contracting Covid because Plaintiff could not transmit Covid virtually. Plaintiff's accommodation request was squarely in line with the mandate's stated purpose – to keep people safe. There is simply no evidence that granting Plaintiff's accommodation request would have put anyone at risk for the spread of Covid. Period.

13

In summary, Defendant failed to carry its burden on this issue because Defendant failed to show a substantial increased cost of any type – financial or otherwise – tied to Plaintiff's request to continue meeting virtually with her clients.

### D.     Jury's Award of Punitive Damages Was Warranted

Defendant argues that Plaintiff presented no proof that its discriminatory conduct was done with malice or in reckless disregard of Plaintiff's federally protected rights. Defendant is wrong. Plaintiff presented the following evidence to support the jury's award of punitive damages.

Defendant's executives intentionally devised a scheme to uniformly deny all religious accommodation requests and to ensure the speedy termination of any employees asserting their Title VII rights. First, the two main executives involved in this scheme – Chief Human Resources Officer Roy Vaughn and HR Director Hal Gault – were fully cognizant of Title VII's religious accommodation laws. (Tr. Vaughn, p. 73, Doc. 97; Tr. Gault, p. 218, Doc. 97.) Second, Defendant already had in place a religious accommodation procedure in 2021 formulated by Mr. Gault when Defendant hatched its scheme. (Tr. Gault, p. 219, Doc. 97.) The existing procedure allowed the supervisor of the requesting employee to determine whether the accommodation request could be granted or whether it was an undue hardship. (Id. at 220.) But Defendant chose not to follow the existing procedure for accommodation requests to the Covid vaccination mandate. (Id. at 220-21.)

Mr. Vaughn and Mr. Gault together drafted a new procedure for handling religious accommodation requests to the vaccination mandate. (Tr. Gault, p. 221, Doc. 97.) Under the new procedure, the employee's supervisor was completely removed from the process. (Id. at 222.) Additionally, the front-line HR Business Partner's decision-making role was also removed. (Id. at 223.) Instead, the HR department, including the HR Business Partner, simply functioned as a funnel or conduit of information between the employee and the legal department. (Tr. Gault, pp.

14

223, 226, Doc. 97; Tr. Shields, p. 214, Doc. 97.) No one in the Human Resources department even read the employees' accommodation requests. (Tr. Gault, p. 224, Doc. 97; Tr. Vaughn, pp. 83-84, Doc. 97; Tr. Shields, p. 25, Doc. 97.)

Notably, Mr. Vaughn and Mr. Gault intentionally included an "interactive process" requirement in its new procedure. (Tr. Vaughn, p. 77, Doc. 97; Joint Ex. 2.) Mr. Vaughn understood the interactive process to be a back-and-forth dialogue between the employee and HR and Legal to discuss possible alternative accommodations. (Tr. Vaughn, pp. 77-78, Doc. 97.) Mr. Vaughn clarified his understanding of the interactive process requirement as follows:

> Q: And so the fluidity that you're talking about, that was why there's supposed to be a back-and-forth dialogue between the employee on the one hand and HR on the other hand; correct?
>
> A: The – yes, absolutely, to – to consider –
>
> Q: Now –
>
> A: -- any information that they would want to present.
>
> Q: **And discuss any possible alternatives or any concerns that the – employer might have saying hey, I'm not sure about this, would you consider this? That was part of the back-and-forth process, wasn't it?**
>
> A: To – to be clear, Mr. Hamill, it is not – it is not – it doesn't mean that we accept all alternatives or options. It was meant to have a dialogue about the process. **And so, ultimately, yes, that's why it was in there.**

(Tr. Vaughn, pp. 79:15 – 80:6, Doc. 97.)

Despite "paying lip service" to the law's requirements, such as an open dialogue with employees when considering accommodation requests, Defendant did not intend to allow any employee to have input into the company's accommodation considerations. Instead, Defendant predetermined the accommodation it would offer to any employee who objected to the vaccine mandate on religious grounds. As written in the new procedure, which was attached to a

15

September 1, 2021 email from Hal Gault to his staff, Defendant had already decided that, "[a]s a general matter, the company views requests for an accommodation in the form of maintaining current job functions . . . but not getting fully vaccinated is unduly burdensome to the company." (Joint Ex. 2.) This undue hardship decision, as well as the accommodation to be offered, was made at least one week before any employee could even request an accommodation to the mandate. See Pl. Ex. 5 (Email from Ms. Shields to Plaintiff stating that HR would begin accepting accommodation requests on September 7, 2021). Thus, Defendant's undue hardship analysis and accommodation determination were made without knowledge of the identity of the objecting employees or any details about their positions. As Roy Vaughn admitted, when deciding the accommodation to offer, the executives had no knowledge of the frequency and extent of the employees' public interactions. (Tr. Vaughn, p. 90, Doc. 97.) The same, one-size-fits-all accommodation was given to every employee who requested a religious accommodation. (Id. at 82-83.) No back-and-forth dialogue occurred with Plaintiff (or any objecting employee) before Defendant offered her the predetermined accommodation. (Id. at 86-87.) Ms. Shields also admitted that no back-and-forth dialogue occurred with Plaintiff before the company's accommodation proposal was made. (Tr. Shields, pp. 149, 151-52, Doc. 97.) The jury could reasonably infer that Defendant did not want the employee's input into the accommodation considerations. Mr. Vaughn even admitted that the company was not going to change its mind about the accommodation being offered. (Tr. Vaughn, pp. 87, 130-31, Doc. 97.)

The law requires an employer to consider all options before making a reasonable accommodation determination. *See Groff v. DeJoy*, 600 U.S. 447, 473 (2023) ("an employer must consider other options to resolve the employee's religious conflict"). In this case, the jury heard deposition testimony from Mr. Vaughn where he could not answer for certain whether Defendant's

executives, including himself, considered options of masking and social distancing. (Tr. Vaughn, pp. 126-27, Doc. 97.) Both Mr. Vaughn and Dr. Andrea Willis admitted that there was no documentation showing what accommodation options, if any, the executive team considered when it determined the accommodation to be offered to all objecting employees. (Tr. Vaughn, pp. 128-29, Doc. 97; Tr. Willis, pp. 296-97, Doc. 97.) Again, from this evidence, the jury could reasonably infer that Defendant did not consider all options, but instead picked its desired path to follow in reckless disregard of the religious accommodation rights of its workforce.

The scheme to purposely avoid input from lower-level management was highlighted by the trial testimony of Tony Pepper. He testified that three of his staff voiced an objection to Covid vaccination. (Tr. Pepper, p. 186, Doc. 96.) Mr. Pepper and his subordinate manager assessed the situation and determined that they could accommodate the objecting employees without any detriment to business operations. (Id.) Mr. Pepper approached HR Business Partner Jennifer Shields and explained the employees' objections and that accommodations could be managed by the team. (Id.) This was exactly the scenario that Defendant's executives wished to avoid – Covid vaccination accommodations actually being handled (and granted) at lower levels. Based on this evidence, the jury could have reasonably inferred that Defendant's executives removed lower-level management involvement from the accommodation process because, otherwise, many employee accommodation requests might be granted.

Finally, the jury was presented with statistics that further highlighted a uniform scheme of "rigging" the accommodation process to achieve a uniform outcome. Defendant received 60 employee accommodation requests to the public-facing Covid vaccination mandate. (Tr. Vaughn, p. 91, Doc. 97; Pl. Ex. 26.) Of the 60 employees who requested accommodations, none were allowed to remain in their jobs without being vaccinated. (Id. at 92.) Notably, not a single

17

employee who requested a religious accommodation remained employed after the November 3, 2021 deadline. (Id. at 132.) These statistics do not show haphazard circumstances. Rather, the facts and figures demonstrate an intentional scheme to "rig" or skew the legal accommodation process to effectuate a uniform outcome – that no employee's specific religious accommodation request would be granted and that all objecting employees would be discharged.

A Title VII plaintiff may recover punitive damages upon a showing that the defendant engaged in a "discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In the present case, the jury was presented with sufficient evidence that Defendant recklessly disregarded the religious rights of its employees by implementing its discriminatory accommodation policy. Discriminatory personnel policies can form the basis of a punitive damages award. *See, e.g., EEOC v. Mike Fink Corp.*, 1998 WL 34078445, at *6 (M.D. Tenn. July 17, 1998) (denying summary judgment as to punitive damages where evidence showed that employer intentionally utilized a male-only hiring policy, noting a triable issue of fact that the employer recklessly disregarded the rights of female applicants in following the challenged policy).

Defendant argues that, because it implemented the Covid vaccination mandate to keep people safe, punitive damages are not warranted. This argument misses the mark for three reasons. First, Plaintiff's claim does not challenge the legality of the mandate itself. Rather, Plaintiff's claim (and the underlying basis for awarding punitive damages) addresses how Defendant responded to religious accommodation requests to the mandate. Second, just because Defendant claims to have an altruistic motive does not make it so. The jury was free to disbelieve Defendant's assertions as to why it implemented the mandate. Nor does an altruistic motive justify Defendant's

18

flagrant violations of religious accommodation law. Just because an employer believes to be acting for the public good does not give it license to trample upon its employees' statutory rights. Third, Defendant's "altruistic" motive argument is not a complete defense to punitive damages, particularly in the context of formulating company-wide personnel policies. This argument might address the issue of malice, but it fails to address the "reckless disregard" basis for assessing punitive damages. As one district court explained when faced with a similar argument:

> Defendant's primary argument is that its actions and policies regarding pregnant waitresses were the result of concern for the waitresses, not malice. In making this argument, Defendant neglects the fact that malice is not the sole basis for an award of punitive damages. Punitive damages may also be awarded as a result of reckless indifference or callous disregard for an individual's federally protected rights.
>
> While Defendant may rightly argue that its alleged concern for the health and safety of the waitresses and customers precludes a finding of "callous" disregard, such an argument does not help Defendant on the subject of reckless indifference. Simply because Defendant may have been concerned about the health of a waitress does not mean that Defendant's policies did not exhibit a reckless disregard for that waitress's federally protected rights.

*EEOC v. W & O, Inc.*, 36 F. Supp. 2d 1348, 1350 (S.D. Fla. 1998).

Finally, Defendant argues that it had a good-faith belief that it would suffer undue hardship from offering an alternative accommodation to Plaintiff. In making this argument, Defendant alleges that its good-faith belief was based upon the *de minimis* undue hardship standard which existed before the Supreme Court's decision in *Groff v. DeJoy*, 600 U.S. 447 (2023). Respectfully, this argument stretches credulity. First, Defendant does not cite any witness testimony or trial exhibit to support its good-faith-belief argument. The argument is conclusory without any evidentiary underpinnings. Second, Defendant's argument completely ignores the fact that the *Groff* decision did not change the law with respect to whether a religious accommodation is reasonable. The *Groff* decision only addressed the undue hardship defense, not the employer's burden of proving that it had offered a reasonable accommodation. Even before *Groff*, the law

19

was clear that employers could not completely bypass the employee's involvement in the accommodation process, *i.e.*, that bilateral cooperation was required in addressing whether a reasonable accommodation could be offered. It is axiomatic that, in order for an accommodation to be considered, the employer would need to at least know the employee's identity and the details of the employee's particular job. But Defendant made the risky calculation to determine the religious accommodation in this case before it even knew of Plaintiff or any details of her particular job. Defendant cannot now cry victim of the *Groff* decision when its blatantly discriminatory behavior would have failed any pre-*Groff* legal challenge.

### IV. CONCLUSION

For the reasons stated herein, Defendant's motion should be denied.

Respectfully submitted,

**MIKEL & HAMILL PLLC**

By: s/ *Doug S. Hamill*
Doug S. Hamill, BPR No. 022825
Attorney for Plaintiff
620 Lindsay Street, Suite 200
Chattanooga, TN 37403
(423) 541-5400
dhamill@mhemploymentlaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of July, 2024, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

By: s/ *Doug S. Hamill*