# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| TANJA BENTON, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 1:22-cv-118 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| BLUECROSS BLUESHIELD OF | ) | Magistrate Judge Dumitru |
| TENNESSEE, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiff Tanja Benton's Motion for Interim Statutory Attorney Fees and Prejudgment Interest [Doc. 100], Defendant BlueCross BlueShield of Tennessee, Inc.'s ("BCBST") Renewed Motion for Judgment as a Matter of Law [Doc. 104], and BCBST's Motion to Alter or Amend the Judgment [Doc. 105]. For the following reasons, Benton's Motion [Doc. 100] is **GRANTED**, BCBST's Renewed Motion for Judgment as a Matter of Law [Doc. 104] is **DENIED**, and BCBST's Motion to Alter or Amend the Judgment [Doc. 105] is **GRANTED**.

## I.    BACKGROUND

Tanja Benton filed this action against her former employer, BCBST, on May 16, 2022, alleging that BCBST failed to accommodate her religious objection to the company's COVID-19 vaccine mandate. [Doc. 1]. She brought two failure to accommodate claims, one under Title VII and the other under the Tennessee Human Rights Act. [*Id.*]. BCBST, unsurprisingly, denied Benton's allegations. [Doc. 10]. Later, Benton moved for summary judgment. [Doc. 40]. The Court denied this motion after finding there was a genuine dispute as to whether Benton's objection to the COVID-19 vaccine mandate was based on a sincerely held religious belief. [Doc. 69]. With summary judgment denied, the case proceeded to trial.

At trial, BCBST moved for judgment as a matter of law, which the Court took under advisement. [*See* Docs. 85–86; Doc. 97 at 315–25; Doc. 98 at 2]. The trial proceeded, and the jury ultimately found in Benton's favor. [Doc. 94]. Specifically, the jury found: (1) that Benton had proven by a preponderance of the evidence that her refusal to receive the COVID-19 vaccine was based upon a sincerely held religious belief; (2) that BCBST had *not* proven by a preponderance of the evidence that it offered Benton a reasonable accommodation; and (3) that BCBST had *not* proven by a preponderance of the evidence that it could not reasonably accommodate Benton's religious beliefs without undue hardship. [*Id.*]. Based on these findings, the jury awarded Benton $177,240.00 in back pay damages and $10,000.00 in compensatory damages. [*Id.*]. The jury, by separate verdict, further found that Benton had proven by a preponderance of that evidence that she was entitled to punitive damages and awarded her an additional $500,000.00. [*Id.*].

In the months that followed, the parties filed the three motions currently pending before the Court. [*See* Docs. 100, 104–05]. Of these motions, the Court will first examine BCBST's Renewed Motion for Judgment as a Matter of Law [Doc. 104] as its resolution impacts the analysis of the other two

## II.    BCBST'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

BCBST asserts that it is entitled to judgment as a matter of law for three reasons. First, BCBST asserts that Benton's objection to the COVID-19 vaccine was not based on a sincerely held religious belief and therefore lacks protection under Title VII. [Doc. 104 at 1]. Second, BCBST asserts that the unrebutted proof shows that it offered Benton reasonable accommodations but that she failed to put forth the good faith effort needed to make them workable. [*Id.*]. Third and finally, BCBST asserts that the unrebutted proof it would have incurred substantial increased costs if it provided Benton her requested accommodation.

In addition, BCBST also asserts that even if it is not entitled to judgment as a matter of law regarding liability, it is nevertheless entitled to judgment as a matter of law regarding the availability of punitive damages because Benton could not establish that BCBST acted maliciously or with reckless disregard to her rights. [*Id.* at 2].

For the following reasons, BCBST's Motion [Doc. 104] is **DENIED**.

### A. Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure provides that "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a)," then "the movant may file a renewed motion for judgment as a matter of law" no later than 28 days after the entry of judgment or, "if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged[.]" "A court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting FED. R. CIV. P. 50(a)(1)). In determining whether this standard has been met a court "may not weigh the evidence, question the credibility of witnesses, or substitute [its] own judgment for that of the jury." *Smith v. Rock-Tenn Servs.*, 813 F.3d 298, 306 (6th Cir. 2016). "Instead, a renewed motion pursuant to Rule 50(b) may only be granted when, 'viewing the evidence in a light most favorable to the non-moving party [and] giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.'" *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 683 (6th Cir. 2024) (alteration in original) (quoting *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012)). Succeeding on such a motion requires a party to overcome "the substantial deference owed a jury verdict." *Id.* (internal quotation marks

omitted).

**B. Analysis[1]**

> **1.** *A reasonable jury could find BCBST liable for religious discrimination.*

>> **a.** A reasonable jury could find that Benton's opposition to BCBST's COVID-19 vaccine mandate was based on her sincerely held religious beliefs.

BCBST asserts that it is entitled to judgment as a matter of law because "[Benton] did not offer any testimony from which a jury could reasonably conclude that her objection to vaccination against COVID-19 was a legally protected religious belief." [Doc. 104 at 3]. It asserts that her vaccine opposition is emblematic of an "isolated teaching" as opposed to a "comprehensive belief system" that receives legal protection. [*See id.* at 3–5]. In response, Benton asserts that she provided ample evidence that her COVID-19 vaccine opposition stems from her sincerely held religious beliefs, specifically her beliefs surrounding abortion and the sanctity of human life. [Doc. 107 at 2–6]. The Court finds that Benton has the better argument.

To establish a prima facie case of religious discrimination—such as Benton's failure to accommodate claim—a plaintiff employee must establish: (1) that she holds a sincere belief that conflicts with an employment requirement; (2) that she informed her employer of the conflict; and (3) that the employer took an adverse employment action against her because of her failure to comply with the conflicting employment requirement. *Sturgill v. Am. Red Cross*, 114 F.4th 803, 809 (6th Cir. 2024). In this case, the parties only disputed the first element of Benton's prima facie case, and it is this element that BCBST challenges through its assertion that Benton failed to introduce any evidence from which the jury could reasonably conclude that her opposition

---

[1] The Court's analysis of BCBST's Motion does not distinguish between Benton's federal and state failure to accommodate claims as both claims are analyzed identically. *Cox v. Little Clinic of Tenn., LLC*, 858 F. App'x 176, 179 (6th Cir. 2021).

stemmed from a sincerely held religious belief. As Benton correctly notes, however, she testified at length about the role her religion plays in her life and how her faith informed her opposition to the COVID-19 vaccine.

Benton testified at trial that she has been a Christian her whole life. [Doc. 96 at 6–7]. She stated that she reads the Bible "[f]airly regularly" and will "seek the scripture for guidance" and "inspiration." [*Id.* at 7]. She further testified that she participates in podcast-based Bible study and that she prays "for guidance" and "to show gratitude to God." [*Id.*]. When asked how important her Christian faith was to her, Benton stated, "It's very important. It provides the fundamental framework for how I view myself in this world, what my mission is. It provides the basic underpinnings and guidance for my life." [*Id.*]. After describing these general tenets of her faith, Benton discussed her views concerning abortion and the sanctity of life, testifying:

> I believe that God is our divine creator and he has created us in his image. I believe that life starts at conception and that the fetus is formed in God's image. I believe that God's laws prohibit the taking or killing of innocent life. I believe that abortion is the taking of innocent life. So I believe that God views abortion as murder, and I believe that abortion is an affront to God.

[*Id.* at 9]. She then went on to cite Bible passages in support of her views and stated that she has opposed abortion her entire adult life. [*Id.* at 9–10].

Benton later linked her views on abortion to her opposition to the COVID-19 vaccine. She testified that after researching the vaccine, she learned that "aborted fetal cell lines" were used in the "research, development, or testing of the COVID vaccines that were authorized for use in the United States." [*Id.* at 28]. Benton testified that because of this link to abortion, her faith precluded her from getting the vaccine. [*Id.* at 27–29]. She reiterated this belief in her request for a religious accommodation—which was both admitted as an exhibit and partially read to the jury. [*Id.* at 32–36; Joint Ex. 6]. Finally, Benton offered several written messages at trial discussing opposition to

the COVID-19 vaccine and linking it to her faith. [*See* Doc. 96 at 170–73; Def. Exs. 10–11].

BCBST attempts to undercut this evidence by asserting that Benton's opposition to the COVID-19 vaccine is an "isolated teaching" as opposed to a comprehensive belief system that is entitled to legal protection. [Doc. 104 at 3–5]. It attempts to support this position by pointing out that opposition to abortion is not *per se* religious, that Benton and her children previously received other non-COVID vaccines, and that her claimed belief "is not marked by the presence of formal and external signs characteristic of religion." [Doc. 104]. But none of these arguments establishes that no reasonably jury could find in Benton's favor.

Starting with the presence of formal and external signs of religion, "[a]lthough 'religion' is often marked by external manifestations such as ceremonies, rituals or clergy, such manifestations *are not required* for a belief to be 'religious.'" EEOC Compliance Manual § 12-I(a)(1) n. 27 (Jan. 15, 2021) (emphasis added) (citing *Malnak v. Yogi*, 592 F.2d 197, 209–10 (3d Cir. 1979)). Accordingly, the jury was instructed that they could, but were not required, to consider "the presence of certain formal and external signs" when "determining if an observance, belief, or practice is religious."[2] [Doc. 99 at 16–17]. Thus, while BCBST is correct that Benton does not appear to outwardly display her faith, [*see* Doc. 96 at 7–8], a reasonable jury could still have concluded that her opposition to the COVID-19 vaccine was religiously based.

Turning next to previous vaccinations, Benton did not testify that she opposed vaccines generally but rather that her opposition to the COVID-19 vaccine was based on the vaccine's use of "aborted fetal cell lines." [*See id.* at 27–29]. And while she testified that she did not research other vaccines to see if they also used "aborted fetal cell lines," the jury could have reasonably credited her explanation that she did not research these prior vaccines because they were not

---

[2] BCBST did not object to this jury instruction. [Doc. 98 at 11–12].

"novel." [*See id.* at 137–39]. Furthermore, "[a] religious belief 'need not be acceptable, logical, consistent, or comprehensible to others in order to merit' protection[.]" *DeVore v. Univ. of Ky. Bd. of Trs.*, 118 F.4th 839, 845-46 (6th Cir. 2024) (quoting *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)). The fact that Benton objects to some but not all vaccines does not preclude a reasonable jury from concluding that her opposition to the COVID-19 vaccine was based on a sincerely held religious belief.

Looking finally at the fact that opposition to abortion is not *per se* religious, this is a correct statement. BCBST, however, is not correct when it asserts that Benton "could not identify an external source or doctrine" underlying her beliefs. [Doc. 104 at 4]. As the Court has already noted, Benton testified at length regarding her views on abortion, the Biblical basis for those beliefs, and how those beliefs informed her views on the COVID-19 vaccine. [Doc. 96 at 6–10, 27–29, 32–36, 170–73]. A reasonable jury could have credited her statements and concluded that her opposition to abortion—and by extension the COVID-19 vaccine—was religiously based. Thus, whether BCBST is entitled to judgment as a matter of law depends on whether a reasonable jury could have found against it regarding both of its affirmative defenses.

> **b.** A reasonable jury could find that Benton cooperated with BCBST's efforts to accommodate her but that BCBST's proposed accommodations were unreasonable under the circumstances.

BCBST contends that it provided Benton with two reasonable accommodations that she failed to take advantage of. [Doc. 104 at 6–11]. Specifically, it asserts that it provided Benton the opportunity to apply for alternative employment within BCBST not subject to the COVID-19 vaccine mandate and that it designated her for rehire after her termination. [*Id.* at 9–11]. BCBST further assert that Benton failed to meaningfully take advantage of these opportunities and that her failure to cooperate cannot render these otherwise reasonable accommodations unreasonable. [*Id.*].

7

Because the provision of a reasonable accommodation is a defense to liability, BCBST asserts that it is entitled to judgment as a matter of law. [*d.* at 11]. Benton disputes whether the opportunity to apply for alternative positions was reasonable, especially considering the lack of support she testified she received from BCBST but does not address BCBST's arguments concerning the reasonableness of designating her for rehire. [Doc. 107 at 6–11].

If an employer reasonably accommodates an employee's religious needs, "the statutory inquiry is at an end[,]" and the employer cannot be held liable for failure to accommodate. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986); *see also Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987). Determining whether an accommodation is reasonable requires a case-by-case analysis because "what may be a reasonable accommodation for one employee may not be reasonable for another." *Smith*, 827 F.2d at 1085. That said, an "employee must make some effort to cooperate with an employer's attempt at accommodation" in all cases. *Id.*

> "An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible."

*Id.* (quoting *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir. 1977)).

BCBST asserts that Benton failed to cooperate with its attempts to accommodate her by applying to only two of roughly 100 positions that were available during the 30-day period it provided Benton to seek alternative employment. [Doc. 104 at 9–10]. It also asserts that Benton failed to seek any assistance regarding which positions were subject to the mandate until mere days before the 30-day period concluded. [*Id.*]. BCBST claims that it was this lack of diligence that made the accommodation unworkable, not any inherent unreasonableness of the accommodation itself. [*See id.*]. Benton responds by asserting that the evidence was sufficient for

a jury to conclude that BCBST's accommodation was unreasonable given the difficulties she experienced locating a position that she was both qualified for and which did not conflict with her religious beliefs. [Doc. 107 at 7–8]. As further evidence of the accommodation's unreasonableness, Benton claims that BCBST did not take affirmative steps to help her identify and obtain an alternative position within the company. [*Id.*].

Benton testified at trial that she reviewed the job postings for all of the roughly 100 open positions but that she had difficulty identifying which of these positions were not subject to BCBST's COVID-19 vaccine mandate. [Doc. 96 at 53, 56–57]. She further testified that despite the number of postings overall, "[t]he pickings were slim" regarding the number of positions she met the minimum qualifications for. [*See id.* at 53–54]. Benton also complained about the lack of affirmative support she received from BCBST, stating, among other things, that it never provided her with a list of positions not subject to the COVID-19 vaccine mandate and that it was only after she was told to look for the phrase "various immunizations and/or associated medical tests may be required for this position" that she was able to discern what positions required vaccination against COVID-19. [*See id.* at 60]. Benton ultimately applied to two positions—both of which were posted partway through her 30-day period to find alternative employment—but was selected for neither. [*See id.* at 60–63, 66].

BCBST contends that the foregoing shows its accommodation was reasonable, but that Benton rendered it unworkable through her lack of cooperation. [Doc. 104 at 6]. It cites two cases in support of this position: *Bruff v. Northern Mississippi Health Services* from the Fifth Circuit and *Telfair v. Federal Express Corporation* from the Eleventh. [*Id.* at 6–10]. Both are distinguishable.

In *Bruff*, the plaintiff, a counselor, brought a Title VII failure to accommodate claim after

she was terminated for refusing to counsel individuals concerning same-sex relationships on religious grounds. 244 F.3d 495 (5th Cir. 2001). Prior to her termination, the plaintiff's employer attempted to accommodate her by giving her 30 days to find another position in the company. *Id.* at 498. The employer's in-house employment counselor was instructed to help the plaintiff in her search. *Id.* The employment counselor showed plaintiff a list of available openings and offered "two tests designed to manifest her aptitudes and interests." *Id.* Plaintiff declined to take these tests and apply for any non-counselor positions, applying only for one counselor opening. *Id.* When a second counselor position became available, plaintiff did not apply. *Id.* at 499. She also declined to consider transferring to her employer's pastoral counseling department based on her speculation that she would have a personal conflict with its director. *Id.* at 498. After considering these facts, the Fifth Circuit held that the employer's accommodation was reasonable as a matter of law and chastised the plaintiff for her lack of flexibility and cooperation. *Id.* at 503.

While offering an employee time to obtain an alternative position was reasonable in *Bruff*, that does not automatically mean it was reasonable here. *See Smith*, 827 F.2d at 1085. Notably, there are several key distinctions between the parties' action in *Bruff* and those of Benton and BCBST. First, the employer in *Bruff* took affirmative steps, without any prompting, to help the plaintiff find and apply for a new position, something that Benton has claimed BCBST failed to do [Doc. 107 at 7] and which BCBST says it was not obligated to do [Doc. 109 at 8–9]. Second, although Benton could have been more diligent in her efforts to secure a different position, the evidence presented at trial shows that unlike the *Bruff* plaintiff, Benton was open to exploring different positions and even applied to one that would have resulted in a pay cut. [Doc. 96 at 61, 63, 65–66; Joint Exs. 14–15]. Finally, Benton testified that she had difficulty determining which open positions were not subject to the COVID-19 mandate [Doc. 96 at 58–60] whereas nothing in

*Bruff* indicates that the plaintiff was precluded from applying to any open positions by anything other than her own stubbornness. *See* 244 F.3d at 502–03. These differences change the equation enough such that a reasonable jury could find that offering Benton 30 days to find an alternative job within BCBST was not a reasonable accommodation under the circumstances.

It is a similar case with *Telfair*. There, the plaintiffs could not work on Saturdays for religious reasons. 567 F. App'x 681, 682 (11th Cir. 2014). After being assigned to a Tuesday-through-Saturday work schedule, they sought an accommodation from their employer. *Id.* The plaintiffs were first offered the option of accepting different positions within the company that did not require Saturday work but were accompanied by a pay cut. *Id.* The plaintiffs declined this offer and were then placed on leave for more than 90 days during which they had the opportunity to apply for any open position. *Id.* Despite this, plaintiffs did not apply to any of the more than 50 comparable positions available during that time. *Id.* Based on these circumstances, the Eleventh Circuit concluded that the employer had provided a reasonable accommodation. *Id.* at 684.

Here, Benton was not offered an alternative position, whether at a pay cut or otherwise. [*See* Doc. 96 at 43]. Additionally, while the *Telfair* plaintiffs received more than 90 days to apply for open positions, Benton received only 30. [*Id.* at 41–43]. Finally, whereas the *Telfair* plaintiffs did not apply for any open position, Benton applied to two. [*Id.* at 60–61]. As the Court stated regarding *Bruff*, such differences change the equation. While the accommodations at issue in *Telfair* were reasonable under those circumstances, that does not automatically mean that BCBST's accommodation was reasonable under the circumstances of this case. *See Smith*, 827 F.2d at 1085. Based on the evidence presented at trial, a reasonable jury could conclude that BCBST's accommodation of giving Benton 30 days to seek alternative positions was unreasonable under the circumstances.

Thus, the question becomes whether BCBST's second accommodation was reasonable as a matter of law. BCBST asserts that in addition to providing Benton 30 days to secure an alternative position, it also reasonably accommodated Benton by designating her for rehire after her termination. [Doc. 104 at 10–11]. It bases this argument on *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277 (11th Cir. 2012). There, the Eleventh Circuit held that an employer had reasonably accommodated an employee's religious needs despite terminating her because the employer encouraged the employee to apply for a new position, offered her assistance in obtaining a position, and designated her termination as a layoff meaning that she would have retained her tenure with the company had she been rehired within one year. *Id.* at 1294.

Again, just because an accommodation is reasonable in some circumstances does not mean it is reasonable in others. *See Smith*, 827 F.2d at 1085. BCBST argues that designating Benton for rehire was reasonable because its COVID-19 vaccine mandate was independently enjoined after her termination meaning that she could reapply for her former position. [Doc. 104 at 10–11]. It further argues that had Benton reapplied, she would have likely been hired given her former supervisor's testimony. [*Id.* (citing Doc. 97 at 40–41); *see also* Doc. 109 at 14]. The problem with BCBST's argument, however, is that even if Benton was guaranteed to obtain her former position, her ability to serve in that role while not being subject to BCBST's COVID-19 vaccine mandate was based on an injunction entered in separate case. [*See* Doc. 96 at 163–64]. An injunction can be modified or overruled on appeal. Furthermore, unlike most district court decisions, the grant or denial of an injunction can be appealed on an interlocutory basis. 28 U.S.C. § 1292. Therefore, there was no guarantee that the injunction which stopped BCBST's COVID-19 vaccine mandate would stay in effect had Benton reapplied for her former position, and a reasonable jury could have concluded that this made the accommodation unreasonable under the circumstances.

**c.** <u>A reasonable jury could have found that allowing Benton to continue working remotely would not have imposed an undue burden on BCBST.</u>

BCBST asserts that it is entitled to judgment as a matter of law on the issue of whether Benton's requested accommodation—continuing to work and meet with clients virtually—would have caused it an undue hardship. [Doc. 104 at 10–13]. It asserts that granting Benton this accommodation would have created substantial administrative costs, damaged BCBST's client relationships, and impacted BCBST's ability to "keep people safe in an unprecedent [sic] time of crisis." [*Id.*]. Benton, on the other hand, contends that BCBST has overstated the impact that allowing her to continue working remotely would have had and that her requested accommodation furthered BCBST's goal of keeping people safe. [Doc. 107 at 11–14]. The Court finds that a reasonable jury could find in Benton's favor and that BCBST is therefore not entitled to judgment as a matter of law on this issue.

An employer is not obligated to provide an accommodation that would impose an undue hardship. *See Smith*, 827 F.2d at 1084–85. For years, this meant that an employer was not required to provide an accommodation that imposed anything more than a de minimis cost. *See e.g.*, *Small v. Memphis Light, Gas & Water*, 952 F.3d 821, 825 (6th Cir. 2020). But the Supreme Court recently changed this standard, holding that to establish undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). These "increased costs" are not limited to the economic costs of providing an accommodation but may also include "more intangible costs like the loss of office efficiency and the safety risk an accommodation can pose to other employees." *Speer v. Ucor LLC*, No. 3:22-cv-426, 2023 U.S. Dist. LEXIS 198889, at *20 (E.D. Tenn. Nov. 6, 2023). It is these kinds of intangible costs that BCBST claims prevented

it from allowing Benton to continue working remotely. [Doc. 104 at 11–13].

BCBST asserts that allowing Benton to continue working remotely would have imposed "substantial administrative costs" on the company as it would have required BCBST to facilitate client swapping, something it claims would have both damaged client relationships and been difficult to implement as clients began requesting in-person meetings. [*Id.* at 12 (citing Doc. 97 at 64–66)]. BCBST further asserts that granting Benton an exemption from the COVID-19 vaccine mandate would have essentially done away with the mandate and limited its ability to "achieve its mission to keep people safe in an unprecedented time of crisis." [*Id.* at 13 (citing Doc. 97 at 99– 103, 113–21, 217, 238 274–75, 281–83)]. Benton questions whether there would have been any client trading as BCBST claims, noting that none of BCBST's "Major Account" clients were asking to resume in-person meetings in August and September of 2021 and that none of her specific clients requested in-person meetings in 2022. [Doc. 107 at 12 (citing Doc. 96 at 188; Doc. 97 at 29–30)]. Benton further asserts that she was just as effective in virtual meetings as she was in person and that testimony at trial showed that in-person meetings were not essential to the client relationship. [*Id.* at 12–13 (citing Doc. 96 at 23–24, 188–89; Doc. 97 at 24, 69)]. Finally, Benton argues that a jury could have reasonably disbelieved BCBST's assertion that allowing her to work remotely would have done away with the mandate and limited its ability to keep people safe because she could not have transmitted COVID-19 virtually. [*Id.* at 13–14].

Both parties have cited ample portions of the record supporting their contentions. Given this competing evidence, the Court cannot say that "reasonable minds could come to but one conclusion" regarding whether BCBST established that accommodating Benton would have caused an undue hardship. *See Schlosser*, 113 F.4th at 683. Consequently, BCBST is not entitled to judgment as a matter of law regarding this issue.

Having found that none of BCBST's arguments entitle it to judgment as a matter of law regarding liability, the Court next turns its attention to whether Benton's punitive damages award must be vacated as a matter of law.

### 2. A reasonable jury could have found that BCBST acted with at least reckless indifference towards Benton's religious beliefs.

As its final defense, BCBST contends that even if the Court does not grant its Renewed Motion generally, it is nevertheless entitled to judgment as a matter of law regarding Benton's punitive damages award. [Doc. 104 at 13–17]. It asserts that the record is devoid of any evidence that it acted with malice or reckless indifference towards Benton's rights and that it reasonably believed it had a statutory defense to liability, both of which prevent Benton from recovering punitive damages. [*Id.*; *see also* Doc. 109 at 4–8]. Benton responds that BCBST's malice or reckless indifference can be seen in the fact that BCBST developed a "one-size-fits all" approach for employees requesting religious accommodations that failed to consider each employee's unique circumstances and was designed to "ensure the speedy termination of any employees asserting their Title VII rights." [Doc. 107 at 14–19]. Benton similarly asserts that BCBST's belief that it had a defense to liability cannot save it where it "completely bypass[ed] [her] involvement in the accommodation process" and determined what her accommodation would be before she even asked for one. [*Id.* at 19–20]. After reviewing the evidence in the record, the Court finds that a reasonable jury could find for Benton.

Under Title VII, a plaintiff alleging intentional discrimination may recover punitive damages only if she "demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). BCBST asserts no reasonable jury could find that it acted with malice or reckless indifference because the record contains no evidence showing that

either its COVID-19 vaccine mandate or the application of that mandate to Benton were motivated by anything other than its desire to keep people safe during the pandemic. [Doc. 104 at 14–16]. While the record supports this altruistic motive, [*see, e.g.*, Doc. 97 at 99–103, 113, 274–75, 282–83], BCBST's argument misses the mark. An altruistic motive for discrimination may show that an employer did not act with malice, but it does not establish that the employer was not recklessly indifferent to its employee's federally protected rights. As one court in the Southern District of Florida has noted:

> While Defendant may rightly argue that its alleged concern for the health and safety of the waitresses and customers precludes a finding of "callous" disregard, such an argument does not help Defendant on the subject of reckless indifference. Simply because Defendant may have been concerned about the health of a waitress does not mean that Defendant's policies did not exhibit a reckless disregard for that waitress's federally protected rights.

*EEOC v. W & O, Inc.*, 36 F. Supp. 2d 1348, 1350 (S.D. Fla. 1998). Here, BCBST may not have acted maliciously in either implementing its COVID-19 vaccine mandate or applying that mandate to Benton. But a reasonable jury could find that such actions showed a reckless disregard for Benton's religious beliefs.

This conclusion is bolstered by the fact that a reasonable jury could also view the evidence as showing that BCBST failed to consider Benton's proffered accommodation of continuing to work remotely. While BCBST correctly notes that Title VII, unlike the ADA, does not require employers to engage in an interactive process with employees to develop individualized accommodations, *see Bilyeu v. Ut-Battelle, LLC*, No. 3:21-cv-352, 2024 U.S. Dist. LEXIS 81539, at *16 (E.D. Tenn. Mar. 22, 2024) (Atchley, J.), Title VII still requires BCBST to attempt to reasonably accommodate its employees' religious beliefs. *Smith*, 827 F.2d at 1084–85. "If the accommodations originally proposed by the employer are not reasonable, the employer has a continuing obligation to attempt to accommodate an employee's religious beliefs." *EEOC v. Tex.*

*Hydraulics, Inc.*, 583 F. Supp. 2d 904, 910-11 (E.D. Tenn. 2008) (citing *Smith*, 827 F.2d at 1088).

"A refusal to accommodate is justified *only* when an employer…can show that an undue hardship would in fact result from each available alternative method of accommodation." 29 C.F.R. § 1605.2(c)(1) (emphasis added). The Court has already found that a reasonably jury could conclude both that the accommodations BCBST offered Benton were unreasonable and that Benton's proposed accommodation of continuing to work remotely would not have imposed an undue burden. *See supra* Subsections II.B.1.b & c. Taking these conclusions together, a reasonable jury could have also found that BCBST acted with at least reckless indifference by only offering Benton unreasonable accommodations and refusing to accept her proposed accommodation even though that accommodation would not have imposed an undue hardship.

This is true not notwithstanding the fact that "undue hardship" was defined as anything that imposed more than a de minimis cost during the events underlying this case. If the jury credited the testimony that Benton was just as effective at her job virtually as in person and that allowing her to continue working remotely would not have adversely affected BCBST's operations, [*see* Doc. 96 at 23–24, 188–89; Doc. 97 at 26], then it could have reasonably concluded that allowing her to continue working remotely would not have imposed more than de minimis costs on BCBST. By the same token, a reasonable jury could have also concluded that because of these negligible costs, BCBST could not have reasonably and in good faith believed that it had a statutory defense to any potential failure to accommodate claim. *See Kolstad v. ADA*, 527 U.S. 526, 537 (1999) (noting that an employer is not subject to punitive damages under Title VII if it "reasonably believe[s] that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability").

In short, a reasonable jury could have found that notwithstanding BCBST's motive for its

COVID-19 vaccine mandate, it recklessly disregarded Benton's religious beliefs by providing unreasonable accommodations and failing to utilize Benton's proposed accommodation even though it would not have entailed more than de minimis costs. A reasonable jury could have further found that because Benton's proposed accommodation lacked any meaningful costs, BCBST could not have reasonably and in good faith believed that it had a statutory defense to liability. Accordingly, BCBST is not entitled to judgment as a matter of law regarding Benton's punitive damages award.

## III.   BCBST's MOTION TO ALTER OR AMEND THE JUDGMENT

With BCBST's Renewed Motion for Judgment as a Matter of Law denied, the next question is whether the Judgment should nevertheless be amended. At trial, the jury awarded Benton $177,240.00 in back pay damages, $10,000.00 in compensatory damages, and $500,000.00 in punitive damages. [Doc. 94]. BCBST moves to reduce Benton's compensatory and punitive damages awards to a combined total of $300,000 in accordance with 42 U.S.C. § 1981a(b)(3)(D). [Doc. 105]. Benton does not oppose the Motion. [Doc. 108]. Accordingly, the Motion [Doc. 105] is **GRANTED**. Benton's compensatory and punitive damages awards are **REDUCED** to a combined total of **$300,000**.

## IV.   BENTON'S MOTION FOR INTERIM STATUTORY ATTORNEY FEES AND PREJUDGMENT INTEREST

Benton moves for an award of interim statutory attorney's fees and prejudgment interest. [Doc. 100]. Specifically, she requests a lodestar award of $192,860.00 in interim statutory attorney's fees and an award of $25,140.65 in prejudgment interest. [*Id.*]. BCBST does not oppose the Motion. [Doc. 106]. For the following reasons, the Motion [Doc. 100] is **GRANTED**.

### A. Benton is entitled to an award of reasonable attorney's fees in the amount of $192,860.00.

42 U.S.C. §§ 2000e-5(k) and 1988(b) authorize a court to award "a reasonable attorney's fee" to a prevailing party in a action brought to enforce Title VII. In determining whether a fee award is reasonable, courts employ the lodestar method. "The lodestar is 'the number of hours reasonably expended on the litigation multiplied by a reasonably hourly rate.'" *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 702 (6th Cir. 2016) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). Courts determine the "reasonable hourly rate" by looking to the prevailing market rate of lawyers with comparable skills and experience in the jurisdiction. *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004). This market rate can be based on either historic or current billing rates, provided that the court explains how its decision comports with the goal of providing a reasonable fee award. *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 617 (6th Cir. 2007). When, as is the case here, plaintiff's counsel accepts representation on a contingency fee basis, courts often apply current market rates to compensate counsel for the delay they experienced in receiving payment. *See, e.g.*, *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 684 F.Supp. 953, 958 (6th Cir.1988) (noting that current rates were appropriate to counterbalance a delay in payment) (reversed on other grounds); *L.H. v. Hamilton Cnty. Dep't of Educ.*, 356 F. Supp. 3d 713, 723 (E.D. Tenn. 2019).

Here, Benton is seeking a lodestar award based on the 411.3 hours her attorney, Doug Hamill, spent on this case plus the 70.6 hours Hamill's paralegal, Krista Guinn, spent assisting him in the month leading up to trial. [Doc. 101 at 4]. She requests a $450 hourly rate be applied to Hamill's time and that a $125 hourly rate be applied to Guinn's. After due consideration, the Court finds these rates and amounts of time reasonable.

Benton submitted the declarations of two experienced East Tennessee employment

attorneys, both of whom believe that Hamill's $450 hourly rate and Guinn's $125 hourly rate are reasonable—if not on the low side—when considering their experience and the nature of this case. [*See generally* Docs. 100-2, 100-3]. Given these statements, the Court's own experience regarding prevailing attorney rates in this district,[3] and the lack of opposition, the Court finds that $450 per hour for Hamill and $125 per hour for Guinn are appropriate rates for calculating the lodestar amount.

The Court also finds that the hours Hamill and Quinn worked are reasonable. "Shepherding a case from its beginning to a jury verdict is an extraordinarily labor-intensive process," regardless of the case's complexity. *Hanson v. McBride*, 337 F.R.D. 139, 148 (M.D. Tenn. 2020). Nothing in the time sheets presented to the Court, [Doc. 100-1 at 6–12] stand out as unreasonable, a conclusion that is bolstered by the fact that BCBST has not objected to any of the time entries. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection.").

Accordingly, Benton's request for interim statutory attorney's fees is **GRANTED**. BCBST is **ORDERED** to pay Benton's attorney's fees in the amount of **$192,860.00**.[4]

## B. Benton is entitled to an award of prejudgment interest in the amount of $25,140.65

"Title VII authorizes prejudgment interest as part of the backpay remedy in suits against private employers." *Loeffler v. Frank*, 486 U.S. 549, 557 (1988). "Indeed, it is ordinarily an abuse

---

[3] *See McGruder v. Metro. Gov't of Nashville*, No. 3:17-cv-01547, 2022 U.S. Dist. LEXIS 133374, at *4 (M.D. Tenn. July 27, 2022) (determining the appropriate lodestar rate "based on [the court's] experience in this district and its familiarity with prevailing practices, as well as having considered and ruled on numerous other attorney's fees motions").

[4] Based on the Court's calculations below, Benton's lodestar award should be $193,910.00 rather than the requested $192,860.00. But because Benton limited her Motion to $192,860.00 in fees, so too will the Court limit its fee award.

(450 x 411.3 = $185,085.00); (125 x 70.6 = $8,825.00); (185,085 + 8,825 = 193,910)

of discretion not to include pre-judgment interest in a back-pay award." *EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1098 (6th Cir. 1996) (cleaned up). To calculate prejudgment interest, courts often apply the statutory postjudgment framework set forth in 28 U.S.C. § 1961. *See, e.g.*, *Pittington v. Great Smoky Mt. Lumberjack Feud, LLC*, 880 F.3d 791, 807 (6th Cir. 2018). But before applying this rate, a court must consider case-specific factors such as "'the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation.'" *Id.* (quoting *Schumacher v. AK Steel Corp. Ret. Accumulation Pension Plan*, 711 F.3d 675, 687 (6th Cir. 2013)).

Here, judgment was entered in Benton's favor on June 28, 2024. [Doc. 94]. This means that if the Court were to apply § 1961 as Benton requests, her prejudgment interest rate would be 5.10%. *See* Bd. Of Governors of the Fed. Rsrv. Sys., *Mkt. Yield on U.S. Treasury Secs. At 1-Year Constant Maturity*, https://fred.stlouisfed.org/series/DGS1 (last visited Jan. 31, 2025). The Court finds that this rate is fair when considering: (i) the remedial goal of making Benton whole; (ii) the high rates of inflation in recent years, *see* Fed. Rsrv. Bank of Minneapolis, *Consumer Price Index, 1913*-https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913- (last visited Jan. 31, 2025); and (iii) the fact that it appears neither party would be unjustly enriched or penalized if Benton's prejudgment interest was calculated using a 5.10% interest rate. *See Schumacher*, 711 F.3d at 687.

With an interest rate established, the next steps are to determine the period during which interest accrued and whether that interest should be compounded. In cases like this one where the plaintiff was terminated, she is generally entitled to prejudgment interest starting from the date of her termination until the date of the court's judgment. *See Lankford v. Reladyne, LLC*, No. 1:14-

cv-682, 2016 U.S. Dist. LEXIS 85003, at *30 (S.D. Ohio June 29, 2016); *Bell v. Prefix, Inc.*, No. 05-74311, 2010 U.S. Dist. LEXIS 51025, at *12 (E.D. Mich. May 24, 2010). This means that Benton is entitled to prejudgment interest for the period running from November 4, 2021, through June 28, 2024. As for whether this interest should be compounded, that decision is left to the Court's discretion. *E.E.O.C. v. Kentucky State Police Dep't*, 80 F.3d 1086, 1098 (6th Cir. 1996). Exercising this discretion, the Court finds it appropriate to compound Benton's prejudgment interest annually as she requests. [*See* Doc. 101 at 12].

Applying a 5.10% interest rate, compounded annually, to Benton's back pay award of $177,240.00 for a period of two years, eight months (November 2021 through June 2024), the Court finds that Benton is entitled to a prejudgment interest award of $25,140.65. Accordingly, Benton's request for prejudgment interest is **GRANTED**. The judgment will be amended to reflect a prejudgment interest award of **$25,140.65**.

## V.    CONCLUSION

For the foregoing reasons, the Court orders as follows:

- Benton's Motion for Interim Statutory Attorney Fees and Prejudgment Interest [Doc. 100] is **GRANTED**. BCBST is **ORDERED** to pay Benton's attorney's fees in the amount of **$192,860.00**. An Amended Judgment Order will enter reflecting the award of **$25,140.65** in prejudgment interest.

- BCBST's Renewed Motion for judgment as a Matter of law [Doc. 104] is **DENIED.**

- BCBST's Motion to Alter or Amend the Judgment [Doc. 105] is **GRANTED**. An Amended Judgment Order will enter reflecting the reduction of Benton's compensatory and punitive damages awards to the **$300,000** statutory cap.

**SO ORDERED.**

/s/*Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY JR.**
**UNITED STATES DISTRICT JUDGE**